# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

Case No. 00-1386-CIV-Ungaro-Benages/Brown



**NIGHT BOX**
FILED

'J:1 – 9 2:J

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

RICHARD RUBIN,

      Plaintiff,

vs.

U.S. NEWS & WORLD REPORT, INC.
and David E. Kaplan,

      Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

Laura R. Handman (5353)
Richard L. Cys (0239)
DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, DC 20005-1262
Telephone: (202) 508-6600

Jerold I. Budney (FBN 283444)
GREENBERG TRAURIG, P.A.
515 East Las Olas Boulevard
Suite 1500
Fort Lauderdale, Florida 33301
Telephone: (954) 768-8246

ATTORNEYS FOR DEFENDANTS

June 9, 2000

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    STATEMENT OF THE CASE .......................................................................... 3

      A.    References in the Article to Rubin ......................................................... 3

      B.    References in the Article to Those Who Allegedly Participate in Money Laundering .............................................................................. 5

      C.    Subsequent Proceedings ........................................................................ 6

III.   ARGUMENT:  The Complaint Fails to State a Claim for Defamation Arising Out of the Article ........................................................................... 6

      A.    Rubin Cannot State a Claim for Libel-by-Implication ........................... 6

            1.    Specific Statements About Rubin in the Article Could Not Be Reasonably Understood to Give Rise to the Alleged Implication ................................................................................. 9

            2.    The Article as a Whole Could Not be Reasonably Understood to Give Rise to the Alleged Implication .................................. 13

            3.    The Article on its Face Does Not Show That the Article Intended or Endorsed the Alleged Implication ........................... 14

      B.    The Article is Not "Of and Concerning" Rubin ...................................... 18

IV.   CONCLUSION ............................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

\* *Anson v. Paxson Communications Corp.*, 26 Med. L. Rptr. 2374 (Fla. Cir. Ct. 1998) ..................................................................................................................19

*Carlson v. WPLG/TV-10, Post-Newsweek Stations of Florida*, 956 F. Supp. 994 (S.D. Fla. 1996)..........................................................................................................18

*Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689 (S.D.N.Y. 1995), *aff'd*, 119 F.3d 1018 (2d Cir. 1997)...........................................................................8, 18

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993).........................7, 8, 11, 13

*Cianci v. New Times*, 639 F.2d 54 (2d Cir. 1980). ....................................................18

*Edward L. Nezelek, Inc. v. Sunbeam Television Corp.*, 413 So. 2d 51 (Fla. Dist. Ct. App.), *review denied*, 424 So. 2d 763 (1982) .................................................6

*Fudge v. Penthouse Int'l Ltd.*, 840 F.2d 1012 (1st Cir.), *cert. denied*, 488 U.S. 821 (1988)......................................................................................................................18

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) .......................................................18

*Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d 1461 (11th Cir. 1984) ..........................................................................................................8, 11, 17

\* *Islam v. Globe Int'l*, 12 Med. L. Rptr. 1864 (S.D. Fla. 1985) ........................................6

\* *Jefferson v. Winnebago County, Illinois*, 23 Med. L. Rptr. 1641 (N.D. Ill. 1995), *aff'd*, 90 F.3d 1291 (7th Cir. 1996) ..........................................................................8

*Jones v. ABC, Inc.*, 694 F. Supp. 1542 (M.D. Fla. 1988) ....................................8, 11, 19

*Klein v. Victor*, 903 F. Supp. 1327 (E.D. Mo. 1995) ......................................................8

*Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230 (11th Cir. 1999), *cert. denied*, 120 S. Ct. 1262 (2000)..................................................................................................13

*Levin v. McPhee*, 119 F.3d 189 (2d Cir. 1997)...............................................................10

*McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793 (Fla. Dist. Ct. App. 1986).......................19

*Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662 (9th Cir. 1990), *cert. denied*, 502 U.S. 896 (1991) ...............................................................................7

*Schuler v. The McGraw-Hill Companies, Inc.*, 989 F. Supp. 1377 (D.N.M.), *aff'd*, 145 F.3d 1346 (10th Cir. 1997), *cert. denied*, 525 U.S. 1020 (1998)..................8

*Silvester v. ABC*, 650 F. Supp. 766 (S.D. Fla. 1986) , *aff'd on other grounds*, 839 F.2d 1491 (11th Cir. 1988) ...............................................................................12

*Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800 (Fla. Dist. Ct. App. 1997) ...................19

*Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983) .................................................11

*Washington Nat'l Ins. Co. v. The Administrators*, 2 F.3d 192 (7th Cir. 1993)...............................16

* *Weinstein v. Friedman*, 24 Med. L. Rptr. 1769 (S.D. N.Y.), *aff'd*, 112 F.3d 507 (2d Cir. 1996)...................................................................................................8, 11

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ...........................7, 15, 16, 17

* *Wilson v. News-Press Publishing*, 28 Med. L. Rptr. 1694 (Fla. Cir. Ct. Apr. 7, 2000) ................................................................................................................8

*Woods v. Evansville Press Co.*, 791 F.2d 480 (7th Cir. 1986)......................................7

## Statutes

Federal Rules of Civil Procedure, 12(b)(6)................................................................1

Florida Statutes § 770.01 ...........................................................................................6

Florida Statutes § 770.02 ...........................................................................................6

## Other Authorities

*Sack on Defamation*, § 2.4.6 (3rd ed. 1999) ..............................................................18

**\* Cases marked with an asterisk are attached in an Appendix to this Memorandum because they are cited to the Media Law Reporter.**

This libel action arises out of the publication of an article entitled, "The Golden Age of Crime: Why International Drug Traffickers are Invading the Global Gold Trade" (the "Article"),[1] published by U.S. News and World Report Inc. ("U.S. News") in the November 29, 1999 edition of its weekly magazine, *U.S. News & World Report.* and written by David E. Kaplan ("Kaplan"). The action was brought pursuant to this Court's diversity jurisdiction by Richard Rubin ("Rubin"), the Chief Executive Officer of Republic Metals, a gold refining company doing business in Miami-Dade County, Florida.  Complaint, ¶ 3.[2]  Defendants, U.S. News and Kaplan, respectfully submit this memorandum of law in support of their motion to dismiss the Complaint with prejudice, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.    PRELIMINARY STATEMENT

This is a highly unusual libel action because <u>nothing</u> that is actually stated in the Article is alleged to be false.  Instead, plaintiff invites the Court to find that statements regarding illegal activities, which explicitly refer to other individuals expressly named in the Article, imply that plaintiff "is or has been involved in money laundering, tax fraud, and that he permits the use of his gold refining business to facilitate money laundering by drug dealers and other criminals." Complaint, ¶ 10.  The basis for this claim of libel-by-implication rests on the quotes plaintiff gave, the accuracy of which his Complaint does not challenge, and the pictures plaintiff posed for and permitted of his business.

Thus, this claim starkly presents the threat posed by libel-by-implication to the wall the Constitution has erected and fortified to protect the reporting of truthful information.  It leaves

---

[1] A legible copy of the Article, reproduced in color, is appended hereto as Attachment A to the Declaration of Laura R. Handman, Esq., submitted herewith as Exhibit 1 ("Handman Declaration").

[2] A copy of the Complaint is appended hereto as Attachment B to the Handman Declaration.  A copy of the Article is also appended to the Complaint.

reporters and publishers on the decidedly slippery slope of guessing at implications that others – someone merely quoted and pictured like plaintiff, a reader, a judge or a jury – might later infer from this truthful reporting. The cautious will steer far clear from hard-hitting but vitally important subjects, like that reported in the Article here, to avoid any risk of a claim like plaintiff's. This all too real chilling effect is why courts have universally disfavored and routinely dismissed implication claims.

The three-page, 2019-word investigative report published in *U.S. News* addressed an extremely serious subject: money laundering of proceeds from drug sales through the international gold trade. The Article quotes law enforcement officers, gold analysts, traders and refiners, like Rubin, about these illegal practices. The Article states more than once that much of the gold trade is legitimate but expressly identifies several specific individuals and entities – not including Rubin or his company – who are allegedly involved in money laundering through gold trading and other criminal activity.

Even a casual read of the Article by any reader, but particularly the readers of a serious publication like *U.S. News*, establishes that the Article – on its face – is simply *not* capable of the defamatory meaning plaintiff is urging. In fact, there is a total absence of any explicit accusation against plaintiff – in contrast to the very explicit accusations against other named individuals. Plaintiff is quoted and pictured in his capacity as the owner of a legitimate gold refining business and, like the law enforcement officials also quoted, an observer of illicit practices in the industry.

But even if a defamatory implication such as plaintiff asserts could be reasonably understood from the Article – which it cannot – the law says that is not enough to impose liability because of the risk – the unconstitutional risk – that liability could be imposed for reporting on truthful information and for the inferences that may arise naturally from that accurate reporting. Accordingly, for the claim to survive this Motion to Dismiss, the Article must supply, again on its

face, additional affirmative evidence that the alleged defamatory implication was intended or endorsed by defendants. The Article provides no such evidence.

In fact, just the opposite – the signals to the reader make clear that, when the Article wants to accuse someone of criminal activity, it does so directly. If any inference could be reasonably drawn, that inference arises from what plaintiff himself said – an inference that the Article in no way endorses. The headline, which makes no reference to plaintiff, and the captions are accurate summaries of the Article. The photos are used merely to identify Rubin, one of the industry sources quoted in the Article, and to illustrate the gold refining process.

By the same token, plaintiff fails to establish that the Article's alleged defamatory statements regarding criminal activity are "of and concerning" him – an additional element required to state a libel claim. As is apparent from the face of the Article, those statements are "of and concerning" the individuals and businesses identified by name in the Article as engaging in this activity.

At bottom, plaintiff is contending that, by the mere fact that he is quoted and pictured in an article about illegal activity, he has been libeled. If this were the rule, no one but criminals could be mentioned in such news stories and authorities in the field could not be quoted without risking an implication claim. This can not be – and is not – the law.

## II.   STATEMENT OF THE CASE

### A.   References in the Article to Rubin.

The first mention of Rubin in the text occurs about halfway through the Article:

The big surprise is that it took traffickers like Delgado [a "top money launderer from Colombia's Cali cartel"] so long to tumble to the allure of gold. The industry is largely made up of individual dealers and small companies that prefer to deal in cash. High tariffs on gold have attracted smugglers for years. *"There's a dual economic system in the jewelry industry,"* concedes Richard Rubin, the owner of *Republic Metals in Miami, a gold refiner. "There's on the books and there's off the books."* (Emphasis added.)

3

Article at 43, Col. 2.  The Complaint does not allege that this quotation is inaccurate or that the description of him as "the owner of Republic Metals, a gold refiner," is false in any respect.

The Article contains a posed picture of Rubin accompanied by a caption which identifies Rubin and refers back to his quote in the text:

> Richard Rubin, owner of Republic Metals, on the floor of his Miami gold refinery.
> *   *"There's a dual economic system .... There's on the books and there's off the books."*

The Complaint does not allege that this description of him is false or that the abbreviated quotation of his words – with the omitted words marked by ellipses – is inaccurate.

The only other mention of Rubin in the text is on the third and final page of the Article:

> Investigators have found that in some cases, the launderers even buy back the same gold they've just sold for refining in the United States, paying for it with yet more drug money.  The scheme apparently is also a good deal for tax cheats.  A recent crackdown in Peru found that 40 percent of that nation's gold companies were bogus, set up largely to take advantage of an export-tax rebate.  Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again, grabbing yet another rebate.  *"I may have handled gold coming in that was gold I sent down there to begin with," says Richard Rubin, whose Republic Metals made large shipments to and from Peru.*  (Emphasis added.)

Article at 44, Col. 1.  Once again, Rubin does not allege that the quotation is inaccurate or that the statements about the shipments Republic Metals made to and from Peru are false. [3]

A photograph accompanying the Article depicts a worker refining gold.  The worker is not identified as an employee of Rubin's company, Republic Metals, but a small portion of an "R" on his uniform is discernible upon close inspection.  Under the photograph is the caption, "Refining gold bars from Latin America."  Rubin does not allege that the description is false.

---

[3] The Complaint's quotations from the Article incorrectly suggest that Rubin's statements about "on the books and there's off the books" is consecutive with his other quote on Peruvian gold.  In fact, almost two full columns – seven paragraphs – separate the two quotations.  No ellipses mark the omission of this material in the Complaint.  Complaint ¶ 9.

Finally, the contents page contains a description of the Article ("The golden age of crime – Gold has become the money-laundering mechanism of choice for international drug traffickers") and a photo depicting gold being refined.[4]  Nothing in the photograph or on the page identifies the photograph as Rubin's place of business.

**B.      References in the Article to Those Who Allegedly Participate in Money Laundering.**

In describing unlawful money laundering and other criminal activity in the gold trade, the Article presents directly the information obtained about specific named entities and individuals participating in such activity.  The allegations – and the denials – are quite explicit, as this passage demonstrates:

> Moving money to Speed Joyeros was also on the mind of Inocensio Lopez. According to court testimony, the Dominican drug dealer dropped off a bag stuffed with nearly $300,000 at a Manhattan hotel room; *the money was to go to Moishe Hebroni, the owner of Speed Joyeros.*

> The connection between the two drug cases and Speed Joyeros is more than a coincidence, law enforcement sources say.  Speed is reputed to be Latin America's largest gold trader, with $25 million in sales a month.  *U.S. drug enforcement agents have seized nearly $1 million from a New York bank account belonging to the company.  Now they're examining the firm's movement of millions of dollars of gold and cash around the world.*  Speed has not been charged with any crime; company officials proclaim their innocence and are fighting the government for release of their funds.  But to U.S. experts, the cases show that gold now plays a central role in the billion-dollar business of washing dirty money. (Emphasis added.)

Article at 42, Col. 2.  The Article does not imply in any way that Rubin is associated with Speed Joyeros or any other person or entity named as engaging in illegal activity, nor does the Complaint allege that the Article gives rise to any such implication.

---

[4] A copy of the contents page, which is referred to in the Complaint, is appended as Attachment C to the Handman Declaration.

## C.     Subsequent Proceedings.

On March 1, 2000, Rubin, through his counsel, sent a letter to U.S. News, pursuant to

Florida Statutes § 770.01, demanding a retraction.  In response, while strongly denying that the

Article contained the defamatory implications about Rubin, within the statutory time period

prescribed in Florida Statutes § 770.02, U.S. News published a clarification:[5]

> The article "The Golden Age of Crime," which appeared in the November 29,
> 1999, edition of *U.S. News & World Report*, discussed how drug money is
> laundered through the purchase and resale of gold.  The article includes quotes
> from an interview with Richard Rubin, the owner of Republic Metal, a gold-
> refining business.  U.S. News did not suggest and did not intend to suggest that
> Mr. Rubin or his company were engaged in money laundering, tax fraud,
> smuggling, or any other improper or illegal transactions discussed in the article, or
> that he or his company transacts business "off the books."  U.S. News regrets if
> any reader misread the article to suggest such implications.

Despite the clarification, plaintiff served the Complaint in this case on April 20, 2000.

Pursuant to an Agreed Motion and this Court's Order of May 8, 2000, defendants have until

June 9, 2000 within which to respond to the Complaint.  The Initial Planning and Scheduling

Conference is set for June 30, 2000.  Defendants are simultaneously moving for a stay of

discovery pending decision of this Motion to Dismiss.

## III.     ARGUMENT

### The Complaint Fails to State a Claim for Defamation Arising Out of the Article.

## A.     Rubin Cannot State a Claim for Libel-by-Implication.

The law of libel-by-implication is "fraught with subtle complexities" requiring courts to

"be vigilant not to allow an implied defamatory meaning to be manufactured from words not

---

[5] The Complaint fails to mention either the demand for retraction or the subsequent clarification,
which are attached to the Handman Declaration as Attachments D and E, respectively.  The
failure to aver the existence of the retraction demand renders the Complaint technically deficient.
Fla. Stat. § 770.01; *Islam v. Globe Int'l*, 12 Med. L. Rptr. 1864, 1866 (S.D. Fla. 1985); *Edward L.
Nezelek, Inc. v. Sunbeam Television Corp.*, 413 So. 2d 51 (Fla. Dist. Ct. App.), *review denied*,
424 So. 2d 763 (1982).

reasonably capable of sustaining such meaning." *White v. Fraternal Order of Police*, 909 F.2d

512, 518, 519 (D.C. Cir. 1990). Those "subtle complexities" are evident here where all of

Rubin's claims are based on alleged implications – not any false factual statements about him or

inaccurate quotations from him. Such an open-ended claim:

> requiring a publisher to guarantee the truth of all inferences a reader might reasonably
> draw from a publication would undermine the uninhibited, open discussion of matters of
> public concern. A publisher reporting on matters of general or public interest cannot be
> charged with the intolerable burden of guessing what inferences a jury might draw from
> an article and ruling out all possible false and defamatory innuendoes that could be drawn
> from the article.

*Woods v. Evansville Press Co.*, 791 F.2d 480, 487-88 (7th Cir. 1986).

"[B]ecause the Constitution provides a sanctuary for truth, a libel-by-implication plaintiff

must make an especially rigorous showing where the expressed facts are true." *Chapin v. Knight*

*Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993). Accordingly, as a matter of constitutional

law, to prevail on this theory, Rubin must show, *first*, based just on the face of the Article, that the

alleged implication – that Rubin was engaged in money laundering and other illegal activity –

could be reasonably understood from the Article and, *second*, that the Article demonstrates that

the implication was intended or adopted by the author and U.S. News. *See, e.g., id .*at 1092-93

("The language must not only be reasonably read to impart the false innuendo, but it must also

affirmatively suggest that the author intends or endorses the inference"); *Newton v. National*

*Broadcasting Co., Inc.*, 930 F.2d 662, 681 (9th Cir. 1990), *cert. denied*, 502 U.S. 896 (1991)

(defamatory implication requires a direct showing that defendants "have intended to convey the

defamatory impression at issue"); *Woods v. Evansville Press Co.*, 791 F.2d at 488 ("there is no

evidence that the defendants acted surreptitiously or with invidious intent in publishing the

column"); *White v. Fraternal Order of Police*, 909 F.2d at 520 (the communication "by the

particular manner or language" must supply "additional, affirmative evidence suggesting that

defendant <u>intends</u> or <u>endorses</u> the defamatory inference") (emphasis in the original); *Chaiken v. VV Publishing Corp.*, 907 F. Supp. 689, 698 (S.D.N.Y. 1995), *aff'd,* 119 F.3d 1018 (2d Cir. 1997) ("a publisher is not liable for a defamatory innuendo unless it intended or endorsed that inference").

Because application of these principles to the four corners of the Article involves only legal issues, determining the threshold question of whether the publication is capable of a defamatory implication and whether such implication was intended is appropriately resolved on a motion to dismiss. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d at 1092 ("A defamatory implication must be present in the plain and natural meaning of the words used"); *Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) ("A trial court, however, is not precluded from finding, as a matter of law, that a publication is not defamatory" because statements do not give rise to false implications); *Jones v. ABC, Inc.*, 694 F. Supp. 1542, 1550, 1551-552 (M.D. Fla. 1988) ("It is a question of law, for the trial judge rather than a jury, as to whether ... [the statements at issue] are reasonably capable of a defamatory meaning," i.e., whether they give rise to defamatory implications).[6]

---

[6] Where statements cannot be reasonably read to express a defamatory meaning, courts routinely grant motions to dismiss based solely on examination of the publication in issue. *E.g., Chapin v. Knight Ridder, Inc.*, 993 F.2d at 1091 (district court properly dismissed a complaint because newspaper article could not reasonably be read to imply defamatory meaning); *Schuler v. The McGraw-Hill Companies, Inc.*, 989 F. Supp. 1377, 1388 (D.N.M.), *aff'd,* 145 F.3d 1346 (10th Cir. 1997), *cert. denied*, 525 U.S. 1020 (1998) (pre-answer motion to dismiss granted because statement that there were "ties" between plaintiff and individual who was a convicted felon and disbarred lawyer was not defamatory); *Weinstein v. Friedman*, 24 Med. L. Rptr. 1769, 1777-83 (S.D. N.Y.), *aff'd,* 112 F.3d 507 (2d Cir. 1996) (court granted pre-answer motion to dismiss where published statements did not give rise to a defamatory implication) *Jefferson v. Winnebago County, Illinois*, 23 Med. L. Rptr. 1641, 1652 (N.D. Ill. 1995), *aff'd,* 90 F.3d 1291 (7th Cir. 1996) (pre-answer motion to dismiss granted where a news report was subject to a reasonable, nondefamatory interpretation); *Klein v. Victor*, 903 F. Supp. 1327, 1330, 1335-36 (E.D. Mo. 1995) ("[w]hether allegedly libelous words are defamatory is a question of law which the court may decide on a motion to dismiss," pre-answer motion to dismiss granted); *Wilson v. News-Press Publishing*, 28 Med. L. Rptr. 1694, 1696 (Fla. Cir. Ct. Apr. 7, 2000) ("If a court finds that

This method of early disposition is favored in libel cases, such as this, because of the burden on First Amendment interests imposed by expensive and time-consuming discovery. *See Time, Inc. v. McLaney*, 406 F.2d 556, 566 (5th Cir.), *cert. denied*, 395 U.S. 922 (1969)("the failure to dismiss a libel suit might necessitate long and expensive trial proceedings, which, if not really warranted, would themselves offend . . . [First Amendment principles] because of the chilling effect of such litigation"); *Ceransi v. Sony Corp.*, 991 F. Supp. 343, 352 (S.D. N.Y. 1998) (granting meritorious motion to dismiss libel claim will avoid "the costs of defending against the claim of libel, which can themselves impair vigorous freedom of expression") (citation omitted).

### 1. Specific Statements About Rubin in the Article Could Not Be Reasonably Understood to Give Rise to the Alleged Implication.

Nowhere in the Article is there an allegation that Rubin was engaged in money laundering, tax evasion, or any other illegal activity. Each of the Article's three references to him by name is in the context of quoting him as an industry representative who operates a legitimate gold refining business.[7] The first quotation is about the existence of two sets of books in the jewelry business:

> "There's a dual economic system in the jewelry industry," concedes Richard Rubin, the owner of Republic Metals in Miami, a gold refiner. "There's on the books and there's off the books."

Article at 43, Col. 2.) The only reasonable inference from the quotation and the description of Rubin is that he is a gold refiner who is not in the jewelry business, who nevertheless knows how the jewelry business operates and who is merely stating his knowledge of those operations. Read

---

a statement could not possibly have a defamatory or harmful effect, the court may dismiss the case for failure to state a cause of action," pre-answer motion to dismiss granted).

[7] The first step in determining whether a statement is capable of a defamatory meaning is to examine the words used. *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. Cir.), *cert. denied*, 484 U.S. 870 (1987) ("a court is to consider both the words themselves and the entire context in which the statement occurs").

in context, the statement does not suggest that Rubin does business "off the books" or that he is in the jewelry business.

The same quotation, slightly abbreviated, appears under Rubin's picture, identifying him – accurately – as the "owner" of a "gold refinery." The omission from the quote of "in the jewelry industry" is clearly indicated by ellipses and must be read in the context of the Article as a whole. As is typical in magazines, the caption refers the reader back to and is a lift from the text. A reasonable reader would not conclude that Rubin, who posed for the photograph with outstretched arms in his plant, is talking about himself or his business as "off the books." The signals to the readers all suggest that Rubin is commenting on the jewelry business – and is not himself engaged in those practices. *See Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) (labeling of conflicting accounts of incident as "versions" sent "clear signals" to the reader that accounts were presented as opinion).

The second quotation is offered in the context of the gold trade with Peru where smugglers have cheated Peruvian tax authorities:

> Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again, grabbing yet another rebate. "I may have handled gold coming in that was gold I sent down there to begin with," says Richard Rubin, whose Republic Metals made large shipments to and from Peru.

Article at 44, Col. 1. The clear thrust of this reference is that individuals and companies *in Peru* have acted unlawfully by repeatedly taking advantage of a tax rebate there through smuggling operations. There is no inference that U.S. refiners, or Rubin specifically, are involved in unlawful tax evasion or smuggling in Peru. The quote from Rubin simply confirms that, as a "American refiner," he is aware that he " 'may have' " on occasion processed the same gold from Peru more than once. Here again, Rubin does not allege that the quotation is inaccurate or out of context or that the statement about Republic making large shipments to Peru is false.

10

These quotations taken in context are far less susceptible to a defamatory meaning than those in other cases where such claims have been rejected. In *Weinstein v. Friedman*, 24 Med. L. Rptr. 1769 (S.D.N.Y.), *aff'd*, 112 F.3d 507 (2d Cir. 1996), for example, plaintiff alleged that a book defamed him by "inaccurately portraying him as a militant activist, politically affiliated with far-right groups which advocate violence in the efforts of Jews to establish settlements in the occupied territories of Israel, and as having a distorted, perverse and dangerous view of others". 24 Med. L. Rptr. at 1770. The truthful statements that allegedly gave rise to this implication included that he was allied with activist West Bank settlers and supported the views of the militant Rabbi Kahane who advocated violence. The court granted a pre-answer motion to dismiss, holding that these statements did not imply that plaintiff himself advocated violence, whether "taken alone, or ... read as a whole and in the context of the entire work." *Id.* at 1770. *See also Chapin v. Knight Ridder, Inc.*, 993 F.2d at 1093-98 (statements about a charity charging "hefty mark-ups" and "[i]t is not clear where the rest of the money goes" held not to give rise to a defamatory implication); *Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (statement that FTC warned that "unless some builders shape up ... the government will land on them ... hard" did not imply that plaintiff was the only builder under investigation, despite the article's focus on problems with plaintiff's buildings); *Valentine v. CBS, Inc.*, 698 F.2d 430, 431-32 (11th Cir. 1983) (where "only three stanzas of the song name [plaintiff] and portray her role as a witness to some of the events occurring the night of the murders," despite the reference to plaintiff "nod[ding] her head," the song did not reasonably imply that plaintiff was part of a conspiracy to lie about the events); *Jones v. ABC*, 694 F. Supp. at 1552-54 (dismissing libel claim because the broadcast was not "reasonably capable of a defamatory meaning" in that it did not imply that plaintiff was "inhumane" because the allegations of mistreatment of elephants "could not reasonably be construed to refer to plaintiff" where they

11

referred to a time after the broadcast said the elephants had been "dumped" (*i.e.*, sold), by plaintiff).

That the statements here could not be reasonably understood to give rise to a defamatory meaning is also vividly illustrated by comparison to cases in which such a defamatory meaning has been found. In *Silvester v. ABC*, 650 F. Supp. 766 (S.D. Fla. 1986), *aff'd on other grounds*, 839 F.2d 1491 (11th Cir. 1988), a broadcast on ABC's 20/20 program was held susceptible to defamatory implication as to plaintiffs, a jai alai company and its owners. The court pointed to not too subtle references such as "coincidences" regarding increased insurance coverage and a fire that partially destroyed plaintiffs' arena and burying plaintiffs' betting records that "could have shown a link between [plaintiffs'] employees and the Miami syndicate." The broadcast also reported a conspiracy among plaintiffs' employees, bettors and organized crime and that Florida authorities, although they lacked sufficient evidence to bring criminal charges "as yet," were planning to initiate proceedings against plaintiff owner. The court found that those statements were susceptible of a defamatory meaning because they implied that plaintiffs were guilty of crimes relating to the fire, that criminal charges should and would be brought against plaintiffs and that plaintiffs were involved with illegal betting. *Id.* at 772. In contrast, the Article here does not make any similar direct connection between Rubin and participation in unlawful activity. *In Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1475 (S.D. Fla. 1987), *Newsweek* magazine published the statement "reports of Roxanne's intimacies ... have come from ... the local psychic whose seances regularly brought Roxanne into bed with 10 or 15 other people." In fact, the psychic did not conduct these seances but the court found the article susceptible to the defamatory interpretation that she did. In contrast, the Article here lacks the direct misstatements about plaintiff which supported the defamatory interpretation in *Nelson* – indeed, Rubin does not challenge his quotes nor the facts they reveal.

12

2.     **The Article as a Whole Could Not be Reasonably Understood to Give Rise to the Alleged Implication.**

Notwithstanding the truth of what the Article says about him, Rubin contends that the Article taken as a whole, including "captions, photographs and statements," implies that he has been or is engaged in criminal activity.[8]  Complaint ¶ 10.

The Article explicitly and repeatedly states that legitimate businesses are operating in the gold trade:

> While many gold companies operate legitimately, interviews with traders, refiners, and law enforcement officials depict an industry riddled with money laundering, tax fraud, smuggling, and dubious bookkeeping.

Article at 42, Col. 3 – 43, Col. 1.  These references to "gold companies operat[ing] legitimately" can be reasonably be understood to include Rubin and his company.  He is clearly identified in the Article as a refiner and therefore an operator of a "gold company."  "Refiners" like Rubin are coupled with "traders" and "law enforcement officials" who "depict" but do not participate in the "illegal practices" which "riddle[]" the industry.  Indeed, law enforcement officials are quoted by name regarding the advantages of gold to money launderers.  Gold traders, gold analysts and other refiners are also quoted.  None of these industry observers is accused explicitly or implicitly of criminal wrongdoing and neither is Rubin.

The Article also makes clear that a significant amount of the gold trade from Latin America, trade in which Rubin is engaged, is legitimate:  "While much of this trade [from Latin America] is legitimate, gold analysts remain wary, given the absence of a jewelry-making

___

[8] It is appropriate to analyze the Article in its entirety to determine whether defamatory implications are conveyed.  *See, e.g., Chapin v. Knight-Ridder, Inc.*, 993 F.2d at 1098 ("we would err if we did not consider the article as a whole"); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1240 (11th Cir. 1999), *cert. denied*, 120 S. Ct. 1262 (2000) (the alleged implication "is apparent when reviewing the report as a whole"); *Tavoulareas v. Piro*, 817 F.2d at 779 (court must consider entire context in which the statement occurs).

industry in Florida." Article at 43, Col. 3.  Because Rubin has been identified as a refiner in the gold trade who has dealings with Latin America, a reasonable reader would conclude in the context of the Article that his business is part of "much of this trade" that is legitimate.

Rubin complains that his photograph in conjunction with the Article contributes to the alleged implications that he is engaged in criminal activity.  Reasonable readers would assume the opposite -- that Rubin would not pose for a photograph to illustrate an article on money laundering of drug proceeds in the gold trade and allow himself to be quoted for such an article if he were in fact engaged in such criminal activities.  This is not, after all, a candid shot of a "suspect" caught unawares or a mug shot from a police blotter.  This is clearly a posed picture of a businessman proudly displaying his legitimate business of gold refining.

The photos of Rubin's business in the contents page and with the Article bearing the caption, "Refining gold bars from Latin America," only reinforce that image of a legitimate business in operation.  The photographs show -- and caption describes -- the legitimate and lawful process of refining gold bars from Latin America.  The Article does not state or imply that refining gold bars from Latin America is unlawful in any respect; to the contrary, it explicitly states that "much" of the gold trade with Latin America is legitimate.

### 3. The Article on its Face Does Not Show That the Article Intended or Endorsed the Alleged Implication.

Turning to the second prong of the libel-by-implication standard, even if the alleged implication that Rubin is engaged in money laundering or other illegal activities may be reasonably understood from the Article, nothing in the Article, on its face, demonstrates that the alleged implication was intended or endorsed.  This determination must be made based on an examination of the text itself, i.e., on "the particular manner or language in which the true facts are conveyed" to determine if there is "additional, affirmative evidence suggesting that the

14

defendant *intends* or *endorses* the defamatory inference." *White v. Fraternal Order of Police*, 909

F.2d at 512 (emphasis is in the original). (*See* cases discussed in Section III.A. *supra*.)  Such

"additional, affirmative evidence" is totally missing here.

Most significantly, the Article unmistakably identifies entities that are allegedly involved

in illicit gold trading and money laundering and they do not include Rubin.  In discussing

Panamanian gold company Speed Joyeros, for example, the Article states that:

- Proceeds from drug sales have been paid to Moishe Hebroni, the owner of Speed Joyeros.

- U.S. drug enforcement agents have seized $1 million from bank accounts belonging to Speed Joyeros and are investigating the company's international movement of millions of dollars of gold and cash.

- Federal agents believe that Speed Joyeros is instrumental in the underground gold trade, a charge the company's owners deny.

These are direct allegations, attributed to law enforcement sources and court proceedings, that

Speed Joyeros is engaged in unlawful activity and are properly accompanied by the company's

denials.  There are similar explicit references about several other persons identified in the Article

as engaging in illegal activity. *See, e.g.*, Article at 43, Cols. 1-2 ("Take the case of Gustavo

Upegui Delgado."  Law enforcement officials "found Delgado, a top money launderer for

Columbia's Cali cartel, was buying over a ton of gold a month with his colleagues, using drug

money to purchase the stuff, then shipping it to Panama").

By contrast, the Article does not contain *any* similar allegations against Rubin or his

business.  Rubin is identified as "the owner of Republic Metals in Miami, a gold refiner."  The

only other factual statement about Rubin is that his firm "made large shipments to and from

Peru."  These neutral and truthful explanatory statements do not allege or imply that Rubin is

associated with Speed Joyeros, based in Panama, or any other entity or person named as engaging

in illegal activity.  If the Article had intended or endorsed an implication that Rubin was engaged

in criminal behavior, it would have said so. Indeed, because no such allegations are made against Rubin, if anything, the reasonable implication conveyed is that he is *not* alleged to be engaged in these unlawful activities.[9]

The Article is simply devoid of any evidence that "the author ... has done something beyond the mere reporting of true facts to suggest that the author ... intends or endorses the inference." *White v. Fraternal Order of Police*, 909 F.2d at 520. In that case, White, a police official, alleged that letters written by the Fraternal Order of Police ("FOP") defamed him by accusing him of securing his promotion through bribery. The letters, after citing an incident "involving Captain White," stated:

> If records have been falsified, false statements made, or testing procedures subverted for gain (such as promotion), it is likely that criminal as well as ethical violations have been committed [footnote referencing criminal statutes including bribery].

*Id.* at 515. The Court found that "[b]y raising the specter of criminal violations, including bribery," "in a context that could only be understood to apply to White," the FOP "provided a clear signal from which a reader could conclude that the defamatory inference was intended or endorsed." *Id.* at 521.

The same *White* Court came to a different conclusion, however, regarding media reports by NBC and The Washington Post that White's drug test came back positive but that a second test "was reported free of drugs." *Id.* at 526. The Court found that the phrase "White [plaintiff] comes up clean" used by NBC was not "sufficiently suggestive to enable a viewer to infer that [NBC] intended or endorsed a defamatory inference that White used drugs." *Id.* at 526. The use

---

[9] The clarification U.S. News published served to underscore to its readers, and to Rubin himself, that the Article did not suggest and did not intend the implications Rubin alleges. *See Washington Nat'l Ins. Co. v. The Administrators*, 2 F.3d 192, 196 (7th Cir. 1993) ("subsequent statements negating any defamatory implications may show the absence of malice by demonstrating that the speaker did not contemplate the defamatory reading in the first place").

of a photo of White at the beginning of NBC's broadcast, "was not in any way suggestive" but "merely attached a face to the name that would be used" in the broadcast. The *Washington Post's* report of "unpleasant but true facts" could not render the *Post* liable. The absence of "any suggestive juxtapositions, turns of phrases, or incendiary headlines" in the *Post* stories made the *Post* stories not actionable. *White*, 909 F.2d at 526.

The accurate reporting of true facts – or, here, true quotes – cannot be the basis for a libel-by-implication claim absent affirmative evidence that such implication was intended or endorsed. Rubin's complaint is not with the accuracy of his quotes but with the inferences that those quotes allegedly give rise to – namely, that he may have handled gold used by Peruvian traders, who, in turn, have taken advantage of tax rebates. Such inferences, if any, from true facts, where there is no additional evidence that the Article intended or endorsed any suggestion of criminal participation on Rubin's part, can not be actionable. *See Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d at 464 (the close-up shot of a crack in a house built by plaintiff was not actionable since "it represented the truth and was not susceptible to any defamatory meaning".)

The headlines and photos in the Article also do not point to "additional affirmative evidence" that any negative implications about plaintiff were intended or endorsed. Like the photo of White in the NBC broadcast, the photo of Rubin posing at his plant simply serves to identify him as the gold refiner quoted in the text of the Article. The photos at his place of business illustrate the gold refining process, nothing more. The headlines "The Golden Age of Crime: Why international drug traffickers are invading the global gold trade" and the similar line in the table of contents do not refer to Rubin but are an accurate summary of the general subject matter of the Article. When the headline here is read in the context of the whole Article, as it must be, the headline obviously refers to the owners of Speed Joyeros and the others specifically

17

named in the Article. *See Sack on Defamation*, § 2.4.6 at p. 2-34 (3rd ed. 1999) ("Most courts…examine headlines as they do any other part of an article … in the context of the work as a whole, giving due allowance for the headline's prominence"); *Fudge v. Penthouse Int'l Ltd.*, 840 F.2d 1012, 1016 (1st Cir.), *cert. denied*, 488 U.S. 821 (1988) (headline "Little Amazons Attack Boys" held to constitute non-actionable rhetorical hyperbole, particularly read in the context of the article).

Contrast the headline here with the headline "Buddy, We Hardly Knew Ya" in *Cianci v. New Times*, 639 F.2d 54, 60 (2d Cir. 1980).  The headline accompanied a detailed account of allegations of rape made against Mayor "Buddy" Cianci.  The Court concluded the article, along with the headline, endorsed the victim's allegations.  In *Chaiken*, the court found just the opposite.  The article at issue contained a statement that "[s]ettlers like the Chaikens" have turned West Bank settlements into "hothouses for the growth of terrorism" and a headline, "In the Realm of Perfect Faith:  Israel's Jewish Terrorists," which referred to a quote from plaintiff used in the text of the article.  Nonetheless, the district court found – and the Second Circuit affirmed – that, even if the article and headline implied that the Chaikens were terrorists, there was no evidence that the article intended or endorsed such an implication. *Chaiken v. VV Publishing Corp.*, 907 F. Supp. at 698 ("the article does not state that [the Chaikens] are terrorists; and it would be speculation to assume that the *Voice* realized that such an implication was possible.")

**B.       The Article is Not "Of and Concerning" Rubin.**

Rubin also bears the burden of showing that any allegedly defamatory statements in the Article are "of and concerning" him. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980) (plaintiffs bear the burden of demonstrating that "the libel designates the plaintiff in such a way as to let those who knew [him] understand that [he] was the person meant"). *See Carlson v. WPLG/TV-10, Post-Newsweek Stations of Florida*, 956 F. Supp. 994, 1007 (S.D. Fla. 1996)

18

(statement not actionable where "*by itself* does not directly address [the] Plaintiff") (emphasis in original). Like risks to truthful speech posed by an implication claim, "allow[ing] a plaintiff who is not clearly identified to institute a defamation action" would pose "an unjustifiable threat to society" by silencing the kind of generalized discussion common in public debate. *Anson v. Paxson Communications Corp.*, 26 Med. L. Rptr. 2374, 2375 (Fla. Cir. Ct. 1998).

Accordingly, Florida courts regularly dismiss libel claims when the plaintiffs have failed to prove that the defamatory statements are "of and concerning" them. *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 805 (Fla. Dist. Ct. App. 1997) (affirming dismissal of group libel claim for failure to satisfy "of and concerning" requirement); *McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. Dist. Ct. App. 1986) (summary judgment upheld where article was not of and concerning plaintiff corporation).

Under these standards, Rubin's case must fail because the Article's allegedly defamatory statements can not be reasonably understood as "of and concerning" him. Indeed, all of the indicia in the Article demonstrating that it does not give rise to libel-by-implication are the same indicia that show it is not "of and concerning" him under this separate required element for a claim. The Article does not contain any allegations that Rubin is engaged in illegal activity. These allegations are clearly "of and concerning" those who are specifically identified in the Article as engaging in such activity. *Jones v. ABC, Inc.*, 694 F. Supp. at 1550 (dismissing libel claims because charges of animal abuse "could not reasonably be construed to refer" to plaintiff but to those who bought the animals from him). The descriptions of Rubin and his company refer to him as a refiner aligned with "much" of the Latin American gold trade that is legitimate.

## IV.   CONCLUSION

For the foregoing reasons, this Court should find that, based on the face of the Article, the Complaint fails to state a claim and should be dismissed with prejudice.

DATED this 9th day of June, 2000.

Respectfully submitted,

ATTORNEYS FOR DEFENDANTS

DAVIS WRIGHT TREMAINE LLP
1500 K Street, N.W., Suite 450
Washington, DC  20005-1262
Telephone:  (202) 508-6600
Facsimile:  (202) 508-6699

By: _Laura Budney For_____
Laura R. Handman (5353)
e-mail:  laurahandman@dwt.com
Richard L. Cys (0239)
e-mail:  rickcys@dwt.com

GREENBERG TRAURIG, P.A.
515 East Las Olas Boulevard, Suite 1500
Fort Lauderdale, Florida 33301
Telephone:  (954) 768-8246
Facsimile:  (954) 765-1477

By: _____
Jerold I. Budney (FBN 283444)
e-mail:  budneyj@gtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of June, 2000, true and correct copies of the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss, Appendix and Exhibit thereto, were served by first class mail, postage prepaid, upon:

Richard B. Simring, Esq.
Stroock & Stroock & Lavan LLP
3300 First Union Financial Center
200 South Biscayne Boulevard
Miami, Florida  33131

Barry Langberg, Esq.
Deborah Drooz, Esq.
Stroock & Stroock & Lavan LLP
2029 Century Park East, Floors 16 & 18
Los Angeles, California  90067-3086

_____
Jerold I. Budney

20

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No. 00-1386-CIV-Ungaro-Benages/Brown

RICHARD RUBIN,

       Plaintiff,

vs.

U.S. NEWS & WORLD REPORT, INC.
and David E. Kaplan,

       Defendants.

_____/

ATTACHMENT / EXHIBIT

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

## EXHIBIT 1

## DECLARATION OF LAURA R. HANDMAN, ESQ.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-1386-CIV-Ungaro-Benages/Brown

RICHARD RUBIN,

        Plaintiff,

vs.

U.S. NEWS & WORLD REPORT, INC.
and David E. Kaplan,

        Defendants.

_____/

DECLARATION OF LAURA R. HANDMAN, ESQ.

Pursuant to 28 U.S.C. § 1746, I, Laura R. Handman, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

      1.     I am a partner in the law firm of Davis Wright Tremaine LLP and I am admitted *pro ha vice* to practice before this Court. I am lead counsel for defendants U.S. News & World Report, Inc. and David E. Kaplan in the above-captioned lawsuit. I am submitting this Declaration in support of Defendants' Motion to Dismiss in this case.

      2.     Appended to this Declaration are true and correct copies of the following documents:

      ATTACHMENT A    The article of November 29, 1999, published in *U.S. News & World Report* and reproduced in color.

      ATTACHMENT B    Plaintiff's complaint, with attachment, served April 20, 2000.

ATTACHMENT C    The contents page of the November 29, 1999 issue of *U.S. News & World Report* reproduced in color.

ATTACHMENT D    Letter of March 1, 2000, from Barry B. Langberg, Esq. to Mortimer B. Zuckerman and David E. Kaplan

ATTACHMENT E    The clarification published pursuant to Florida Statutes §770.02 in *U.S. News & World Report* and reproduced in color.

DATED this 8th day of June, 2000.

Laura R. Handman, Esq.

a London-based research firm.

In Panama, nearly all the gold arrives at the Colón Free Zone, a bustling market perched on the edge of the Panama Canal. Home to Speed Joyeros and 1,600 other companies, the *zona libre* is the world's second-largest free port, after Hong Kong. Bound by an imposing gray wall topped by barbed wire, the 1.5-square-mile zone is home to a dizzying potpourri of global traders: Arabs, Chinese, Indians, Jews. More than $6 billion of merchandise passes through the district each year—as much as a quarter of it, investigators say, financed by drug money.

**In the money.** Once in Colón, much of the Italian gold is sold to Colombian front men for the cocaine industry. It is Colón, for example, where the Cali cartel's Delgado sent his gold each month. The gold is then smuggled back to Colombia, where some dealers sell it for pesos and use the money for living expenses and to fund more drug production. But others melt down the jewelry, recast it into ingots, and sell the gold to refiners in the United States or Switzerland, producing a stream of income that looks legitimate.

Investigators have found that in some cases, the launderers even buy back the same gold they've just sold for refining in the United States, paying for it with yet more drug money. The scheme apparently is also a good deal for tax cheats. A recent crackdown in Peru found that 40 percent of that nation's gold companies were bogus, set up largely to take advantage of an export-tax rebate. Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again, grabbing yet another rebate. "I may have handled gold coming in that was gold I sent down there to begin with," says Richard Rubin, whose Republic Metals made large shipments to and from Peru.

Gold traders say the influence of narcotraffickers is so pervasive that they are taking over Latin America's gold trade, co-opting legitimate firms and buying up traders in country after country. "They're squeezing out the legitimate dealers," says one prominent trader who insisted on anonymity.

Federal agents believe companies like Speed Joyeros play a key role in the underground gold trade, a charge the firm's owners emphatically reject. "If my clients are laundering money, why haven't they been indicted?" argues Speed attorney Louis Diamond. Business for Speed, meanwhile, is booming. In Colón, the company is building what a competitor calls "a tem-



ALEX QUESADA—MATRIX FOR USN&WR

**Richard Rubin, owner of Republic Metals, on the floor of his Miami gold refinery**
● *"There's a dual economic system.... There's on the books and there's off the books."*

ple of gold"—possibly the largest jewelry store in Latin America.

Drug dealers playing the gold card are doing it in increasingly sophisticated ways. In 1989, federal agents stopped a billion-dollar money laundry that exported so much gold from Uruguay that that country became America's largest gold supplier. The fact that Uruguay had no gold industry mattered little to the launderers—what mattered was creating a credible cover for their flow of narcodollars. Today, some criminals are importing gold-plated bronze into the United States, others are shipping out just the opposite: gold disguised as other metals. Having taken payment in gold, the traffickers simply want to move their assets back home. Customs inspectors, now on the lookout for gold smugglers, have made repeated seizures in recent months. In one case, a woman flying to Colombia from New York was stopped

with two tractor-trailer hitches, seemingly made of steel. Under the paint, inspectors say they found solid gold.

The gold trade poses other challenges for law enforcement. The industry's bookkeeping practices can be nightmarish, and gold traders often are shielded by ethnic and family bonds. "Arms cases are comparatively easy," says Casarra, the money laundering watchdog. "They are a commodity you follow from country A to country B. But gold is more like a currency. Moreover, its form can change, and that can make it extremely difficult to follow."

Law enforcement's gold bugs also face obstacles within their own camp. Casarra and a handful of colleagues have fought a sometimes frustrating battle within the U.S. government to focus more attention on the gold trade. Many investigators still view gold cases as exotic, even while their bosses stress the importance of going after criminal money. Washington, meanwhile, has taken its campaign against money laundering overseas, prompting governments worldwide to put new laws on the books. But cutting the underworld's financial pipeline will take more than seizing bank accounts. If the focus remains merely on hard cash and not precious metal, the world's drug barons may yet live to see a new Golden Age. ●

JOHN VAN HASSELT—CORBIS SYGMA

**The bustling Colón Free Zone on the Panama Canal**
● *Home to a dizzying potpourri of global traders*

*With Philip P. Willan and Eleni Dimmler in Rome, Carol Salguero in Lima, and Mark Madden*

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

**NIGHT BOX FILED**

APR 1 8 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

RICHARD RUBIN,

**00 - 1386**

Plaintiff,

**JURY TRIAL DEMANDED**

vs.

**CIV · UNGARO · BENAGES ·**

U.S. NEWS & WORLD REPORT, INC.,
a Delaware corporation, and
DAVID E. KAPLAN, individually,

**MAGISTRATE JUDGE
BROWN**

**ATTACHMENT / EXHIBIT** ___

Defendants.

_____/

## COMPLAINT

Plaintiff Richard Rubin sues defendants U.S. News & World Report, Inc. and David E. Kaplan and alleges:

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2).

3.      Plaintiff Richard Rubin resides in Miami-Dade County.  Rubin is the owner and Chief Executive Officer of Republic Metals, a gold refining company doing business in Miami-Dade, County.

4.      Defendant U.S. News & World Report, Inc. ("U.S. News") is a Delaware corporation with its principal place of business in Washington, D.C.  At all material times, U.S. News was and is involved in the publication of a weekly news magazine entitled, U.S. NEWS & WORLD REPORT (the "Magazine").

-1-

200 SO. BISCAYNE BLVD.        STROOCK & STROOCK & LAVAN LLP        MIAMI, FLORIDA 33131-2385
FIRST UNION FINANCIAL CENTER · 33RD FLOOR
TELEPHONE 305-358-9900

5.      Defendant David E. Kaplan is a Washington, D.C. resident and is the author of the article that is the subject of this action.

6.      All defendants acted in concert with respect to the creation, writing, editing and publishing of the defamatory article that is the subject of this action.

7.      The issue of the Magazine that contained the article that is the subject of this action was read and seen by a great number of people in the State of Florida, throughout the country and the world. The defendants caused thousands of copies of the article to be circulated in Miami-Dade County and the State of Florida.

8.      On or about November 29, 1999, defendants published an article in the Magazine entitled, **"The Golden Age Of Crime: Why International Drug Traffickers Are Invading The Global Gold Trade"** (hereinafter the "Article"). A true and correct copy of the Article is attached hereto as Exhibit A.

9.      The focus of the Article was the process by which drug money is "laundered" through the purchase and resale of gold. The Article is illustrated by photographs of Rubin and his place of business. A photograph of Rubin, standing with outstretched arms in front of his gold refining machinery bears the caption: **Richard Rubin, owner of Republic Metals, on the floor of his Miami gold refinery:** *"There's a dual economic system ... There's on the books and there's off the books."* Another photograph portrays one of Rubin's employees engaged in the gold refining process. That photograph bears the caption, **"Refining gold bars from Latin America."** The Magazine's contents page for the issue in question is illustrated with another photograph of Mr. Rubin's place of business. The contents page describes the Article as follows:

-2-

> **"The Golden Age of Crime** Gold has become the money laundering mechanism of choice for international drug traffickers."

The Article also contained the following statements:

> "The industry is largely made up of individual dealers and small companies that prefer to deal in cash. High tariffs on gold have attracted smugglers for years. 'There's a dual economic system in the jewel industry,' concedes Richard Rubin, the owner of Republic Metals in Miami, a gold refiner. 'There's on the books and there's off the books.'
>
> "Latin American gold enters the United States largely through Miami. From 1989 to 1998, annual gold imports through Miami International Airport jumped from $18 million to $465 million -- a 26-fold increase. ... Indeed, U.S. money laundering experts believe these odd statistics reflect a myriad of schemes for laundering drug money. ... Investigators have found that in some cases, the launderers even buy back the same gold they have just sold for refining in the United States, paying for it with yet more drug money. The scheme apparently is also a good deal for tax cheats. A recent crackdown in Peru found that 40% of that nation's gold companies were bogus, set up largely to take advantage of an export tax rebate. Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again, grabbing yet another rebate. 'I may have handled gold coming in that was gold I sent down there to begin with,' says Richard Rubin whose Republic Metals made large shipments to and from Peru."

10.   When read in context, the foregoing captions, photographs and statements (collectively the "Materials") are false and defamatory in that they imply that Rubin is or has been involved in money laundering, tax fraud, and that he permits the use of his gold refining business to facilitate money laundering by drug dealers and other criminals. Such depictions of Rubin are absolutely false and tend to subject Rubin to hatred, distress, ridicule, contempt, and disgrace.

-3-

11.     At the time the statements were made, the defendants knew that the statements would expose Rubin to hatred, distress, ridicule, contempt, and disgrace.

12.     The Materials are false and defamatory *per se*.

13.     Defendants published the defamatory Materials knowing that they were false or with reckless disregard for their truth or falsity.  The defendants knew that they had no reasonable basis in fact to imply to readers that Rubin was involved in money laundering, tax fraud or any criminal or unethical activity of any kind and that they had no reliable or unbiased evidence or information to support such implications.

14.     The defendants failed to properly determine the truth or falsity of the defamatory implications conveyed by the Materials and, in fact, intended to convey a defamatory implication to the reading public.

15.     The Article was published in Miami-Dade County and throughout the United States and the world.  The foregoing defamatory statements were seen and read by persons who reside, among other places, in Miami-Dade County.

16.     As a direct and proximate result of the publication of the defamatory statements alleged above, Rubin has suffered damage to his reputation, shame, mortification and emotional distress.

17.     The defendants' conduct was reckless and constituted a conscience disregard or indifference to the rights of plaintiff and done willfully, maliciously, with ill-will toward Rubin and with conscience disregard for Rubin's rights.

200 So. Biscayne Blvd.          STROOCK & STROOCK & LAVAN LLP          Miami, Florida 33131-2385
First Union Financial Center • 33rd Floor
Telephone 305-358-9900

WHEREFORE, Rubin demands judgment against the defendants for compensatory damages in excess of $75,000, punitive damages, costs, and all other relief that this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 18, 2000

> STROOCK & STROOCK & LAVAN LLP
> 3300 First Union Financial Center
> 200 South Biscayne Boulevard
> Miami, Florida 33131
> Telephone:  (305) 358-9900
> Facsimile:  (305) 789-9302
>
> -and-
>
> STROOCK & STROOCK & LAVAN LLP
> Barry Langberg, Esq.
> Deborah Drooz, Esq.
> 2029 Century Park East, Floors 16&18
> Los Angeles, CA 90067-3086
> Telephone:  (310) 556-5800
> Facsimile:  (310) 556-5959
>
> **ATTORNEYS FOR RICHARD RUBIN**
>
> By: _____
> Richard B. Simring +
> Florida Bar No. 890571
> Sean W. Firley
> Florida Bar No. 0118567

30078552.01

EXHIBIT

A

# ⓦORLD REPORT

# The golden age of crime

*Why international drug traffickers are invading the global gold trade*

**BY DAVID E. KAPLAN**

Marian Wales was feeling the heat. He had helped send more than 100 kilos of cocaine from Chicago to Eastern Europe, federal agents say, but he owed his Colombian suppliers $2 million and they were threatening his life. He swore that the money would be wired immediately. His partner even showed them where: to the account of a Panamanian gold company named Speed Joyeros.

Moving money to Speed Joyeros was also on the mind of Inocensio Lopez. According to court testimony, the Dominican drug

INVESTIGATIVE REPORT

dealer dropped off a bag stuffed with nearly $300,000 at a Manhattan hotel room; the money was to go to Moishe Hebroni, the owner of Speed Joyeros.

The connection between the two drug cases and Speed Joyeros is more than a coincidence, law enforcement sources say. Speed is reputed to be Latin America's largest gold trader, with $25 million in sales a month. U.S. drug enforcement agents have seized nearly $1 million from a New York bank account belonging to the company. Now they're examining the firm's movement of millions of dollars of gold and cash around the world. Speed has not been charged with any crime; company officials proclaim their innocence and are fighting the government for release of their funds. But to U.S. experts, the cases show that gold now plays a central role in the billion-dollar business of washing dirty money.

**Good as gold.** The gold trade has become "the money laundering mechanism of choice," according to internal law enforcement reports, and is being used to wash "staggering amounts" of dirty cash. The way it works is complex—and varied: Basically, drug profits are used to purchase gold, whether as jewelry, ingots, or even scrap, then shipped across borders and resold. The resulting profits are "clean," the drug trafficker who bought the gold in the first place free to do with his money as he pleases. So pervasive is its criminal use that gold is joining the U.S. dollar as the standard currency of the drug trade. Among the evidence:

● Nearly every major U.S. money laundering case in recent years has involved gold. Authorities have traced the movement of tons of gold and billions of dollars to deals by Latin American drug cartels.

● U.S. gold imports from Latin American drug havens have skyrocketed. Imports of gold from Colombia—a minor producer—ballooned from virtually nothing in 1993 to nearly $200 million in 1996.

● In the past 10 years, nearly $2.5 billion in foreign gold flowed into Miami—despite Florida's lack of a jewelry-making industry. Authorities say much of the gold is tied to money laundering and tax scams.

● Narcotics traffickers are taking over the Latin American gold trade, industry officials say. Colombian drug dealers are paying exorbitant prices for gold and buying up small dealers across the region.

For drug traffickers, the gold market is like a magnet. So much of the international gold trade operates "off the books" that it is an easy target for organized crime, officials say. While many gold companies operate legitimately, interviews with



Refining gold bars from Latin America, (above). Jewelry at a workshop in Italy
● *The gold trade is a magnet for crooks.*



FROM LEFT: DANIELE CHINELLA—CONTRASTO/MATRIX FOR USN&WR; ALEX QUESADA—MATRIX FOR USN&WR



traders, refiners, and law enforcement officials depict an industry riddled with money laundering, tax fraud, smuggling, and dubious bookkeeping.

But the impact of an illicit gold trade goes beyond the corruption of one industry. Having refined methods to detect money laundering in financial institutions, U.S. investigators are stymied by the ancient trade in gold. Officials also worry that corruption in Latin America's gold trade will spread to the United States, where refiners are importing record amounts of gold from Colombia and Peru. "There's nothing else out there like gold," says U.S. customs agent John Casarra. Posted to Rome in the early 1990s to investigate the Mafia, Casarra found to his surprise that gold figured again and again as the key to laundering cases. "Money launderers are foremost businessmen, and businessmen want certainty," he says. "Gold gives that to them. They can exchange it anywhere in the world."

Take the case of Gustavo Upegui Delgado. Casarra and his Italian colleagues were stunned in 1994, when they found Delgado, a top money launderer for Colombia's Cali cartel, was buying over a ton of gold a month with his colleagues, using drug money to purchase the stuff, then shipping it to Panama. The launderers moved so much of the metal, officials say, that it depressed the price of gold between the two countries.

The big surprise is that it took traffickers like Delgado so long to tumble to the allure of gold. The industry is largely made up of individual dealers and small companies that prefer to deal in cash. High tariffs on gold have attracted smugglers for years. "There's a dual economic system in the jewelry industry," concedes Richard Rubin, the owner of Republic Metals in Miami, a gold refiner. "There's on the books and there's off the books."

How big is the underground gold trade? No one really knows, but customs officials got an unsettling hint a few years ago when they began checking trade data on U.S. gold shipments. "We began to see spikes—

crazy spikes," says Lou Bock, a customs specialist in international trade crimes. "We thought they must have been errors at first." Initially, analysts discovered large movements of gold between the United States and various Caribbean islands—places known not for their gold industry but for laundering dirty money. U.S. gold imports from the Netherlands Antilles, for example, jumped from $68,000 in 1993 to $29 million just four years later.

In the zone. Equally impressive spikes soon emerged from Colombia and Peru, the centers of cocaine production. Between 1994 and 1997, U.S. imports of Peruvian gold grew more than ninefold, from $19 million to $177 million. Imports of gold from Colombia ballooned from a mere $120,000 in 1993 to nearly $200 million in 1996.

Much of the jump in Peruvian production may be due to rapid growth in that nation's legitimate gold industry, says John Lutley, a veteran analyst at the industry-sponsored Gold Institute in Washington, D.C. But Lutley finds the data for Colombia hard to explain. "That's a totally incredible number," he says. The flood of Colombian gold has made at least some American refiners wary. "We do no business out of Colombia, for the pure and simple reason that we can't establish the identity of the owner of the gold," says Michel Berleson, marketing manager for top refiner Handy & Harman.

Latin American gold enters the United States largely through Miami. From 1989 to 1998, annual gold imports through Miami International Airport jumped from $18 million to $468 million—a 26-fold increase. While much of this trade is legitimate, gold analysts remain wary, given the absence of a jewelry-making industry in Florida. Indeed, U.S. money laundering experts believe these odd statistics reflect a myriad of schemes for laundering drug money.

One typical scheme works like this: Top refiners in Switzerland sell their gold to jewelry makers in Italy, the world's largest supplier of fine gold jewelry. The Italian jewelry is sold to U.S. buyers—most of this trade is thought to be legitimate—and to their second top market, Panama, which imported $300 million worth of Italian gold last year—25 to 30 tons—according to Gold Fields Mineral Services,

**WORLD REPORT**

a London-based research firm.

In Panama, nearly all the gold arrives at the Colón Free Zone, a bustling market perched on the edge of the Panama Canal. Home to Speed Joyeros and 1,600 other companies, the *zona libre* is the world's second-largest free port, after Hong Kong. Bound by an imposing gray wall topped by barbed wire, the 1.5-square-mile zone is home to a dizzying potpourri of global traders: Arabs, Chinese, Indians, Jews. More than $6 billion of merchandise passes through the district each year—as much as a quarter of it, investigators say, financed by drug money.

**In the money.** Once in Colón, much of the Italian gold is sold to Colombian front men for the cocaine industry. It is Colón, for example, where the Cali cartel's Delgado sent his gold each month. The gold is then smuggled back to Colombia, where some dealers sell it for pesos and use the money for living expenses and to fund more drug production. But others melt down the jewelry, recast it into ingots, and sell the gold to refiners in the United States or Switzerland, producing a stream of income that looks legitimate.

Investigators have found that in some cases, the launderers even buy back the same gold they've just sold for refining in the United States, paying for it with yet more drug money. The scheme apparently is also a good deal for tax cheats. A recent crackdown in Peru found that 40 percent of that nation's gold companies were bogus, set up largely to take advantage of an export-tax rebate. Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again, grabbing yet another rebate. "I may have handled gold coming in that was gold I sent down there to begin with," says Richard Rubin, whose Republic Metals made large shipments to and from Peru.

Gold traders say the influence of narcotraffickers is so pervasive that they are taking over Latin America's gold trade, co-opting legitimate firms and buying up traders in country after country. "They're squeezing out the legitimate dealers," says one prominent trader who insisted on anonymity.

Federal agents believe companies like Speed Joyeros play a key role in the underground gold trade, a charge the firm's owners emphatically reject. "If my clients are laundering money, why haven't they been indicted?" argues Speed attorney Louis Diamond. Business for Speed, meanwhile, is booming. In Colón, the company is building what a competitor calls "a tem-



Richard Rubin, owner of Republic Metals, on the floor of his Miami gold refinery
● *"There's a dual economic system.... There's on the books and there's off the books."*

ple of gold"—possibly the largest jewelry store in Latin America.

Drug dealers playing the gold card are doing it in increasingly sophisticated ways. In 1989, federal agents stopped a billion-dollar money laundry that exported so much gold from Uruguay that that country became America's largest gold supplier. The fact that Uruguay had no gold industry mattered little to the launderers—what mattered was creating a credible cover for their flow of narcodollars. Today, some criminals are importing gold-plated bronze into the United States, others are shipping out just the opposite: gold disguised as other metals. Having taken payment in gold, the traffickers simply want to move their assets back home. Customs inspectors, now on the lookout for gold smugglers, have made repeated seizures in recent months. In one case, a woman flying to Colombia from New York was stopped

with two tractor-trailer hitches, seemingly made of steel. Under the paint, inspectors say they found solid gold.

The gold trade poses other challenges for law enforcement. The industry's bookkeeping practices can be nightmarish, and gold traders often are shielded by ethnic and family bonds. "Arms cases are comparatively easy," says Casarra, the money laundering watchdog. "They are a commodity you follow from country A to country B. But gold is more like a currency. Moreover, its form can change, and that can make it extremely difficult to follow."

Law enforcement's gold bugs also face obstacles within their own camp. Casarra and a handful of colleagues have fought a sometimes frustrating battle within the U.S. government to focus more attention on the gold trade. Many investigators still view gold cases as exotic, even while their bosses stress the importance of going after criminal money. Washington, meanwhile, has taken its campaign against money laundering overseas, prompting governments worldwide to put new laws on the books. But cutting the underworld's financial pipeline will take more than seizing bank accounts. If the focus remains merely on hard cash and not precious metal, the world's drug barons may yet live to see a new Golden Age. ●



The bustling Colón Free Zone on the Panama Canal
● *Home to a dizzying potpourri of global traders*

*With Philip P. Willan and Eleni Dimmler in Rome, Carol Salguero in Lima, and Mark Madden*

# CONTENTS

NOVEMBER 29, 1999 • VOLUME 127 • NUMBER 21
U.S. NEWS ONLINE: www.usnews.com 


ALEX QUESADA—MATRIX FOR USN&WR

**ATTACHMENT / EXHIBIT** 
JUNGHI KIM—CONTACT FOR USN&WR

16

58 • COVER STORY

**U.S.NEWS**

**16 Betting on a new math**
Bill Bradley is stressing genuineness, hoping that voters will see his minuses as a candidate as big pluses

**22 The elusive electorate**
Times are good, but many voters remain unsettled—and undecided. Ten groups of voters whose choices will be crucial

**30 A wing, a prayer, a puzzler**
Clues in the crash of EgyptAir 990 provide no answers but fuel suspicions of a deliberate act

**34 Congress to voters, We're OK**
Lawmakers from both parties head home feeling good about themselves

**35 The best judges that money can buy**
Biggest donors in state courts are often lawyers who appear before the judges or the clients they represent

**38 Sex, lies, and a family affair**
Lessons in morality at a small college

**38 Texas A&M tragedy**
Eleven students die in freak accident

**WORLD REPORT**
**42 The golden age of crime**
Gold has become the money-laundering mechanism of choice for international drug traffickers

**46 Sharing the spotlight**
Aging Fidel Castro puts his protégé front and center at the summit

**49 Croatia faces a new era**
Key decisions need to be made

**49 Smoking gun or dirty trick on Yeltsin?**

**BUSINESS & TECHNOLOGY**
**51 The great trade wall**
With the historic U.S.-China agreement, it may come tumbling down. America will benefit

**54 Should Bill Gates worry about Sony?**
The company's goal is to oust Microsoft from living rooms

**55 The cigar boom goes up in smoke**
As the craze for premium stogies dies, business casualties abound

**56 The ATM fee rebellion**
Banks fight new bans on surcharges

**56 How's that for buying low?**
Giving away stock on the Internet

**SCIENCE & IDEAS**
**58 When strangers become family**
As stepfamilies become increasingly common, parents find strategies to make them work. By Wray Herbert

**NEWS YOU CAN USE**
**68 Children's asthma, 'mild' but deadly**
Kids' most common chronic disease may have serious complications

**71 Babies and parents can sleep together**
Hospitals' recycled tools

**74 Reassessing the risk to you**

**76 Bring out the stereo**
New ways to get music on your PC

**78 Soliciting online with fruitcakes**

**79 Plugged-in kids becoming isolated**
A new study raises concerns

**80 Mad about Harry Potter? Try Diana**
Bestsellers; Top Picks; Dr. Hip

**DEPARTMENTS**
4 Letters
7 Washington Whispers
12 Outlook
14 People
15 On Society
40 The National Interest
84 Editorial


ALEX QUESADA—MATRIX FOR USN&WR
42

COVER: PHOTOGRAPH BY KAREN KUEHN—MATRIX FOR USN&WR

Copyright © 1999, by U.S.News & World Report Inc. All rights reserved. U.S.News & World Report (ISSN 0041-5537) is published weekly, except for one combined issue mailed in August and a second combined issue mailed in December. $44.75 per year, by U.S.News & World Report Inc., 450 W. 33rd Street, 11th Floor, New York, NY 10001. Periodicals postage paid at New York, NY, and at additional mailing offices. POSTMASTERS: Send address changes to U.S.News & World Report, PO Box 55929, Boulder, CO 80328-5929. U.S. News may allow others to use its mailing list. If you do not want your name included, please contact our Subscription Department by mail or phone.

BULK RATE U.S. POSTAGE PAID PEWAUKEE, WI PERMIT #908. (STANDARD MAIL ENCLOSED VERSIONS 039G-040G, 061I-062I, 065J-066J, 105M-106M, 127P-128P, 149T-150T, 153U-154U, 1931-1941)

U.S.NEWS & WORLD REPORT® U.S. NEWS® WORLD REPORT® NEWS YOU CAN USE® WASHINGTON WHISPERS® Canadian Post International Publications Mail (Canadian Distribution) Sales Agreement No. 545643, Canadian Goods and Service Tax No. R124481334                                            U.S.News & World Report also automatable polywrap                    **Printed in the U.S.A.**

EDITORIAL OFFICES                          ADVERTISING AND CORPORATE OFFICES          SUBSCRIPTION DEPARTMENT          CLASSROOM PROGRAM
1050 Thomas Jefferson Street, N.W., Washington, DC 20007-3837    450 West 33rd Street, 11th Floor, New York, NY 10001    PO Box 55929, Boulder, CO 80322-5929    33 S. Delaware Avenue, Suite 202, Yardley, PA 19067
(202) 955-2000                            (212) 716-6800                              (800) 333-8130                   (800) 736-9623
                                                                                                                     www.usnews.com/classroom          H

# STROOCK & STROOCK & LAVAN LLP

SUITE 1800
2029 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-3086

PHONE 310-556-5800
FAX    310-556-5959

BARRY B. LANGBERG, ESQ.
(310) 556-5885

March 1, 2000

**Via First Class Mail, Certified Mail,**
**Return Receipt Requested and Facsimile**

Mortimer B. Zuckerman,
Chairman and Editor-in-Chief
U.S. NEWS & WORLD REPORT
Editorial Offices
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007-3837



David E. Kaplan
U.S. NEWS & WORLD REPORT
Editorial Offices
1050 Thomas Jefferson Street, N.W.
Washington, D.C. 20007-3837

Re:   U.S. News & World Report Article, November 29, 1999: "The Golden Age of Crime"

Dear Messrs. Zuckerman and Kaplan:

This office represents Richard Rubin and his company, Republic Metals.

U.S. NEWS & WORLD REPORT, in its November 29, 1999 edition, published an article by David
E. Kaplan entitled "The Golden Age of Crime . . . Why International Drug Traffickers are
Invading the Global Gold Trade" (the "Article"). This Article focused on the process by which
drug money is "laundered" through the purchase and resale of gold. The Article repeatedly
referred to Mr. Rubin and his company and, in fact, purported to quote him. It was illustrated
with color photographs of Mr. Rubin and his facilities.

In fact, Mr. Rubin has been in the gold refining business for over twenty years. In that time, he
has built a sterling reputation for honesty and integrity. Throughout his career, Mr. Rubin has
conducted his business in strict accordance with the law.

50099151v1

100 FEDERAL STREET
BOSTON, MA 02110
PHONE 617-482-6800
FAX    617-330-5111

RAKOCZI UT 1-3
H-1088 BUDAPEST, HUNGARY
PHONE 361/266-9520
FAX    361/266-9279

200 SOUTH BISCAYNE BLVD
MIAMI, FL 33131
PHONE 305-358-9900
FAX    305-789-9302

180 MAIDEN LANE
NEW YORK, NY 10038
PHONE 212-806-5400
FAX    212-806-6006

1150 SEVENTEENTH STREET, N.W.
WASHINGTON, D.C. 20036
PHONE 202-452-9250
FAX    202-293-2293

STROOCK & STROOCK & LAVAN LLP

Mortimer B. Zuckerman
David E. Kaplan
March 1, 2000
Page 2

The references in your article, including the quotations and photographs, falsely implied that Mr. Rubin is a knowing participant in the money laundering operations described in the Article. The entire tone and tenor of the Article is false and defamatory insofar as it implies that Mr. Rubin is involved in improper or illegal transactions. Indeed, the very structure of the Article suggests that Mr. Kaplan deliberately attempted to provoke this erroneous inference.

The contents of the Article are defamatory *per se*. The implication generated by the caption below Mr. Rubin's picture that Mr. Rubin or his company transacts business "off the books" is absolutely false. The implication that Mr. Rubin or his company are in any way involved in money laundering activities is absolutely false. The language of the Article implying that Mr. Rubin or his company transacts business "off the books" is false. The language of the Article and its positioning implying that Mr. Rubin ". . . handled gold coming in that was gold I sent down there to begin with . . ." creating the implication that Mr. Rubin or his company were involved in tax fraud or smuggling with respect to transactions in Peru are absolutely false. The positioning and distortion of Mr. Rubin's comments, and pictures of Mr. Rubin and his facilities create an absolutely false implication that Mr. Rubin and his company are involved in "the golden age of crime" and international money laundering involving drug traffickers.

The reputational injury and emotional distress suffered by Mr. Rubin as a result of the publication of this defamatory material is incalculable. No apology or correction on the part of your publication can fully undo the damage that has been done here. However, injury to Mr. Rubin's reputation may be made less severe by a prompt and unequivocal retraction. Accordingly, we hereby demand that you publish such a retraction in a manner that is comparable in size, placement and prominence to the offending Article.

Very truly yours,

Barry B. Langberg

BBL:rlv

50099151v1

**Ⓛ** LETTERS

majority of students in high school have utilized the Internet for its vast resources of knowledge and freebie information. Book analyses for book reports and free study guides for various other subjects abound. Hard work is no longer a necessity for many students.

YUHMIN LING
*Toms River, N.J.*

NOW WE KNOW WHY WE HAVE ECO-nomic depressions. They teach young people not to become too complacent. Two decades of economic prosperity, conversely, have taught them that they do not have to work and learn to survive.

DENNIS M. CLAUSEN
*Escondido, Calif.*

## N.Y. shooting

IN JOHN LEO'S COLUMN "DID I SAY Murder?" [February 7], he complains that the New York City police shooting of Amadou Diallo has been referred to as murder by Hillary Clinton and others. What would he prefer to call it? "A horrific mistake by jittery cops"? The act of shooting an unarmed person 41 times is the very definition of murder. The fact that it is "unprecedented" for police to be charged with murder in such cases is, in my judg-

ment, a horrific mistake. The occurrence of such shootings perhaps does not reflect "jitteriness" but rather overzealous, unprofessional, and unacceptable police behavior that must be corrected.

LAURENCE GEVERS
*Harrisburg, Pa.*

YES, IT'S TRAGIC THAT FOUR OF NEW York City's finest made this fatal mistake. But to keep every citizen's faith that they have the finest protection, we all have a vested interest in ensuring that the integrity of law enforcement isn't compromised. An effective criminal justice system is founded in the confidence of society.

RUSSELL GOTTFRIED
*Mayport, Fla.*

LEO CLAIMS THAT HILLARY CLINTON rushed to judgment about the Diallo case, inappropriately announcing her opinion in order to further political ends. I would agree. Oddly, though, Leo then proceeds to do the exact same thing. He declares the incident simply "a horrific mistake by jittery cops," and then he proceeds to tout New York Mayor Rudy Giuliani's record on crime.

SHALLEE PAGE

**Correction:** Among the numerous public officials convicted on federal and state charges in northwestern Ohio ["The Sopranos Come to Youngstown, Ohio," March 6], only one was a county commissioner.

### Clarification

The article "The Golden Age of Crime," which appeared in the Nov. 29, 1999, edition of *U.S.News & World Report,* discussed how drug money is laundered through the purchase and resale of gold. The article includes quotes from an interview with Richard Rubin, the owner of Republic Metal, a gold-refining business. *U.S. News* did not suggest and did not intend to suggest that Mr. Rubin or his company were engaged in money laundering, tax fraud, smuggling, or any other improper or illegal transactions discussed in the article, or that he or his company transacts business "off the books." *U.S. News* regrets if any reader misread the article to suggest such implications.

ATTACHMENT / EXHIBIT

---

# Patanol©
### (olopatadine hydrochloride ophthalmic solution) 0.1%

**DESCRIPTION**

PATANOL* (olopatadine hydrochloride ophthalmic solution) 0.1% is a sterile ophthalmic solution containing olopatadine, a relatively selective H₁-receptor antagonist and inhibitor of histamine release from the mast cell for topical administration to the eyes. Olopatadine hydrochloride is a white, crystalline, water-soluble powder with a molecular weight of 373.88. The chemical structure is presented below:

**Chemical Name:** 11-[(Z)-3-(Dimethylamino)propylidene]-6-11-dihydrodibenz[b,e] oxepin-2-acetic acid hydrochloride

Each mL of PATANOL contains: **Active:** 1.11 mg olopatadine hydrochloride equivalent to 1 mg olopatadine. **Preservative:** benzalkonium chloride 0.01%. **Inactives:** dibasic sodium phosphate; sodium chloride; hydrochloric acid/sodium hydroxide (adjust pH); and purified water. It has a pH of approximately 7 and an osmolality of approximately 300 mOsm/kg.                                                      DM-00

**CLINICAL PHARMACOLOGY**

Olopatadine is an inhibitor of the release of histamine from the mast cell and a relatively selective histamine H₁-antagonist that inhibits the *in vivo* and *in vitro* type 1 immediate hypersensitivity reaction. Olopatadine is devoid of effects on alpha-adrenergic, dopamine, muscarinic type 1 and 2, and serotonin receptors. Following topical ocular administration in man, olopatadine was shown to have low systemic exposure. Two studies in normal volunteers (totaling 24 subjects) dosed bilaterally with olopatadine 0.15% ophthalmic solution once every 12 hours for 2 weeks demonstrated plasma concentrations to be generally below the quantitation limit of the assay (<0.5 ng/mL). Samples in which olopatadine was quantifiable were typically found within 2 hours of dosing and ranged from 0.5 to 1.3 ng/mL. The half-life in plasma was approximately 3 hours, and elimination was predominantly through renal excretion. Approximately 60-70% of the dose was recovered in the urine as parent drug. Two metabolites, the mono-desmethyl and the N-oxide, were detected at low concentrations in the urine. Results from conjunctival antigen challenge studies demonstrated that PATANOL, when subjects were challenged with antigen both initially and up to 8 hours after dosing, was significantly more effective than its vehicle in preventing ocular itching associated with allergic conjunctivitis.

**INDICATIONS AND USAGE**

PATANOL (olopatadine hydrochloride ophthalmic solution) 0.1% is indicated for the temporary prevention of itching of the eye due to allergic conjunctivitis.

**CONTRAINDICATIONS**

PATANOL is contraindicated in persons with a known hypersensitivity to olopatadine hydrochloride or any components of PATANOL.

**WARNINGS**

PATANOL is for topical use only and not for injection or intraocular use.

**PRECAUTIONS**

**Information for Patients:** To prevent contaminating the dropper tip and solution, care should be taken not to touch the eyelids or surrounding areas with the dropper tip of the bottle. Keep bottle tightly closed when not in use. Patients should be advised not to wear a contact lens if their eye is red. PATANOL should not be used to treat contact lens related irritation. The preservative in PATANOL, benzalkonium chloride, may be absorbed by soft contact lenses. Patients who wear soft contact lenses and whose eyes are not red, should be instructed to wait at least ten minutes after instilling PATANOL, before they insert their contact lenses.

**Carcinogenesis, Mutagenesis, Impairment of Fertility:** Olopatadine administered orally was not carcinogenic in mice and rats in doses up to 500 mg/kg/day and 200 mg/kg/day, respectively. Based on a 40 µl drop size, these doses were 78,125 and 31,250 times higher than the maximum recommended ocular human dose (MROHD). No mutagenic potential was observed when olopatadine was tested in an *in vitro* bacterial reverse mutation (Ames) test, an *in vitro* mammalian chromosome aberration assay or an *in vivo* mouse micronucleus test. Olopatadine administered to male and female rats at oral doses of 62,500 times MROHD level resulted in a slight decrease in the fertility index and reduced implantation rate; no effects on reproductive function were observed at doses of 7,800 times the maximum recommended ocular human use level.

**Pregnancy: Pregnancy Category C.** Olopatadine was found not to be teratogenic in rats and rabbits. However, rats treated at 600 mg/kg/day, or 93,750 times the MROHD and rabbits treated at 400 mg/kg/day, or 62,500 times the MROHD, during organogenesis showed a decrease in live fetuses. There are, however, no adequate and well controlled studies in pregnant women. Because animal studies are not always predictive of human responses, this drug should be used in pregnant women only if the potential benefit to the mother justifies the potential risk to the embryo or fetus.

**Nursing Mothers:** Olopatadine has been identified in the milk of nursing rats following oral administration. It is not known whether topical ocular administration could result in sufficient systemic absorption to produce detectable quantities in the human breast milk. Nevertheless, caution should be exercised when PATANOL is administered to a nursing mother.

**Pediatric Use:** Safety and effectiveness in pediatric patients below the age of 3 years have not been established.

**ADVERSE REACTIONS**

Headaches were reported at an incidence of 7%. The following adverse experiences were reported in less than 5% of patients: Asthenia, blurred vision, burning or stinging, cold syndrome, dry eye, foreign body sensation, hyperemia, keratitis, lid edema, pharyngitis, pruritus, rhinitis, sinusitis, and taste perversion. Some of these events were similar to the underlying disease being studied.

**DOSAGE AND ADMINISTRATION**

The recommended dose is one to two drops in each affected eye two times per day at an interval of 6 to 8 hours.

**HOW SUPPLIED**

PATANOL (olopatadine hydrochloride ophthalmic solution) 0.1% is supplied as follows:
5 mL in plastic DROP-TAINER® dispenser.

5 mL:     **NDC** 0065-0271-05

**Storage:** Store at 39°F to 86°F (4°C to 30°C).

Rx Only

U.S. Patent Nos. 4,871,865; 4,923,892; 5,116,863; 5,641,805.

© 2000 Alcon Laboratories, Inc.
Revised: October 1998

# Alcon®
**PHARMACEUTICALS**
ALCON LABORATORIES, INC.
Fort Worth, Texas 76134 USA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 00-1386-CIV-Ungaro-Benages/Brown

RICHARD RUBIN,

Plaintiff,

vs.

U.S. NEWS & WORLD REPORT, INC.
and David E. Kaplan,

Defendants.

_____/

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS THE COMPLAINT

APPENDIX OF CASES CITED TO THE
MEDIA LAW REPORTER

Cited at Page:

A.   *Anson v. Paxson Communications Corp.*, 26 Med. L. Rptr. 2374 (Fla. Cir. Ct. 1998) ...................................................................................................19

B.   *Islam v. Globe International*, 12 Med. L. Rptr. 1864 (S.D. Fla 1985) ...............................6

C.   *Jefferson v. Winnebago County, Illinois*, 23 Med. L. Rptr. 1641 (N.D. Ill. 1995), *aff'd*, 90 F.3d 1291 (7th Cir. 1996)...........................................................8

D.   *Weinstein v. Friedman*, 24 Med. L. Rptr. 1769 (S.D.N.Y.), *aff'd*, 112 F.3d 507 (2d Cir. 1996)...........................................................................8, 11

E.   *Wilson v. News-Press Publishing*, 28 Med. L. Rptr. 1694 (Fla. Cir. Ct. April 7, 2000)...........................................................................................8

the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and of establishing — based on the relevant portions of the pleadings, depositions, affidavits, if any, answers to interrogatories, and admissions on file — that there is no genuine issue of material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must go beyond the pleadings and must, by its own affidavits and by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Matsushita*, 475 U.S. at 587. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* at 586. Material facts are those facts whose determination will affect the outcome of the lawsuit, and an issue of material fact is genuine if the evidence is such that a reasonable jury could find for the nonmoving party, *Anderson*, 477 U.S. at 248.

To prevail in a copyright infringement action, plaintiff must prove that: (1) he has a valid copyright to *N and Out* (which HBO concedes solely for the purpose of this motion); (2) the creators of *First Time Felon* had access to plaintiff's script when they created *First Time Felon;* and (3) defendant's movie is substantially similar to *N or Out. See, Towler v. Sayles*, 76 F.3d 579, 581-82 (4th Cir. 1996); *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 732 (4th Cir.), *cert. denied*, 498 U.S. 981 (1990). Under this standard, summary judgment is appropriate if either: (1) "the similarity between two works concerns only 'non-copyrightable elements of the plaintiff's work,'" or (2) no reasonable jury, when properly instructed, could find that the works are substantially similar. *Eaton v. National Broad. Co.*, 972 F. Supp. 1019, 1023 (E.D. Va. 1997) (citations omitted), *aff'd*, No. 97-2162 (4th Cir. May 21, 1998) (unpublished *per curiam* opinion).



*Discussion*

[1] Under this standard, the court finds that plaintiff's claim does not survive. First, plaintiff presents no evidence that *defendant* ever had access to plaintiff's script when defendant made *First Time Felon*. This undermines his claim under the second part of the three-part test in *Towler*.

Second, the court finds that, based on the record, the two scripts at issue are very dissimilar, rather than substantially similar as required under the third part of the test in *Towler*. The only similarities between the two works appears to be the gender, race and general age of the two main characters, and the fact that both "did time" in one capacity or another.

Defendant, however, has presented ample evidence that its story is based on the true-life story of Greg Yance, whose journey has been well documented in various newspaper articles submitted as exhibits to defendant's motion. Def. Exs. C through E. In the court's view, this soundly rebuts any reasonable question about the source of defendant's film, and demonstrates that it was not based on plaintiff's work. Consequently, defendant's motion for summary judgment will be granted, and this action will be dismissed.

~~ATTACHMENT / EXHIBIT~~ A

# ANSON v. PAXSON COMMUNICATIONS CORP.

### Florida Circuit Court
### Broward County

MORGAN LINDEN ANSON v. PAXSON COMMUNICATIONS CORPORATION, a Florida corporation, STEVEN KANE and NICK LAWRENCE, No. 97-12783 (02), May 4, 1998

## REGULATION OF MEDIA CONTENT

**1. Defamation — Defamatory content — "Of and concerning" (§11.0502)**

**Defamation — Privilege — Fair comment/opinion (§11.4502)**

Defamation action against radio defendants is dismissed, since plaintiff was not identified by name in broadcast, and

thus allegedly defamatory statements were not "of and concerning" plaintiff, and since format of broadcast, i.e., radio talk show, was sufficient to alert listeners that defendants' statements were opinion.

---

Defamation action against radio defendants. On defendants' motion to dismiss.

Granted.

John R. Hargrove, of Heinrich Gordon Hargrove Weihe & James, Fort Lauderdale, Fla., for defendants.

*Full Text of Opinion*

Stafford, J.:

### AMENDED ORDER OF DISMISSAL WITH PREJUDICE

This is a defamation case involving remarks made by defendants STEVEN KANE and NICK LAWRENCE during their talk radio program broadcast on WFTL AM in Fort Lauderdale, Florida. Plaintiff has sued the former station owner, PAXSON COMMUNICATIONS CORPORATION, along with KANE and LAWRENCE. Defendants have now filed a motion to dismiss the amended complaint arguing essentially two points. First, because the plaintiff was never identified in the broadcast, defendants contend that plaintiff has no claim. Second, even if plaintiff were identified, defendants assert that the law defines the statements as legally protected opinion. Because the alleged facts are not in dispute, the claim may be appropriately be determined on the basis of defendants' motion to dismiss. *Stewart v. Sun Sentinel Company,* 695 So.2d 360 [25 Med.L.Rptr. 1763] (Fla. 4th DCA 1997), *cert. denied* 697 So.2d 5122 (Fla. 1997); *accord, Morse v. Ripken,* 1998 WL 113541 (Fla. 4th DCA March 11, 1998). Having considered the motion, the court agrees with defendants' position and accordingly dismisses the case with prejudice.

### I. Pretrial Disposition Favored in Defamation Cases.

As the Fourth District noted in *Stewart,* Florida courts uniformly hold that early disposition of defamation cases is "especially appropriate" because of the chilling effect such cases have on freedom of speech. *Id.* at 363. Both the antecedents and progeny of *Stewart* reflect the Fourth District's consistent view in such matters. *See, e.g., Morse v. Ripken,* 1998 WL 113541 (Fla. 4th DCA March 11, 1998); *Seropian v. Forman,* 652 So.2d 490 (Fla. 4th DCA 1995). The rationale is clear. Unless such cases are summarily handled, media defendants in particular would be forced to steer so far wide of the "unlawful zone" that public debate would be stymied. *Stewart, supra.* The threshold question in this case, therefore, is whether plaintiff has set forth a legally enforceable claim. For the reasons noted below, the court answers that question in the negative.

### II. Inherent Defects in Plaintiff's Claim.

[1] *A. Plaintiff Is Not Identified.* The subject of that portion of the radio broadcast in issue was two unidentified young men who had attended a party with one Norman Kent, a Fort Lauderdale attorney. One of the two unidentified men is the plaintiff in this lawsuit. Plaintiff's complaint was initially dismissed because plaintiff was not identified. Thereafter, he amended the complaint, and defendants have once again moved to dismiss. To sustain a defamation claim, the challenged words must refer to or be "of and concerning" *plaintiff. See Langner v. Charles A. Binger, Inc.,* 503 So.2d 1362 (Fla. 3d DCA 1987); *Harwood v. Bush,* 223 So.2d 359 (Fla. 4th DCA 1969). The "on the air" colloquy in this case referred generally to two unidentified males only. Consequently, the "of and concerning" requirement is not satisfied. To allow a plaintiff who is not clearly identified to institute a defamation action poses an unjustifiable threat to society. Sach & Baron, *Libel, Slander, and Related Problems* ch. 2 at 68 (PLI 1997 Supp.).

*B. Defendants' Statements are Expressions of Opinion.* Even if plaintiff were identified, the claim is nevertheless unenforceable. This lawsuit involves statements expressed solely in the context of an "on the air" radio talk show, where nonactionable epithets, insults, name-calling and abusive statements are commonplace. Talk radio has come to be accepted by the listening public as a controversial opinion forum, and for better or worse outrageous comments are viewed as a part of its "schtik", routine or "gim-

mick". As such, talk radio represents a distinct type of forum, the general tenor of which negates any realistic impression that statements by the hosts represent assertions of objective fact. *See, e.g., Wilson v. Grant,* 687 A.2d 1009, 1014 (N.J. App. 1996); *see also Partington v. Bugliosi,* 56 F.3d 1147 [23 Med.L.Rptr. 1929] (9th Cir. 1995). What is said in this type of live broadcast is normally taken "with a grain of salt." *See, Hunter v. Hartman,* 545 N.W.2d 699, 705-06 [24 Med.L.Rptr. 2004] (Minn. App. 1996).

In this case, the complaint, as amended, discloses that once on the air, KANE and LAWRENCE simply launched into their usual talk show mode and expressed opinions as a part of their routine. Once again, nobody was ever identified except for Norman Kent, who is not a party. In fact, the complaint, as amended, quotes Al Rantel, another WFTL announcer, who actually debated on the air with KANE and LAWRENCE, firing back at both of them about their remarks. This underscores the "opinion" nature of the broadcast, from which a listener "might easily arrive at a *different* opinion." *Morse v. Ripken,* 1998 WL 113541, *2 (Fla. 4th DCA March 11, 1998) (emphasis added). Thus, even if plaintiff *were* identified, the "cross-fire" format and context of the program rendered defendants' statements as nonactionable opinions which the law absolutely protects. Accordingly, it is

ORDERED and ADJUDGED as follows:

1. Defendants' motion to dismiss is granted.

2. Plaintiff's claim is hereby dismissed with prejudice.

3. The court reserves jurisdiction to assess costs under *Florida Statutes* Chapter 57.

interest would be furthered by not revealing evaluative material. See *Wylie v. Mills*, 195 *N.J. Super.* 332 (Law Div. 1984). In the circumstances we have determined to remand the matter to the trial court to balance the public's interest in maintaining confidentiality in the reports against plaintiff's interest in examining them. We would expect the judge to examine the reports and edit out the matters, if any, which should not be disclosed.

We have not discussed plaintiff's constitutional contentions for two reasons. Firstly, plaintiff seems primarily to mention the constitutional provisions in connection with its common law and statutory contentions rather than as independent grounds for relief. Secondly, we are satisfied that in any event plaintiff on a constitutional basis would be entitled to no greater relief than it will obtain under the common law.

The order of March 27, 1985 is affirmed to the extent it denied plaintiff's request for an evidentiary hearing. It is otherwise reversed and the matter is remanded to the Superior Court, Law Division, Monmouth County, for further proceedings not inconsistent with this opinion. We do not retain jurisdiction.

---

## ISLAM v. GLOBE INTERNATIONAL

### U.S. District Court
### Southern District of Florida

YUSUF ISLAM v. GLOBE INTERNATIONAL, INC. and LEN STONE, No. 85-8213-Civ-PAINE, July 29, 1985

## REGULATION OF MEDIA CONTENT

### 1. Defamation—Determining public official/public figure (§11.20)

Libel plaintiff who alleges that he has "built up and enjoyed a reputation throughout the world as a popular composer, singer, and entertainer," is, as matter of law, public figure, even though suit was filed by plaintiff under different name than his stage name.

### 2. Defamation—Retraction (§11.47)

Libel plaintiff whose suit against Florida newspaper was originally filed in fed-

eral district court in Illinois and was ordered transferred to federal district court in Florida must demonstrate compliance with Florida retraction statute.

### 3. Defamation—Pre-trial procedures—In general (§11.10)

Libel plaintiff who alleges only that defendant newspaper "is disseminated within Cook County, Illinois, and throughout the world," and who has failed to identify one or more particular persons to whom allegedly defamatory statement was communicated, has failed to set forth cause of action.

---

Libel action against newspaper and staff writer. On plaintiff's motion to strike certain portions of defendants' answer and affirmative defenses.

Granted in part, denied in part.

Abdullah A. Bade, Indianapolis, Ind., Wayne B. Giampietro, of DeJong, Poltrock & Giampietro, Chicago, Ill., and Richard L. Martens, of Boose, Ciklin, Martens & Lubitz, West Palm Beach, Fla., for plaintiff.

Paul M. Levy, of Deutsch, Levy & Engel, Chicago, Ill., and Dan Paul, of Paul & Burt, Miami, Fla., for defendants.

*Full Text of Order*

ATTACHMENT / EXHIBIT

Paine, J:

This cause came to be heard on the motion filed by Plaintiff on July 15, 1985 (Docket Entry 8), asking this Court to strike certain portions of the answer and affirmative defenses filed by Defendants on May 23, 1985 (Docket Entry 6). In his motion to strike, Plaintiff presents his requests in several numbered paragraphs. This Court will discuss each of these paragraphs, in the order presented. The complaint referred to in this order is Plaintiff's second amended complaint, filed on October 16, 1984 (Docket Entry 11 as filed in the Northern District of Illinois, prior to transfer to this District.

[1] In Paragraph 5 of his complaint, Plaintiff, suing under the name Yusuf Islam, states that, under the name of Cat Stevens, he had "built up and enjoyed a reputation throughout the world as a popular composer, singer, and entertainer." This would appear to be an allegation of "such pervasive fame or notoriety that he becomes a public figure for all purposes

and in all contexts." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 [1 Med.L.Rptr. 1633] (1974). The fact that Plaintiff brings this suit under a different name is of no consequence, as Plaintiff complains of statements that refer to him as Cat Stevens. *Meeropol v. Nizer*, 381 F.Supp. 29, 34 (S.D.N.Y., 1974), affirmed in relevant part, reversed as to other issues, 560 F.2d 1061 [2 Med.L.Rptr. 2269] (2d Cir., 1977), cert. denied 434 U.S. 1013 (1978).

Whether a plaintiff in an action for defamation is determined to be a public figure is important because, in order to prevail, such a plaintiff must prove "that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Gertz*, supra, at 342. "In a defamation case, the question of public figure status is pervasive, and it should be answered as soon as possible." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 [6 Med.L.Rptr. 1598] (5th Cir., 1980), on rehearing 628 F.2d 932 [6 Med.L.Rptr. 2252] (5th Cir., 1980) (per curiam), cert. denied 450 U.S. 1041 (1981). One court has noted that identifying "public figures in a defamation case is like trying to nail a jellyfish to a wall." *Rosanova v. Playboy Enterprises, Inc.*, 411 F.Supp. 440, 443 (S.D. Ga., 1976), affirmed 580 F.2d 859 [2 Med.L.Rptr. 1550] (5th Cir., 1978). This Court believes that this difficulty is avoided here, because Plaintiff's description of himself, quoted above, leads to a conclusion that he is a public figure.

This Court, therefore, holds that for the purposes of this action Plaintiff is considered to be a public figure, and must establish the additional elements of proof required of such plaintiffs in defamation actions. This Court will deny the request (in paragraph 1 of Plaintiff's motion) to strike the portion of Defendants' answer in which they admit that Plaintiff is a public figure.

For the considerations just stated, this Court will deny the requests to strike contained in paragraphs 2 through 5, inclusive, of Plaintiff's motion to strike.

As stated in paragraph 6 of Plaintiff's motion to strike, Defendants' fourth affirmative defense is essentially nothing more than a denial. That is not, however, grounds for striking that portion of the pleading. *Augustus v. Board of Public Instruction of Escambia County, Florida*, 306 F.2d 862, 868 (5th Cir., 1962); *United States v. Articles of Food*, 67 F.R.D. 419, 421 (D. Idaho, 1975). This Court will deny the request in paragraph 6 of Plaintiff's motion to strike.

For the reasoning just stated, this Court will also deny the requests to strike contained in paragraphs 7, 10, and 13 of Plaintiff's motion.

In paragraph 8 of his motion, Plaintiff asks this Court to strike Defendants' sixth affirmative defense. As this affirmative defense, Defendants assert that Plaintiff has failed to state the elements of a claim for which this Court may grant relief, in that Plaintiff has not alleged that he served a demand upon either Defendant for retraction of the allegedly defamatory statements.

This affirmative defense is presumably premised upon Section 770.01 of the Florida Statutes, Fla.Stat.Ann. §770.01 (West). That section requires a plaintiff in a civil action for libel to provide to the defendant written notice of the plaintiff's claim at least five days prior to filing suit. The Florida courts have held that compliance with this statute is a condition precedent to a suit for libel, *Ross v. Gore*, 48 So.2d 412 (Fla., 1950), and that an allegation of such compliance is an essential element of a claim for relief. *Edward L. Nezelek, Inc. v. Sunbeam Television Corporation*, 413 So.2d 51, 56 (Fla., 3d DCA), cert. denied 424 So.2d 763 (Fla., 1982).

In deciding whether this is a proper affirmative defense in this action, this Court must first determine whether the law of the state of Florida is to be applied here. This Court has jurisdiction over this action, under 28 U.S.C. §1332, because of the diversity of citizenship of the parties. In a diversity case, this Court must generally apply the state law that would be applied by the courts of the state of Florida, in which state this Court sits. *Roofing & Sheet Metal Services, Inc. v. La Quinta Motor Inns, Inc.*, 689 F.2d 982, 991 (11th Cir., 1982). The requirements of Fla.Stat.Ann. §770.01 have been held to apply in an action for libel brought in this District, under diversity jurisdiction. *Laney v. Knight-Ridder Newspapers, Inc.*, 532 F.Supp. 910, 911, n.2 (S.D. Fla., 1982) (King, J.).

This action, however, was initially brought in the District Court for the Northern District of Illinois. In an order dated March 18, 1985 (Docket Entry 32 in the Northern District of Illinois), Judge Marshall granted Defendants' motion, and directed that this action be transferred to this District, under 28 U.S.C. §1404(a). In *Van Dusen v. Barrack*, 376 U.S. 612 (1964), the Supreme Court held that where a defendant successfully obtains a transfer under Section 1404(a), the

transferee court must "apply the state law that would have been applied if there had been no change of venue." *Id.*, at 639; *Roofing & Sheet Metal Services, Inc.*, supra, at 991. This holding would seem to require this Court to follow and apply the law of the state of Illinois. In *Van Dusen*, however, the Court expressly left open the question of whether its holding in that case would apply "if it was contended that the transferor State would simply have dismissed the action on the ground of *forum non conveniens*." 376 U.S., at 640. This question is apparently still unsettled. See *Golden Eagle Distributing Corporation v. Burroughs Corporation*, 103 F.R.D. 124, 127 (N.D. Cal., 1984) (quoting, without discussion, a statement to this effect in a party's brief). This Court has found no reported opinion addressing this question.

It has been held that following a Section 1404(a) transfer from a district in which personal jurisdiction over the defendant could not be obtained, the transferee court must apply the law of the state in which the transferee court sits. *Roofing & Sheet Metal Services, Inc.*, supra, at 992; *Gonzalez v. Value of America Corporation*, 734 F.2d 1221, 1223 (7th Cir., 1984), *modified on other grounds*, 746 F.2d 1365 (7th Cir., 1985) (per curiam). The rationale behind this holding is that a plaintiff should not be permitted to abuse the holding of *Van Dusen* so as to obtain the application of the law of a state more favorable to his position. This Court believes that this rationale should also apply where the courts of the state in which the transferor court sits would have dismissed the action on the ground of *forum non conveniens*.

This Court must, therefore, determine whether the courts of the state of Illinois would have dismissed this action on those grounds, had this action been filed in those courts. The fact that the transferor court here did not dismiss this action on those grounds is, of course, not conclusive. The transferor District Court had the option of acting under Section 1404(a), a remedy not available to a state court. See *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1246–47 (5th Cir., 1983).

Without making an exhaustive analysis of the law of Illinois on this point, this Court believes that, for the reasons presented in Judge Marshall's order of transfer, the courts of the state of Illinois would have dismissed this libel action, brought by a plaintiff residing outside of Illinois against defendants publishing a newspaper in Florida, on the grounds of *forum non conveniens*, if not for lack of personal jurisdiction over Defendants. Cf. *Curtis Publishing Company v. Birdsong*, 360 F.2d 344 (5th Cir., 1966) (holding that the courts of the state of Alabama could not properly exercise jurisdiction over nonresident defendants in a libel action brought by a Mississippi plaintiff, even though the defendants' publication was distributed in Alabama).

[2] For the foregoing, this Court concludes that it must follow and apply the law of the state of Florida in this action, and that an affirmative defense premised on Fla.Stat.Ann. §770.01 is proper. This Court will deny the request (in paragraph 8 of the motion to strike) to strike Defendants' sixth affirmative defense. Furthermore, finding that Plaintiff has failed to properly allege compliance with the requirements of Section 770.01, this Court will dismiss this action unless Plaintiff promptly amends his complaint to include such an allegation.

It is a proper affirmative defense to assert that an allegedly defamatory statement was rendered as opinion or "fair comment" regarding a matter or person of public interest. *Curtis v. Robert Welch, Inc.*, supra, at 339–40; *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 [7 Med.L.Rptr. 1811] (Fla., 1st DCA, 1981), cert. denied 412 So.2d 465 (Fla., 1982). The determination of whether a statement is one of opinion, so as to not give rise to a cause of action for defamation, is a question of law. *Id.*, at 56-57. This determination is made from an examination of the statement, and the manner and context in which the statement was presented. *Smith v. Taylor Publishing Company, Inc.*, 443 So.2d 1042, 1047 (Fla., 1st DCA, 1983), citing *Information Control Corporation v. Genesis One Computer Corporation*, 611 F.2d 781, 784 (9th Cir., 1980). Upon reviewing the allegedly defamatory statements, as set forth in the complaint, this Court concludes that these statements were not presented as opinion, and would not be construed by a reasonably prudent reader as such. Rather, these statements were reported as fact. This Court will grant the request (in paragraph 9 of the motion to strike) to strike Defendants' seventh affirmative defense.

It is a proper affirmative defense, in an action for libel, for a defendant newspaper to assert that it merely reproduced, or republished, press dispatches from other generally recognized sources of news. *Layne v. Tribune Co.*, 108 Fla. 177, 146 So.234, 237 (1933); *Cardozo v. True*, 342 So.2d 1053, 1056 [2 Med.L.Rptr.

1635] (Fla. 2d DCA), cert. denied 353 So.2d 674 (Fla., 1977). Therefore, this Court will deny the request (in paragraph 11 of the motion to strike) to strike Defendants' thirteenth affirmative defense.

Because this Court has concluded that Plaintiff has, in his complaint, presented himself as a public figure, this Court will deny the request (in paragraph 12 of the motion to strike) to strike Defendants' fourteenth affirmative defense. That affirmative defense is a denial of one of the elements of proof of a claim for damages by a public figure.

This Court has noted a further defect in the complaint, in addition to the failure to allege compliance with the requirements of Fla.Stat.Ann. §770.01. To set forth a claim for defamation, a plaintiff must identify one or more particular persons to whom the allegedly defamatory statement was allegedly communicated. *Advantage Personnel Agency, Inc. v. Hicks & Grayson, Inc.*, 447 So.2d 330, 331 (Fla., 3d DCA, 1984). An allegation that an allegedly defamatory statement was made to "numerous third parties on numerous occasions" has been held to be insufficient. *Buckner v. Lower Florida Keys Hospital District*, 403 So.2d 1025, 1027–28 (Fla., 3d DCA, 1981), cert. denied 412 So.2d 463 (Fla., 1982).

[3] In his complaint, Plaintiff has not identified any third party as having actually read the allegedly defamatory statements published by Defendants, nor has Plaintiff even alleged that any third party did read these statements. Plaintiff alleges only that Defendants' newspaper "is disseminated within Cook County, Illinois, and throughout the world." To state a cause of action for libel, the complaint must name those who have read the allegedly libelous publication. *Malone v. Longo*, 463 F.Supp. 139, 144 (E.D.N.Y., 1979) (citing New York law). This Court will dismiss this action unless Plaintiff promptly amends his complaint to properly identify one or more persons as having allegedly read the allegedly defamatory statements.

Accordingly, it is ORDERED and ADJUDGED that the motion to strike, filed by Plaintiff on July 15, 1985 (Docket Entry 8), is hereby granted in part, and denied in part, as follow:

1. The requests to strike, made in paragraphs 1 through 8, inclusive, and in paragraphs 10 through 13, inclusive, of that motion, are denied.

2. The request to strike, made in paragraph 9 of that motion, is granted, and the seventh affirmative defense is stricken from the answer and affirmative defenses filed by Defendants on May 23, 1985 (Docket Entry 6).

It is further ORDERED and ADJUDGED that Plaintiff is hereby given leave to file an amended complaint (which would be his third amended complaint), properly alleging that Plaintiff has complied with the requirements of Fla.Stat.Ann. §770.01, and properly identifying one or more persons as having allegedly read the allegedly defamatory statements described in the complaint. In the event that Plaintiff fails to file such an amended complaint, with the Clerk of this Court, within fifteen (15) days of the date of this order, this action will stand dismissed as of this order, for the failure of the Plaintiff to allege all the elements of a claim for which this Court may grant relief.

---

## CATALFO v. JENSEN

### U.S. District Court
### District of New Hampshire

GINA MARIE CATALFO, ALFRED T. CATALFO, CAROLE JOANNE CATALFO, and ALFRED CATALFO, JR., v. JACK JENSEN, JON CRISPIN, BRAD EDMONDSON, and ITHACA TIMES, Nos. 85–588, 589, 590, 591-D, February 21, 1986

## REGULATION OF MEDIA CONTENT

### Defamation—Publication—In general (§11.031)

Freelance photographer who was responsible only for photographs accompanying allegedly defamatory newspaper article, who did not write or edit article, and who did not assist in writing of article, has not published, either directly or indirectly, allegedly defamatory statements, even though plaintiff's name appeared on article's byline.

---

Libel action against newspaper and individuals. On defendant Crispin's motion for summary judgment.

Granted.

# JEFFERSON v. WINNEBAGO COUNTY, ILLINOIS

### U.S. District Court
### Northern District of Illinois

GILES JEFFERSON v. WINNE-BAGO COUNTY, ILLINOIS, et al., No. 94 C 50151, March 2, 1995

## REGULATION OF MEDIA CONTENT

**1. Privacy — Common law right — In general (§ 13.01)**

**Liability for non-defamatory communication — In general (§ 14.01)**

Police department's placement of trace on telephones from which plaintiff probation officer called radio show to make comments critical of police department and judicial system did not violate plaintiff's privacy, since he had no legitimate expectation of privacy in location from which he made telephone call, which he voluntarily revealed to telephone company when he placed call; plaintiff failed to demonstrate causal connection between trace and alleged denial of his rights of free speech, petition, and association.

**2. Liability for non-defamatory communication — In general (§ 14.01)**

Plaintiff probation officer, who was dismissed after he called radio show and made comments critical of police department and judicial system, cannot prevail on his First Amendment claim against court services department, since balance between plaintiff's interest in expressing himself and defendant's interest in promoting public services it provides through probation officers weighs heavily in favor of plaintiff's termination.

**3. Privacy — Common law right — In general (§ 13.0101)**

Ninth Amendment does not provide independent cause of action for invasion of privacy.

**4. Liability for non-defamatory communication — In general (§ 14.01)**

Plaintiff probation officer, who was dismissed after he called radio talk show and made comments critical of police department and judicial system, did not state claim for conspiracy under 42 USC 1983, since he failed to allege class-based

animus on part of defendants or that defendants conspired to deprive him of his First Amendment rights.

**5. Defamation — Pre-trial procedures — Jurisdiction (§ 11.1203)**

Supplemental claims for intentional infliction of emotional distress, defamation, and false light that were brought against state employees in federal court in Illinois are dismisssed, since Illinois law requires actions arising out of state employee's breach of duty imposed on him solely by virtue of his employment to be brought in Illinois Court of Claims.

**6. Defamation — Defamatory content — Innocent construction (§ 11.0503)**

**Defamation — Defamatory content — Headlines (§ 11.0507)**

**Defamation — Privilege — Fair comment/opinion (§ 11.4502)**

Newspaper article about plaintiff probation officer's comments on call-in radio show that were critical of police department and judicial system, published under sub-heading "crime," was not defamatory under Illinois' innocent construction rule, since nothing in body of article suggests that plaintiff had engaged in criminal conduct, and since sub-heading merely refers to topic area that substance of plaintiff's phone calls concerned; editorial that called for plaintiff's termination was privileged opinion.

## ATTACHMENT / EXHIBIT

Action for violation of 42 USC 1983, libel, and invasion of privacy against county and newspaper defendants. On defendants' motion to dismiss.

Dismissed.

Jimmie L. Jones, of J.L. Jones & Associates, Chicago, Ill., for plaintiff.

Charles D. Tobin, assistant general counsel, Gannett Co. Inc., Arlington, Va., and Thomas D. Luchetti and Debra A. Delia, Rockford, Ill., for defendants Gannett Satellite Information Network Inc., d/b/a Rockford Register Star and Neal Justin.

*Full Text of Opinion*

## INTRODUCTION

Plaintiff, Giles Jefferson, filed a twelve-count complaint against defendants,

Winnebago County, Illinois, Donald Gasparini, the Winnebago County Sheriff (both individually and officially), C. Karl Ambroz, Director of Court Services (both individually and officially), Vincent Murphy, Chief Operating Office of Adult Probation and Deputy Director of Court Services (both individually and officially), Ron Parrett, Chief Operating Officer of Juvenile Probation and Deputy Director of Court Services (both individually and officially), Lynn Laney, Supervisor of Adult Probation (both individually and officially), the Rockford Register Star newspaper (Register Star), Neal Justin, and employee of the Register Star (both individually and officially), an unknown Register Star reporter (both individually and officially) and WROK-AM, a local radio station in Winnebago County (WROK). The complaint alleges a variety of federal constitutional and state tort claims against these various defendants arising out of plaintiff's on-air impersonation of a gang member while on duty as a probation officer and his subsequent termination from the probation division. Jurisdiction allegedly arises under 42 U.S.C. §§1981, 1983, 1985(3), 1988 and 1343 and under 28 U.S.C. §1331.[1] Venue is proper here as all complained-of-acts occurred in this division and district. All defendants have moved to dismiss the various counts against them.[2]

## FACTS

The following facts are from plaintiff's complaint and are taken as true for purposes of the motions to dismiss. On approximately July 27 or July 28, 1993, local and federal law enforcement officers arrested alleged members of a gang known as the Black Gangster Disciples. The arrest of the gang members "became the topic of conversation among the citizens" of Winnebago County. The topic was discussed in numerous public forums including talk radio, among which was a particular talk program on WROK.

On or about July 28, 1993, plaintiff, a probation officer in Winnebago County, called the talk program on WROK and identified himself as "George." Plaintiff, for about two and one-half hours, spoke about various subjects including gangs, drugs, the Rockford Police Department, the Rockford Chief of Police and the judicial system in the Seventeenth Judicial Circuit. During this conversation, plaintiff was extremely critical of Rockford's public officials, especially the Rockford Police Department and the Seventeenth Judicial Circuit judicial system.

While plaintiff was expressing his criticisms of Rockford's public officials over the air, Sheriff Gasparini, who was on the premises of WROK, authorized, or caused to be authorized, an "in-process trace of [plaintiff's] communication." According to the complaint, WROK never informed plaintiff or any of its callers that communications would be subject to an in-process trace nor did it request or obtain plaintiff's permission to do so. WROK granted or permitted access to devices or information which allowed the sheriff to conduct the trace.

Approximately one month later, on about August 20, 1993, Parrett, the chief operating officer of juvenile probation, and Laney, a supervisor of adult probation, confronted plaintiff and asked him if he was "George," the caller who "castigated and impugned the integrity" of the police department and the Seventeenth Judicial Circuit. To this, plaintiff responded "no comment."

Later, on September 21, 1993, plaintiff again called WROK, identified himself as "George" and "spoke about issues of public concern, including the arrest of alleged 'gang members' and the Rockford Police Department." Again, he was extremely critical of Rockford police officials and the Seventeenth Judicial Circuit. On or about September 23, Parrett and Laney again asked plaintiff whether he was "George," to which plaintiff again said "no comment."

Following this latter interrogation by Parrett and Laney, Ambroz, along with Murphy, summoned plaintiff to Ambroz's office. Ambroz and Murphy questioned plaintiff as to whether he was "George." Plaintiff refused to answer whether he was "George." Three days later, plaintiff was summoned to Ambroz's office where Ambroz and Murphy suspended plaintiff for fifteen days without explanation. Ambroz subsequently sent a letter to plaintiff which stated, in pertinent part:

---

[1] While not expressly alleged, jurisdiction for the state law claims arises under 28 U.S.C. §1367.

[2] Although plaintiff is represented by counsel, he has chosen to stand on the allegations of his complaint rather than file any response to the various motions to dismiss.

"That on July 28, 1993, you misrepresented yourself as a Black Gangster Disciple to a call-in program to WROK under the name of 'George', you castigated and impugned the integrity of the local police department and the local judicial system. On August 20, 1993, as you were suspected to be the caller by the staff and supervisors of the Probation Department, you were confronted by Supervisors Parrett and Laney as to your identity as 'George' in the two and a half hour call-in to WROK as well as to your simultaneous tardiness of a couple of hours on the same date. You categorically denied that you were 'George' or that you were the caller into WROK. You explained your tardiness on the premise of 'having a flat tire'.

On September 21, 1993, you once again called WROK as a gang member 'George'; this time from your work station and desk telephone at the Department. After approximately eight and a half minutes conversation with the host of WROK, Chris Bowman, you were interrupted in your call by a staff member and you broke off conversation with the radio station. On this particular occasion, you once again made once a mind and unfounded accusations about the Rockford Police Department's handling of [a] very sensitive case that was currently in the middle of a criminal trial, and you left no doubt that you had no respect for the judicial process. You did the aforementioned while you were on duty as an Officer of the Court. On September 21, 1993, at approximately 11:00 a.m., you were requested for a conference with myself and Division Heads Parrett and Murphy for the purpose of confronting you as the caller 'George' to WROK earlier in the day. You vehemently denied to the three of us that you were either 'George' or that you were the caller to WROK that day or any other time. On September 23, 1993, in a telephone conversation on this date to the Rockford Register Star reporter, Neal Justin, you admitted that you were the caller, 'George' and on the same day you also admitted to the radio host of WROK, Chris Bowman, that you and 'George' were one and the same.

On September 23, 1993, at approximately 11:20 p.m., you called my home and you apologized that you lied to me and the supervisors on September 21, 1993 and that you, in fact, were the caller 'George'. You asked as to your consequences resulting from the course of these events, and I advised you to be at your station on the following day and to be present for a conference."

The letter also advised plaintiff he would have a hearing October 4, 1993. At the hearing, neither Ambroz, Murphy, Parrett or Laney demonstrated or proved that plaintiff was negligent regarding his duties as an adult probation officer. These four defendants made it absolutely clear that each of them disapproved of plaintiff's comments regarding the police department and the judicial circuit. That disapproval was further demonstrated by a letter from Ambroz to plaintiff, dated October 8, 1993, which states, in pertinent part:

"You lied and violated the trust with your immediate Supervisor Laney and Parrett. Neither feels that hereafter they may trust you again with privileged or confidential information or even trust you with the day-to-day responsibilities of a Court Officer.

You have grievously damaged our Department's professional relationship with the Rockford Police Department and that your misconduct may have effectively undermined our professional relationship with all the law enforcement agencies of this community. You have permanently damaged our working relationship with the Winnebago County State's Attorney's Office by your conduct. The Adult Probation Department has been denied access to the State's Attorney's Office perceives as a breach of confidence and loss of trust between our two offices.

Your misconduct and your disrespectful and unfounded criticism of the criminal justice process in Winnebago County has severely compromised our relationship with the Courts. Because of your contemptuous statements of the judicial system, you have not only compromised our Department with the Courts but called into question the integrity of the Criminal Justice process vis-a-vis the general public.

You have grievously undermined the integrity of the judicial process. Your contumacious conduct has embarrassed the Court and its administration of justice and your conduct has derogated the Court's authority and dignity.

*Jefferson v. Winnebago County, Illinois*

Your false radio call-in conduct has called into question our Department's reputation with the general public and the agencies that our Department comes into contact with in the community. Your conduct has seriously damaged and discredited the reputation of the Court Services Department.

Finally, and perhaps most importantly, your position as a Probation Officer requires you to supervise probationers, insuring that these probationers comply with the orders of the Court and the laws of the state. To do this, you must be seen as a officer of the Court who commands the respect of the Court and also has respect for the Court. Given your public pronouncements, I cannot see how you could ever carry out the duties of your office or to instill in the probationers the requisite degree of respect for the rule of law that is required to discharge your duties as a Probation Officer or that you might ever command the respect of the Court."

It is further alleged that "[o]n information and belief, AMBROZ, MURPHY, PARRETT, and LANEY created a conspiracy on September 21, 1993." The object of that conspiracy was to deny plaintiff, either directly or indirectly, his First Amendment rights. Parrett, Laney, Ambroz and Murphy conspired with each other to invade plaintiff's privacy by asking him questions which had neither a direct or indirect relationship to his duties as a probation officer. They further acted in their conspiracy when they explicitly or implicitly approved plaintiff's suspension for exercising his First Amendment rights.

Also, on about September 24, 1993 and thereafter, Ambroz, Murphy, Parrett and Laney falsely told plaintiff that he was suspended and then discharged because he revealed confidential information based upon his position as a probation officer. Other court services employees were present when Ambroz, Murphy, Parrett and Laney told plaintiff he was discharged because he lied.

The Register Star publishes a daily newspaper distributed within Winnebago County. Justin and the unknown reporter were at all relevant times acting within the course and scope of their employment with the Register Star. On September 25, 1993, the Register Star published an article written by Justin entitled "OFFICER POSED AS GANGSTER." The article was located

under the sub-heading "CRIME" and contained a photograph of plaintiff. The article, which is attached to plaintiff's complaint, contains no reference to plaintiff being under investigation of, accused of or charged with any crime or criminal activity. The only reference to any illegal activity on the part of plaintiff is plaintiff's own statement that he did not believe his job was in jeopardy because he did not break any laws.

On an unknown date, the Register Star published an article by an unidentified author entitled "Dismiss 'George,' the faker." The article, also attached to plaintiff's complaint, states, among other things, "Good work, George — or Giles. You not only spilled confidential information gained through your position of authority, but you also put a problematic chill on relations between the police and the court agency for which you work."

Based on these foregoing allegations, plaintiff sets forth the following twelve counts against the various defendants.

## COUNT I (Sheriff Gasparini)

Plaintiff alleges that the Sheriff's authorization of the in-process trace of his first telephone call to WROK was designed to, and had the effect of, chilling, deterring, preventing and inhibiting plaintiff's right of free speech, petition and association as guaranteed by the First Amendment. The trace further directly interfered with plaintiff's right to speak out against public officials and upon topics of public interest. It is further alleged in this count that the trace invaded plaintiff's right of privacy under the First, Fourth, Ninth and Fourteenth Amendments.

## COUNT II (County)

It is alleged that the Sheriff was acting within his official capacity and the scope of his employment when he authorized the trace and therefore the County is liable in respondeat superior. The County established or should have established a policy regarding eavesdropping and electronic surveillance of citizens in accordance with Federal and State law and that the County failed to properly train and instruct the Sheriff regarding such policy. The County's failure to either establish a policy or train the Sheriff in regard thereto constituted negligence which resulted in a denial of plaintiff's

First Amendment rights of speech, petition and association.

### COUNT III (WROK)

It is alleged in this count that WROK relinquished to the Sheriff its control and authority over plaintiff's telephone call without plaintiff's permission or the proper judicial authorization, which resulted in chilling, deterring, preventing and inhibiting plaintiff's exercise of his First Amendment rights and directly interfered with his constitutional right to speak out against public officials and on topics of public interest. It is further alleged that because of WROK's acquiescence, plaintiff's right of privacy was violated.

### COUNT IV (Parrett and Laney)

Plaintiff alleges in Count IV that Laney's and Parrett's interrogation of him was designed to stifle and chill his rights of speech, petition and association under the First Amendment. It is further alleged their questioning was an intentional design and scheme to invade his privacy under the Ninth Amendment. Additionally, as a result of the questioning of plaintiff about matters unrelated to his duties as a probation officer, plaintiff lost his right to express his views regarding the political and racial climate within the judicial circuit as well as his livelihood and right to work in his chosen profession.

### COUNT V (Ambroz and Murphy)

Count V alleges that Ambroz and Murphy suspended plaintiff from exercising his right of free speech, petition and association and that such unlawful suspension created a chilling effect not only on plaintiff but on every County employee who "dares to speak out against its oppression." The suspension directly interfered with plaintiff's constitutional right to speak out against public officials and upon topics of public interest.

### COUNT VI (County)

Count VI seeks liability against the County for the conduct of Ambroz and Murphy under the same theory alleged in Count II in which he claims liability of the County based on the Sheriff's conduct.

### COUNT VII (Ambroz, Murphy, Parrett and Laney)

It is alleged in this count that these four defendants' termination of plaintiff for exercising his constitutional rights of free speech, petition and association clearly demonstrated a total and reckless disregard of plaintiff's right of free speech. This allegedly illegal termination of plaintiff deterred not only plaintiff but all County employees from speaking out against County oppression and directly interfered with plaintiff's right to speak out against public officials and upon topics of public interest.

### COUNT VIII (County)

This count alleges liability on the part of the County on the same basis alleged in Counts II and VI.

### COUNT IX (Ambroz, Murphy, Parrett and Laney)

Count IX alleges that these four defendants created a conspiracy, the object of which was to deprive plaintiff either directly or indirectly of his First Amendment rights and to invade his privacy. They furthered the conspiracy by suspending plaintiff for speaking out against the police department and other public officials within the judicial circuit. This conspiracy deterred plaintiff, as well as other citizens, from speaking out against public officials and also deprived plaintiff of his employment because he spoke out against the County and other public officials within the judicial circuit.

### COUNT X (Ambroz, Murphy, Parrett and Laney)

Plaintiff claims that the acts of these four defendants constitute intentional infliction of emotional distress in that they were done willfully, maliciously, outrageously, deliberately and purposely with the intent to inflict and cause plaintiff emotional distress and did in fact cause plaintiff severe and extreme emotional distress.

### COUNT XI (Ambroz, Murphy, Parrett and Laney)

In this count, plaintiff claims that these defendants falsely told him that he was suspended and then discharged be-

cause he lied and because he revealed confidential information. It is further alleged that other court services employees were present when these defendants informed plaintiff he was discharged because he lied. These defendants knew or should have known that this information was false and was made without reasonably adequate investigation. These false statements injured plaintiff's reputation among his friends, coworkers and potential employers within the law enforcement community and caused severe emotional distress, humiliation and embarrassment. It is also alleged that "[o]n information and belief," some, if not all, potential employers of plaintiff's contacted the County and/or Ambroz and the County and/or Ambroz restated the false and defamatory statements alleged in this count and that the potential employers, understanding the statements as defamatory, decided not to hire plaintiff because of the statements.

## COUNT XII (Register Star, Justin and Unknown Reporter)

In Count XII, plaintiff alleges that the article entitled "OFFICER POSED AS GANGSTER", under the subheading "CRIME", falsely implied that plaintiff committed a criminal act and, thus, defamed him and placed him in a false light before the public. He further alleges that the article captioned "Dismiss 'George,' the faker" contained false and defamatory statements attributable to him and, further, placed him in a false light.

## DISCUSSION

In considering defendants' motions to dismiss, the court accepts as true the well-pleaded allegations of the complaint and the inferences that may reasonably be drawn from those allegations. *Palda v. General Dynamics Corp.*, No. 93 C 7323, slip op. at 3 (7th Cir. Feb. 10, 1995). Complaints are to be read liberally, and this court may grant a Rule 12(b)(6) motion only if it is beyond doubt that the non-movant can plead no facts that would support his claim for relief. *Palda*, slip op. at 4.

### I. Sheriff Gasparini

The Sheriff contends that Count I should be dismissed because an in-process telephone trace does not implicate any privacy interest the invasion of which would subject the Sheriff to liability. The Sheriff also argues that plaintiff has failed to allege in Count I that any trace of his call was actually made and that he suffered an actual injury that directly resulted from the Sheriff's conduct.

In *Smith v. Maryland*, 442 U.S. 735, 745 (1979), the Supreme Court held that there is no legitimate expectation of privacy in the telephone numbers a party dials, and, therefore, a pen register does not constitute a search. The court in *Smith* did not, however, address the issue of whether a telephone trace implicates any legitimate expectation of privacy.[3] Because this court does not consider a pen register and a telephone trace to be conceptually different in the privacy context, it considers the telephone trace to implicate no more of a privacy interest than does the pen register addressed in *Smith*.

[1] The trace, like the pen register, does not reveal the content of any telephone conversation. *Cf. United States v. New York Tele. Co.*, 434 U.S. 159, 166-67 (1977) (pen registers do not acquire contents of telephone communications), *Ivey v. Haney*, No. 94–2839, 1995 U.S. App. LEXIS 1273, at *8 (7th Cir. Jan. 23, 1995) (pen register intercepts only numbers dialed and not content of phone conversations). Rather, it merely identifies the source of a particular call. Just as in the pen register situation, when a party uses his telephone, he voluntarily conveys numerical information to the telephone company and exposes that information to the telephone company's equipment in the ordinary course of

---

[3] The terms pen register and trace are defined in the federal statute governing their use. *See* 18 U.S.C. §§3127(3) & (4). In that context, a pen register is defined as "a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached." 18 U.S.C. §3127(3). A "trap and trace device" is "a device which captures the incoming electronic or other impulses which identify the originating number of an instrument or device from which a wire or electronic communication was transmitted." 18 U.S.C. §3127(4). In other words, a pen register identifies what numbers were dialed from a subject telephone whereas a trace identifies from where a particular call is being made. *See In re Application of the United States of America for an Order Authorizing the Installation of a Pen Register*, 610 F.2d 1148, 1152–53 (3d Cir. 1979).

business. *Cf. Smith*, 442 U.S at 744. Thus, when a party chooses to place a telephone call from a particular location, he voluntarily reveals the location of the call to the telephone company. Having done so, there can be no legitimate expectation of privacy in that information. Hence, absent any legitimate expectation of privacy, plaintiff cannot base a claim of invasion of privacy under 42 U.S.C. §1983 on the Sheriff's authorization of an in-process trace of plaintiff's telephone call to WROK. Therefore, the court grants the Sheriff's motion to dismiss Count I to the extent it seeks relief based on an invasion of privacy.

Plaintiff also claims in Count I that he was denied his rights of free speech, petition and association as a result of the Sheriff's authorization of the telephone trace. Curiously, the Sheriff's motion to dismiss is silent as to this claim. Nonetheless, the court dismisses Count I in this regard as well. Count I does not allege any causal connection between the trace and a denial of plaintiff's First Amendment rights. In fact, according to the allegations, plaintiff had no knowledge of the trace until some time after his on air discussions. Those two conversations were, as alleged, unimpeded by the trace. Nor has plaintiff alleged that the ˙ ˙re resulted in him foregoing any fu˙ ture First Amendment activity. Absent such allegations, plaintiff's First Amendment claim based on the trace fails.

## II. The County

The County contends that Count II, which attributes to it the conduct of the Sheriff, should be dismissed for the same reasons raised as to Count I. The County further argues that no liability may be attributed to it based on the conduct of Ambroz, Murphy, Parrett and Laney (Counts VI, VIII, IX, X and XI), because those defendants, as state — not county — employees, cannot have carried out any policy or custom of the County or have been policymakers for the County.

Count II seeks liability on the part of the County based in part on the conduct of the Sheriff. In that regard it is alleged that the County is "liable in respondeat superior." Count II also claims that the County was negligent in its failure to establish policies regarding eavesdropping and electronic surveillance and, to the extent it did have such a policy negligent because of its failure to properly

train and instruct the Sheriff regarding such policy.

First, to the extent Count II seeks liability against the County based on respondeat superior, it is dismissed. It is well-settled that there is no cause of action for respondeat superior liability against a municipality under section 1983. *Thompson v. Boggs*, 33 F.3d 847, 859 n.11 (7th Cir. 1994) (citing *Monell v. New York City Dept. Social Serv.*, 436 U.S 658, 694–95 (1978) ).

Although the County has not sought dismissal of that portion of Count II alleging direct liability based on the County's negligence, the court dismisses that part of Count II as well. The County has no authority over the Sheriff and, hence, has no responsibility for the training and supervision of the Sheriff. *See Ryan v. County of DuPage*, No. 93–3893, 1995 U.S. App. LEXIS 1019, at * 3 (7th Cir. Jan. 19, 1995) (citing *Thompson v. Duke*, 882 F.2d 1180, 1187 (7th Cir. 1989) ); *see also Estate of Drayton v. Nelson*, No. 94–2217, 1994 U.S. App. LEXIS 36445, at * 5–6 (7th Cir. Dec. 27, 1994) (under Indiana law, county cannot be blamed for any deficiency in training or supervision of deputy sheriffs as county has no authority over the sheriff).[4]

---

[4] Of ˙ ˙rse pleading a negligent violation of the First Amendment via §1983 does present the interesting issue of whether a negligence claim is maintainable under §1983. The Supreme Court, while not providing a comprehensive answer to the general question, has stated §1983 contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right. *Daniels v. Williams*, 474 U.S. 327, 329–30 (1986). Thus, depending on the particular constitutional right, merely negligent conduct may not be enough to state a claim. *Id.* at 330.

In the First Amendment context, the Supreme Court has not clearly defined the state-of-mind requirement necessary to plead a §1983 claim. In *Procunier v. Navarette*, 434 U.S. 555, 566 n.14 (1978), a First Amendment case arising in the prison mail context, the Court expressly avoided the issue of negligent deprivation because of its alternative disposition on immunity grounds. Recently, in *Waters v. Churchill*, 114 S. Ct. 1878 (1994), the Supreme Court effectively converted the government employer's First Amendment liability with respect to "public concern" speech from liability for intentional wrong to liability for mere negligence. 114 S. Ct. at 1895 (Scalia, J., concurring) (characterizing the plurality opinion as creating a negligence standard in this First Amendment context). Assuming *Waters* does create a negligence standard for a §1983 claim based on "public

Turning to the County's contention concerning Ambroz, Murphy, Parrett and Laney, Count VI alleges liability against the County based on the conduct of Ambroz and Murphy. Counts VIII, IX, X and XI also claim liability against the County based on the conduct of all four of these defendants. The County maintains it cannot be held liable for the conduct of these four defendants because, as probation officers assigned to court services, they are state, not county, employees.

The Illinois Supreme Court has held, in the labor law context, that the state, not the county, is the sole employer of all court employees. *Orenic v. Illinois State Labor Relations Bd.*, 127 Ill.2d 453, 537 N.E.2d 784, 795 (1989).[5] Furthermore, one Illinois Appellate Court has considered juvenile probation officers to be state employees under the *Orenic* case. *AFSCME v. Chief Judge of the Circuit Court of Cook County*, 209 Ill.App.3d 283, 568 N.E.2d 139, 143 (1st Dist. 1991). Consequently, this court finds Ambroz, Murphy, Parrett and Laney to be state, not county, employees. As such, their conduct cannot be attributable to the County under section 1983. The court therefore dismisses Counts VI, VIII, IX, X and XI to the extent those counts name the County and are based on the conduct of Ambroz, Murphy, Parrett or Laney.

### III. COUNT III (WROK)

WROK seeks dismissal of Count III to the extent it claims an invasion of privacy based on the telephone trace because it fails to identify any privacy interest violated by WROK.

Count III is, at the very least, a prime example of vague, ambiguous and disjointed pleading. While it refers to the First Amendment in paragraphs 66 and 67, it also alleges in paragraph 68 that defendant's "right to privacy was violated" and only seeks relief "for the illegal, and unauthorized invasion of his privacy." The court therefore interprets Count III as only alleging a claim for invasion of privacy. In that regard, Count III is deficient because it fails to allege the source of the privacy interest and how WROK interfered with such a right. To the extent the alleged invasion of privacy is premised on the telephone trace, that theory is insufficient to state a claim for the same reasons this court granted the Sheriff's motion to dismiss Count I in that regard. Thus, the court dismisses Count III of plaintiff's complaint.

### IV. Ambroz, Murphy, Parrett and Laney[6]

These defendants contend that Counts IV, V and VII should be dismissed because the state's interest in promoting the efficient operation of its probation services outweighs any of plaintiff's free speech rights as a state employee. They also assert that Count IV's Ninth Amendment claim should also be dismissed because a civil rights action cannot be premised upon the Ninth Amendment. It is further argued that Count IX should be dismissed because plaintiff has not properly alleged a conspiracy or that the conspiracy was based on any racial or class-based animus. Lastly, as to plaintiff's state-law claims (Counts X and XI), these defendants urge dismissal because (1) the federal claims against them should be dismissed and therefore supplemental jurisdiction should not be exercised; (2) the sole court where such state tort actions may be brought is in the Illinois Court of Claims; (3) Count X fails to state a cause of action for defamation under Illinois law because it fails to precisely plead the language called to be defamatory; and (4) Count XI fails to plead a cause of action for intentional infliction of emotional distress under Illinois law.[7]

---

concern" speech, such standard may not apply here as Count II is unclear as to whether it is premised on "public concern" speech.

[5] The Seventh Circuit has interpreted the holding in *Orenic* not to be limited to collective bargaining under state labor law. *See Warren v. Stone*, 958 F.2d 1419, 1423 and n.4 (7th Cir. 1992).

[6] The court notes at the outset that under Illinois law these four defendants are considered state employees. *See* Section II., *supra*. As such, the Eleventh Amendment bars suit against them in their official capacities as plaintiff seeks monetary damages. *See Estate of Porter v. State of Illinois*, 36 F.3d 684, 690 (7th Cir. 1994) (Eleventh Amendment immunizes state employees from suit in their official capacities where retrospective relief is sought). Accordingly, this court dismisses all claims against Ambroz, Murphy, Parrett and Laney in their official capacities.

[7] Although plaintiff has not filed a response to defendants' motions to dismiss, these four defendants have chosen to file a "reply." The "reply" does not raise any new arguments (although it reinforces some old


A. First Amendment Claims (Counts IV, V and VII)

The Federal Rules of Civil Procedure do not require that a complaint describe the alleged wrongdoing of which it complains with any particularity. If a plaintiff does plead particulars, and they show he has no claim, however, he has pleaded himself out of court. *Thomas v. Farley*, 31 F.3d 557, 558–59 (7th Cir. 1994). A plaintiff is not saved by pleading a legal conclusion, if such conclusion is inconsistent with the pleaded facts. *Id.* at 559.

In the present case, plaintiff has opted to plead with extensive particularity as to the circumstances surrounding his First Amendment claims. He has identified the nature of the speech for which he claims protection as well as the particular reasons upon which these defendants based their suspension and termination decision. Thus, the court may, at this stage of the proceeding, rule as a matter of law whether plaintiff, assuming he can prove all factual allegations of his complaint, could prevail on his First Amendment claims against these four defendants.[8]

The Supreme Court has recently spoken on the issue of when speech by a government employee is protected by the First Amendment. *See Waters v. Churchill*, 114 S. Ct. 1878 (1994). For such speech to be protected, it must be on a matter of public concern,[9] and the employee's interest in expressing himself on this matter must not be outweighed by any injury the speech could cause to the government employer's interest in promoting the public services it performs through its employees. *Id.* at 1884. As to the weight to be given to the government employer's interest, such an interest is far broader than when the government acts as sovereign. *Id.* at 1886. Thus, a court may decide, as a matter of law, whether the potential disruptiveness is enough to outweigh whatever First Amendment value the speech might have. *Id.* at 1891.

In the present case, plaintiff alleges that while employed as a probation officer he telephoned WROK and spoke on the air for about two and one-half hours. In doing so, he falsely identified himself. During his time on the air, plaintiff spoke about various subjects including gangs, drugs, the Rockford police department, the chief of police and the judicial system in the Seventeenth Judicial Circuit. He was extremely critical of Rockford's public officials, especially the police department and the judicial system. On a later date, plaintiff again telephoned WROK and spoke on the air about issues of public concern, including the arrest of alleged gang members and the Rockford police department. He was again also extremely critical of Rockford's public officials, as well as the Seventeenth Judicial Circuit.

As for the four defendants' roles, both Parrett and Laney confronted plaintiff on two occasions and interrogated him as to whether he was the "George" that telephoned the radio station and made the comments. Ambroz and Murphy also interrogated plaintiff as to his involvement in the radio talk show. Three days later, Ambroz and Murphy suspended plaintiff, without immediate explanation, for fifteen days.

Sometime later, Ambroz sent a letter to plaintiff regarding his concerns about

ones) other than noting that this court can grant these defendants' motion to dismiss under Local Rule 7.11 because of plaintiff's failure to file a response. While Local Rule 12P does allow the court, either sua sponte or upon motion, to grant a motion to dismiss for failure to file an answering memorandum, such authority is discretionary. The court declines to grant the motion to dismiss on this basis.

The court notes at this point, however, that plaintiff operates under a distinct handicap by not filing a written response to the motions to dismiss. Moreover, briefing is designed, in part, to assist the court in its consideration of a motion. Plaintiff's complaint in this case is not so clear and well-structured as to be safely relied upon without any briefing. There are many issues that have been raised by the motions to dismiss, the consideration of which would benefit by full, adversarial briefing.

[8] The complaint sets forth significant portions of two letters sent by Ambroz to plaintiff, one concerning plaintiff's suspension and one concerning plaintiff's termination. These letters explain, with some detail, the reasons for the negative employment actions taken in response to plaintiff's speech. Defendants have included as exhibits with their motion to dismiss the letters in their entirety. The court will consider the letters in their entirety as they are referred to in the complaint and are central to plaintiff's claim. *See Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994) (citing *Venture*

*Assoc. v. Zenith Data Sys.*, 987 F.2d 429, 431 (7th Cir. 1993)).

[9] Defendants concede for the purposes of their motion, citing *Glass v. Dachel*, 2 F.3d 733, 744 (7th Cir. 1993), that the alleged speech involved a matter of public concern.

*Jefferson v. Winnebago County, Illinois*

plaintiff's conduct while in the employ of court services. This letter states, in pertinent part, that plaintiff, while misrepresenting himself as a gang member, castigated and impugned the integrity of the local police department and judicial system. According to the letter, plaintiff, who was suspected to be the caller by staff and supervisors, categorically denied that he was the caller when confronted by Parrett and Laney. The letter also notes that plaintiff was tardy from work during the same time period as the two and one-half hour call-in, which tardiness he explained on the basis of having a flat tire. The letter further states that the second call was made from plaintiff's work station and desk telephone. On this latter occasion, plaintiff made unwarranted and unfounded accusations about the police department's handling of a very sensitive case that was in trial during the call. Plaintiff was on duty when he made this latter call to WROK. Plaintiff later admitted to Ambroz that he lied when he earlier denied being "George" and making the telephone call.

Ambroz sent a second letter to plaintiff which states, in relevant part, that plaintiff "lied and violated the trust" of his immediate supervisors (Laney and Parrett) and that neither feels that they can trust plaintiff with privileged or confidential information or with the daily responsibilities of a probation officer. This letter also states that plaintiff "grievously damaged [the court services department's] professional relationship with the Rockford Police Department, perhaps permanently." Ambroz further expresses his fear that the damage might extend beyond the police department and that plaintiff's misconduct might have effectively undermined the court services department's professional relationship with all law enforcement agencies in the community. It is further explained that plaintiff has permanently damaged the court services department's relationship with the Winnebago County State's Attorney's Office and that adult probation has been denied access to the state's attorney's office files because of its perceived breach of confidence and loss of trust between the two offices. Furthermore, Ambroz notes that plaintiff's misconduct and disrespectful and unfounded criticism of the criminal justice process in the county severely compromised the court services department's relationship with the courts. It is further stated that plaintiff's conduct called into question

the department's reputation with the general public and the agencies that come in contact with the department. "Finally, and perhaps most importantly," the letter explains, "[g]iven your public pronouncements, I cannot see how you could ever carry out the duties of your office or to instill in probationers the requisite degree of respect for the rule of law that is required to discharge your duties as a Probation Officer or that you might ever command the respect of the court."

[2] Clearly, the balance between plaintiff's interest in expressing himself and the court services department's interest in promoting the public services it provides through its probation officers weighs heavily in favor of plaintiff's termination. It is nearly indisputable that the degree of public criticism leveled by plaintiff would result in a breach of trust and confidence between plaintiff and the probation department and the other criminal justice agencies who interact with the department. Likewise, plaintiff's superiors' concerns about the department's relationship with these other agencies in the aftermath of plaintiff's diatribe were justified. Moreover, the fact that plaintiff lied to his superiors did nothing to foster a trusting, confidential relationship between them and plaintiff. The court considers the position of probation officer to be one particularly implicating confidentiality between the probation officer and other agencies, between the officer and his superiors and between the officer and his charges. Once that confidentiality is breached, it is difficult to perceive of a probation officer properly carrying out the duties of his office. Furthermore, plaintiff's conduct not only damaged his confidential relationships, it also implicated the relationships of the department as a whole.

Under the facts as alleged, the court finds, as a matter of law, that plaintiff could not prevail on his First Amendment counts as set forth in Counts IV, V and VII. Thus, the court grants the motion to dismiss as to Counts V and VII in their entirety and Count IV to the extent it alleges a First Amendment claim.[10]

---

[10] In dismissing Counts V and VII in their entirety, the court notes that each of these two counts contains a single reference to an "illegal and unauthorized invasion of [plaintiff's] privacy" in their prayers for relief. Each count is otherwise devoid of any allegation concerning a privacy claim. Thus, the court does not consider plaintiff to be raising

### B. Ninth Amendment Claim (Count IV)

Unlike Counts V and VII, Count IV alleges that Parrett and Laney's questioning of plaintiff was an intentional design and scheme to invade his privacy, contrary to the Ninth Amendment. According to Count IV, as a direct result of this questioning of plaintiff about matters totally unrelated to his duties as an adult probation officer, plaintiff's privacy was invaded. Defendants contend plaintiff's claim based on the Ninth Amendment must be dismissed because: (1) the Ninth Amendment is not incorporated through the Fourteenth Amendment; and (2) the Ninth Amendment has never been recognized as independently securing any constitutional right for purposes of a civil rights claim.

The Ninth Amendment has never been recognized as independently securing any constitutional right for purposes of pursuing a civil rights claim. *Olzinski v. Maciona*, 714 F.Supp. 401, 410 (E.D. Wis. 1989) (citing cases). No specific right is protected by the Ninth Amendment. *Quilici v. Village of Morton Grove*, 695 F.2d 261, 271 (7th Cir. 1982), *cert denied*, 464 U.S. 863 (1983). As such, a claim based solely on alleged Ninth Amendment rights must fail because there are no constitutional rights embodied in that amendment. *Gibson v. Matthews*, 926 F.2d 532, 537 (7th Cir. 1991). The Ninth Amendment was added to the Bill of Rights to ensure that no fundamental right would be denied merely because it was not specifically enumerated in the Constitution. *Id.*

[3] Here, plaintiff seeks to allege an independent claim of invasion of privacy via the Ninth Amendment. This he cannot do. While the right of privacy exists in the Constitutions, as well as in state law, it does not emanate from the Ninth Amendment. Hence, the court dismisses Count IV in its entirety.

### C. Conspiracy Claim (Count IX)

These defendants contend that Count IX should be dismissed because plaintiff has failed to allege any class-based ani-

---

mus on their part and because he has not adequately alleged a conspiracy.[11]

Count IX alleges, upon information and belief, that Ambroz, Murphy, Parrett and Laney created a conspiracy on about September 21, 1993, the object of which was to deprive plaintiff, either directly or indirectly, of his First Amendment rights. It is further alleged that these defendants acted in furtherance of their conspiracy when each of them explicitly or implicitly approved plaintiff's suspension for exercising his First Amendment rights. The conspiracy deprived plaintiff of his constitutional right to speak out against the County and public officials.

In a section 1983 action alleging a conspiratorial deprivation of constitutional rights, a plaintiff must demonstrate that the alleged conspirators reached an understanding to deny the plaintiff his constitutional rights. *House v. Belford*, 956 F.2d 711, 721 (7th Cir. 1992). While a conspiracy may be demonstrated by circumstantial evidence, mere conclusional allegations of a conspiracy are insufficient to withstand a motion to dismiss. *Id.*

[4] Plaintiff here must allege that these defendants somehow reached an understanding to deny him his constitutional rights. He has not done so. He has only conclusionally alleged that they "created a conspiracy." Consequently, the court dismisses Count IX as failing to state a claim of conspiracy under section 1983.

### D. Supplemental State Claims (Count X and XI)

---

[11] While paragraph four of plaintiff's complaint refers to 42 U.S.C. §§1981 and 1985(3) as jurisdictional bases for plaintiff's claims, the complaint nowhere else mentions these two provisions. Thus, the court does not consider Count IX, or any other count, to allege a claim based on either §1981 or §1985(3). Even if Count IX was substantively premised on either §1981 or §1985(3), the court would dismiss it on those bases as it does not contain the requisite allegations of class-based animus, *see D'Amato v. Wisconsin Gas Co.*, 760 F.2d 1474, 1485–86 (7th Cir. 1985) (plaintiff must establish some class-based animus behind conspirators' actions) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)), or race-based animus, *see Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir. 1984) (plaintiff cannot maintain §1981 action absent allegation of racial animus).

---

an invasion of privacy claim, constitutional or otherwise, in either Count V or Count VII.

*Jefferson v. Winnebago County, Illinois*

While defendants raise several arguments for dismissal of Counts X and XI, the court finds one contention particularly persuasive. Plaintiff seeks relief in Count X for the tort of intentional infliction of emotional distress and in Count XI for the torts of defamation and false light invasion of privacy. These are purely state law claims brought here via supplemental jurisdiction. As such, this court must strictly adhere to Illinois law. *See Subacz v. Witkowski*, No. 92 C 20025, 1993 U.S. Dist. LEXIS 18402, at * 15 (N.D. Ill. Dec. 27, 1993). In doing so, the court must apply the Illinois Supreme Court's view of when the sovereign immunity doctrine applies to a state official sued in his individual capacity. *Id.* at * 15–16; *see also Benning v. Board of Regents of Regency Univ.*, 928 F.2d 775, 779 (7th Cir. 1991) (in diversity case, state law claims against individuals acting in scope of their employment are actionable only in court of claims).

[5] The Illinois Supreme Court has stated that where the tortious conduct "arose out of the State employee's breach of a duty that is imposed on him solely by virtue of his State employment, sovereign immunity will bar maintenance of the action" in any court other than the Court of Claims. *Subacz*, at * 16 (quoting *Currie v. Lao*, 148 Ill.2d 151, 592 N.E.2d 977, 170, Ill. Dec. 297, 300 (1992) ). Here, the allegations of intentional infliction of emotional distress, defamation and false light privacy arose out of these defendants' performance of their official duties, to supervise plaintiff as an adult probation officer. Thus, because the claims in Counts X and XI may only be brought against these four defendants in the Illinois Court of Claims, this court dismisses Counts X and Count XI in their entirety.[12]

## V. Register Star and Justin (Count XII)

Count XII is premised on two articles appearing in the Register Star, one being a report concerning plaintiff's telephone call to WROK and another an editorial calling for plaintiff's termination due to his making the call. Plaintiff alleges these two articles defamed him and placed him in a false light under Illinois law. The Register Star and Justin contend that Count XII should be dismissed because the articles are subject to the innocent construction rule, are covered by the fair reporting privilege and are nonactionable opinions.

### A. The News Report

The court considers the report to be nonactionable under the innocent construction rule. Illinois adheres to the modified innocent construction rule in defamation cases. *Mittelman v. Witous*, 135 Ill.2d 220, 552 N.E.2d 973, 979 (1989). That rule, as first announced in *Chapski v. Copley Press*, 92 Ill.2d 344, 442 N.E.2d 195 [8 Med.L.Rptr. 2403] (1982), states that "[a] written or oral statement is to be considered in context, with the words and the implications given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Mittelman*, 552 N.E.2d at 979 (quoting *Chapski*, 442 N.E.2d at 199).[13] The rigorous standard of the modified innocent construction rule favors defendants in *per se* actions, in that a nondefamatory interpretation must be adopted if it is reasonable.[14]

[6] In the present case, the news report is subject to a reasonable, nondefamatory interpretation. It is nothing more than a discussion of plaintiff's involvement in making the telephone calls to WROK and the probation department's reaction to plaintiff's conduct. While the report

---

[12] The court, earlier in this order, dismissed Count X as to the County.

[13] While the innocent construction rule applies to *per se* defamation actions only, *see Mittelman*, 552 N.E.2d at 979, plaintiff's claim here is in fact one of *per se* defamation as he claims the report falsely accuses him of criminal activity.

[14] The question of whether an alleged defamatory statement is nonactionable under the innocent construction rule is, under Illinois law, a question of law to be decided by the court. *Chapski*, 442 N.E.2d at 199. As the Seventh Circuit, without comment, has applied this Illinois rule of decision to defamation actions in diversity cases, *see Babb v. Minder*, 806 F.2d 749, 757 and n.3 (7th Cir. 1986), so will this court, *but see Desnick v. ABC, Inc.*, No. 94–2399, 1995 U.S. App. LEXIS 454, at *8–9 [23 Med.L.Rptr. 1161] (7th Cir. Jan. 10, 1995) (suggesting, but not deciding, that application of the Illinois rule in federal court may not be proper as it affects control of the jury and appellate review rather than purely substantive issues).

has a subheading "CRIME," nothing in the body of the article suggests that plaintiff had engaged in criminal conduct. The subheading alone can reasonably be read simply to refer to the topic area which the substance of plaintiff's phone calls to WROK concerned. When viewed in its entirety, the article may reasonably be interpreted as nondefamatory, notwithstanding the singular reference to crime in its subheading. Thus, plaintiff cannot maintain a defamation action under Illinois law based on the news report.

### B. The Editorial

The court also finds the editorial to be nonactionable under the innocent construction rule. When read in its entirety, the editorial is subject to a reasonable, nondefamatory meaning. Moreover, the court does not consider the editorial to be defamatory at all. Under Illinois law, it is not necessary to consider reasonable, nondefamatory constructions of a statement that are not reasonably capable of the defamatory meaning ascribed to it. *Mittelman*, 552 N.E.2d at 979. There are simply no defamatory statements in the editorial. Furthermore, the court considers the editorial to be nothing more than an expression of opinion, not actionable under Illinois law. *See Mittelman*, 552 N.E.2d at 982–84. While the editorial does contain statements of fact, none of those are defamatory. The remaining statements are merely expressions of opinion as to what plaintiff did and what should happen to him as a result. Such opinions, not being capable of falsity, are not subject to defamation. *Id.* at 983 (citing Restatement (Second) of Torts §558 (1977) ). Therefore, plaintiff cannot maintain a defamation action based on the editorial. The court, therefore, dismisses Count XII in its entirety.[15]

---

[15] In dismissing Count XII in its entirety, the court recognizes that plaintiff is also claiming false light invasion of privacy in Count XII based on the news report and the editorial. However, under Illinois law, the innocent construction rule and the defense of opinion apply equally to false light claims. *See Harte v. Chicago Council of Lawyers*, 220 Ill. App. 3d 255, 581 N.E.2d 275, 280 (1st Dist. 1991); *Schaffer v. Zekman*, 196 Ill. App. 3d 727, 554 N.E.2d 988, 993 n.2 [17 Med.L.Rptr. 1931] (1st Dist. 1990).

### CONCLUSION

For the foregoing reasons, the court dismisses Counts II, III, IV, V, VI, VII, VIII, X, XI and XII in their entirety and with prejudice. Count IX is dismissed in its entirety without prejudice. Count I is dismissed with prejudice as to the claim for invasion of privacy and without prejudice as to the First Amendment claim. Plaintiff is given leave to file an amended complaint, within 21 days of the date of this order,[16] as to the First Amendment portion of Count I and all of Count IX. Failure to file an amended complaint within 21 days will result in dismissal of Counts I and IX with prejudice and without further notice, and the entire cause will be dismissed.

---

# CORPORATE TRAINING UNLIMITED INC. v. NBC INC.

### U.S. District Court
### Eastern District of New York

CORPORATE TRAINING UNLIMITED INC., DONALD M. FEENEY JR., and JUDY G. FEENEY, v. NATIONAL BROADCASTING COMPANY INC., No. 93-CV-4756 (RJD), December 1, 1994

## REGULATION OF MEDIA CONTENT

### 1. Defamation — Defamatory content — In general (§11.0501)

Plaintiff "child rescue" corporation stated libel claim against network, based on news magazine broadcast referring to plaintiff as "commando group" and individual plaintiff as "Rambo," and which raised questions about group's finances, since broadcast contained references which, when considered in full context, are reasonably susceptible of defamatory meaning.

---

[16] In granting leave to amend as to a portion of Count I and all of Count IX, the court is not indicating any definitive view on the merits of those potential claims. It is, however, at this stage of the proceedings, difficult to conceive of a First Amendment claim based on the trace. Similarly, plaintiff must carefully evaluate his decision to or attempt to allege a conspiracy as to Ambroz, Laney, Parrett and Murphy.

# WEINSTEIN v. FRIEDMAN

## U.S. District Court
## Southern District of New York

JOSHUA WEINSTEIN v. ROBERT FRIEDMAN, et al., No. 94 Civ. 6803 (LAP), March 26, 1996

## REGULATION OF MEDIA CONTENT

**1. Defamation — Choice of law (§11.15)**

Federal district court in Pennsylvania did not err by finding that libel and invasion of privacy plaintiff is neither Pennsylvania domiciliary nor resident; plaintiff has established new domicile in Israel, in light of his physical presence in Israel and his intent to remain there; New York, not Pennsylvania, law applies to plaintiff's action against book author, publisher, and newspaper, since New York has greater interest in and possesses most significant relationship with dispute.

**2. Defamation — Defamatory content — In general (§11.0501)**

**Defamation — Defamatory content — "Of and concerning" (§11.0502)**

Book author's statements, which were excerpted in newspaper, that plaintiff did not participate in and disapproved of drinking games at his university, that he worked on government research projects as engineering student, that he was involved in fantasy-oriented and war simulation games, and that he was part of West Bank settlement movement, are not capable of defamatory meaning; plaintiff failed to demonstrate that author's statements about influence of militant rabbi on students was "of and concerning" plaintiff; publications as whole are not defamatory.

**3. Defamation — Defamatory content — In general (§11.0501)**

**Defamation — Defamatory content — Headlines (§11.0507)**

Book author's statements, which were excerpted in newspaper, about militant rabbi's views, which plaintiff claims were intended to portray plaintiff as having distorted, perverse, and dangerous views of others, cannot be read by reasonable reader as expressing or implying any facts about plaintiff; although rabbi's

statement that "some of them come from troubled homes" could be interpreted as stating facts about plaintiff, statement did not defame plaintiff; headline of excerpt, "Rule by the Best. Yuppie Settlers from Princeton Play Napoleon on the West Bank," constitutes protected rhetorical hyperbole.

**4. Privacy — Common law right — Public disclosure of private facts (§13.0103)**

**Privacy — Common law right — False light publicity (§13.0104)**

**Privacy — Statutory right to privacy — State statutory protections — New York Civil Rights Law (Sections 50 and 51) (§13.0502.02)**

Plaintiff's cause of action for invasion of privacy against book author, publisher, and newspaper is dismissed, since New York does not recognize claim for private facts or false light invasion of privacy under common law, and since plaintiff failed to state cause of action for commercial misappropriation under New York Civil Rights Law Sections 50 and 51.

DEFENDANT / EXHIBIT

Action for defamation and invasion of privacy against book author, publisher, and newspaper. The U.S. District Court for the District of Pennsylvania granted defendants' motion to transfer (22 Med.L.Rptr. 2089), and denied plaintiff's petition for rehearing of that order (22 Med.L.Rptr. 2415). On defendants' motion to dismiss.

Granted.

Clifford E. Haines and James W. Gicking, of Litvin, Blumberg, Matusow & Young, Philadelphia, Pa., for plaintiff.

Laura R. Handman, Barbara G. Cohen, and Andrew A. Chirls, of Lankenau, Kovner & Kurtz, New York, N.Y., for defendants.

*Full Text of Opinion*

Preska, J.:

This is a libel action by plaintiff Joshua Weinstein ("Weinstein") against defendants Robert Friedman ("Friedman"), author of the book *Zealots for Zion: Inside Israel's West Bank* Settlement Movement ("*Zealots*"); Random House,

*Weinste. v. Friedman*

publisher of *Zealots*; and VV Publishing Co., d/b/a The Village Voice, publisher of *The Village Voice*, a weekly newspaper that published an excerpt from *Zealots* in November 1993. Weinstein alleges that he was defamed in both Chapter 7 of *Zealots* ("Chapter 7"), entitled "Rule by the Best", and *The Village Voice* excerpt (the "Excerpt") which, for the most part, was a re-print of Chapter 7.

Weinstein commenced this action in Pennsylvania state court, and defendants removed it on diversity grounds to the United States District Court for the Eastern District of Pennsylvania. Thereafter, defendants moved to transfer the action to this District or, in the alternative, to dismiss. In his Memorandum and Order dated June 27, 1994 ("6/27/94 Memo."), the Honorable J. Curtis Joyner transferred the action to this District. In a Memorandum dated September 6, 1994 ("9/6/94 Memo."), Judge Joyner reaffirmed his decision from the 6/27/94 Memo. I now consider defendants' motion to dismiss, originally addressed to Judge Joyner but supplemented in this District with numerous letter briefs and oral argument.

In his first claim, Weinstein alleges that Chapter 7 and the Excerpt (collectively, the "Publication") defame him by inaccurately portraying him as a militant activist, politically affiliated with far-right groups which advocate violence in the efforts of Jews to establish settlements in the occupied territories of Israel, and as having a distorted, perverse, and dangerous view of others. (Complaint ("Compl.") ¶16.) Weinstein further alleges that defendants attributed statements to him which he did not make or which were taken out of context. (*Id.* ¶22.) As set forth below, however, the allegedly offensive words, whether taken alone or, as New York law mandates, read as a whole and in the context of the entire work, either are not reasonably susceptible to a defamatory meaning or are non-actionable statements of opinion. Accordingly, defendants' motion to dismiss Weinstein's first claim is granted.

Weinstein's second claim is one for common law invasion of privacy. As set forth below, however, New York does not recognize such a claim and, accordingly, defendants' motion to dismiss this claim is granted.

I. *Choice of Law*

In arguing the law applicable to this diversity action, Weinstein asks that I apply the conflicts rules of Pennsylvania, whereas defendants urge me to apply New York's approach. Ordinarily, a federal court sitting in diversity applies the forum state's choice of law rules to decide which state's substantive law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). However, if an action was transferred from a forum in which the action could have been maintained, then the transferee court must apply the choice of law rules of the transferor court. *Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1086 (S.D.N.Y. 1984).

This action was transferred to this Court from the Eastern District of Pennsylvania. Weinstein, correctly noting that the defendants' motion to transfer was made pursuant to 28 U.S.C. §1404(a)[1] (6/27/94 Memo., at 2), argues that Pennsylvania's choice of law rules therefore apply. Defendants, however, note that they invoked 28 U.S.C. §1406 in their supplemental brief to Judge Joyner (albeit stating that he need not reach a decision under Section 1406 since Section 1404 (a) compelled the transfer) and cite the actual language of the decision, in which Judge Joyner held: "[W]e nevertheless can make no other finding but that the Southern District of New York is not only a more convenient forum but it is the *only* forum in which venue properly lies." (6/27/94 Memo. at 4.) In a later decision, Judge Joyner, adhering to his earlier holding, reiterated that "venue in Pennsylvania was inappropriate." (9/6/94 Memo. at 3.) Given this unequivocal language and the reasoning set forth by Judge Joyner in those decisions, one can conclude only that venue does not lie in Pennsylvania. What follows from this conclusion, of course, is that Pennsylvania choice of law rules do not apply to this action. Nevertheless, the consequence of the choice of law question is not of major significance. As discussed below, the choice of law methodology of both New York and Pennsylvania dictates that New York substantive law applies to this action.

---

[1] Section 1404 (a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." U.S.C. §1404(a).

Regularly No. 25, Rptr. p.

### A. *Pennsylvania Choice of Law Analysis*

Pennsylvania "employs a flexible methodology to choice-of-law problems which combines the 'most significant relationship' test espoused in the Restatement (Second) of Conflicts and the 'interest-analysis' approach." *McFadden v. Burton,* 645 F. Supp. 457, 460 (E.D. Pa. 1986) (citing *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311-13 (3d Cir. 1978)); *accord Griffith v. United Air Lines. Inc.,* 416 Pa. 1, 203 A.2d 796 (1964).

"Interest analysis" involves a qualitative appraisal of the relevant states' policies with respect to the controversy before the court so that the court may determine the state which has the most significant interest in the dispute. The Restatement (Second) examines the totality of the contact which each state has with various portions of the controversy, counting and weighing those contacts in order to determine which state possesses the "most significant relationship" with the dispute. *Savitt v. City of Philadelphia,* 557 F. Supp. 321, 322-23 (E.D. Pa. 1983); *accord McFadden,* 645 F. Supp. at 460. This methodology "takes into account both the grouping of contacts with the various concerned jurisdictions and also interests and policies that may be validly asserted by each jurisdiction." *Melville,* 584 F.2d at 1311. As the Pennsylvania Supreme Court has explained, a court must consider "the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in application of its rule of law." *McSwain v. McSwain,* 420 Pa. 86, 94, 215 A.2d 677, 682 (1966), *quoted by Myers v. Commercial Union Assurance Cos.,* 506 Pa. 492, 496, 485 A.2d 1113, 1116 (1984).

Pennsylvania's conflicts law has been refined further in a variety of contexts, including one similar to that in the case at hand. For example, Weinstein points to *Fitzpatrick v. Milky Way Prods.,* 537 F. Supp. 165 (E.D. Pa. 1982), in which the Court applied Pennsylvania's choice of law rules in a defamation context. The plaintiffs, citizens of Pennsylvania, sued a New York publisher. The Court applied Pennsylvania's choice of law rules and determined that the substantive law of plaintiffs' domicile, Pennsylvania, should apply. *Id.* at 172-73. In reaching its conclusion, the Court found several

policies and interests particularly relevant. First, the state of the plaintiff's domicile has a policy interest in "protecting the individual reputations of its citizens." *Id.* at 171. The Court reasoned that

[i]n general, the state of a plaintiff's domicile will be the place where most, if not all, of his or her reputational contacts are found. Accordingly, in the conflict of laws context, the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by defamatory publication.

*Id.*; *see Marcone v. Penthouse Int'l Magazine for Men,* 754 F.2d 1072, 1077 [11 Med.L.Rptr. 1577] (3d Cir.), *cert. denied,* 474 U.S. 864 (1985) ("Inasmuch as [plaintiff] is a Pennsylvania resident and any harm to his reputation that may have occurred centered in that state, the district court was correct to apply Pennsylvania law."); *Denenbera v. American Family Corp. of Columbus, Ga.,* 566 F. Supp. 1242, 1253 (E.D. Pa. 1983) ("Pennsylvania has a significant interest in protecting the reputation of a domiciliary"). Second, the state in which the publisher is located has an interest in the application of its laws for at least two reasons: "(1) protection of a free and uninhibited press to encourage free discussion and debate on matters of public concern; and (2) protection of the home-state publisher's purse or financial integrity." *Fitzpatrick,* 537 F. Supp. at 172.

The Court, applying these policies and interests, found significant the facts that the plaintiffs were domiciled in Pennsylvania and that they consequently suffered injury in Pennsylvania to their personal and professional reputations and to their business interests and social contacts. *Id.* at 171-72. This "contact" with Pennsylvania and the resulting interest were deemed more significant than the corresponding contact with New York — the defendant was a New York domiciliary — and resulting interest — protecting New York defendants from "any financial injury that might arise from more onerous standards of liability imposed in a foreign jurisdiction." *Id.* at 172. The Court discounted New York's general policy of fostering a free press because the plaintiffs were private figures and the matter was not one of public concern. As the Court recognized,

[w]here the plaintiff is a private figure and the matter not one of public con-

*Weinstein v. Friedman*

cern, New York's interest in encouraging free discussion is attenuated, and "the balance between free speech and private reputation" tips in favor of compensating injured plaintiffs. *Id.* (citations omitted). Consequently, the Court found that New York's interest in the outcome of the litigation was not as significant as that of Pennsylvania.

Another defamation case in which Pennsylvania conflicts laws were applied is *Buckley v. McGraw-Hill, Inc.,* 782 F. Supp. 1042 [19 Med.L.Rptr. 1425] (W.D. Pa. 1991), *aff'd,* 968 F.2d 12 [20 Med.L.Rptr. 1264] (3d Cir. 1992). In that case, the plaintiff grew up in Pennsylvania, was a Pennsylvania domiciliary at the time of the lawsuit, and his family lived in Pennsylvania when the allegedly defamatory article was published. *Id.* at 1046-47. However, the plaintiff lived in New York when the article was published, the subject matter of the article was a New York hotel, the publisher was a New York corporation with its principal place of business in New York, the article in question was edited in New York and the parties filed a "partial pretrial stipulation" that New York law controlled. *Id.* at 1047. In this context, the Court recognized that both Pennsylvania and New York had strong interests in the case — although it did not consider New York's interest in protecting media defendants a "compelling" factor — but, because the plaintiff stipulated to the application of New York law and he did not reside in Pennsylvania when he filed the lawsuit or when the article was published, Pennsylvania's strong interest in protecting him as a Pennsylvania domiciliary was diminished. *Id.* Consequently, the Court held that New York governed.

In the instant case, Weinstein argues that the extent and nature of his contacts with Pennsylvania strongly support an application of Pennsylvania's substantive law. He asserts that he has spent the majority of his life in Pennsylvania and that he has relatives and friends who reside in Pennsylvania. (Affidavit of Joshua Weinstein ("Weinstein Aff."), at 1.)[2] He also states that he never has lived, worked, or otherwise been affiliated with New York. (*Id.* at 2.) I am not persuaded. Judge Joyner, in his 6/27/94 Memo., found that the evidence "clearly evinces that Joshua Weinstein is not a

Pennsylvania resident" and that "there is . . . insufficient evidence that he remains a Pennsylvania domiciliary." (6/27/94 Memo., at 6.) Judge Joyner found, in other words, that insufficient evidence existed to conclude that "Pennsylvania is plaintiff's 'true, fixed and permanent home and principal establishment to which he has the intention of returning whenever he is absent therefrom.'" (*Id.* at 7 (citations omitted).) On plaintiff's motion to reconsider, Judge Joyner adhered to his earlier decision and noted that "[t]his Court's June 27, 1994 decision was largely based on Plaintiff's lack of domicile in Pennsylvania." (9/6/94 Memo., at 4.)

The parties dispute the extent of deference to accord these two decisions by Judge Joyner. Generally, the law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988). This rule applies equally to the decisions of coordinate courts, including transfer decisions. *Id.* at 816. Although it does not limit a court's "power to revisit prior decisions of its own or of a coordinate court in any circumstances," it directs us to "should be reluctant to do so "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice'" *Id.* at 817 (citation omitted). In this action, there is no need to revisit Judge Joyner's finding that Weinstein was not a Pennsylvania domiciliary; his finding is amply supported by all the relevant evidence as set forth in his two memoranda. Nonetheless, in an excess of caution, I will recount some of the reasons that Judge Joyner relied upon in his rulings.

Judge Joyner clearly described the extent of Weinstein's contacts with Pennsylvania and recognized that he had some contacts with Pennsylvania. In addition to those contacts previously mentioned,[3] Weinstein keeps some of his clothing and books at his parents' home in Pennsylvania and all of the statements for his checking, stock and credit card accounts are sent to his parents' address. (6/27/94 Memo., at 5.) However, the stronger

---

[2] Although captioned as an affidavit, this submission is neither dated nor verified.

[3] As discussed on page 8 of this Opinion, Weinstein argues that he has spent most of his life in Pennsylvania and has relatives and friends who reside in Pennsylvania.

evidence, as Judge Joyner recognized, indicates that Weinstein is no longer a Pennsylvania domiciliary. For example, the last full year he lived in Pennsylvania was in 1983, when he was a senior in high school. Subsequently, he resided in Princeton, New Jersey, where he was an undergraduate at Princeton University from 1983 to 1987, and he spent only the summer of 1987 at his parents' residence in Pennsylvania. After attending Princeton, he resided in Irvine, California, where he studied at the University of California until March 1989. In May 1989, he moved to Israel, where he presently resides. He is not registered to vote in Pennsylvania, and does not maintain any professional or religious memberships in Pennsylvania. (*Id.* at 5-6.)

Judge Joyner also relied upon the insufficient evidence of Weinstein's intent to return to Pennsylvania.

> Although Mr. Weinstein freely acknowledges that his future plans are unsettled and that he has "hoped" that IALA [Israel Academy of Liberal Arts] will get off the ground so that he may stay in Israel affiliated with it, he has also "considered" moving to the Eli settlement and would also "consider" taking a position with Harvard University, [MIT], Williams College or some other similar institution of higher education not located in southeastern Pennsylvania. Obviously, we cannot even find from this evidence that Pennsylvania is plaintiff's "true, fixed and permanent home and principal establishment to which he has the intention of returning whenever he is absent therefrom."

(*Id.* at 6-7 (citations omitted).)

Finally, Judge Joyner recognized the extensive nature of Weinstein's contacts with Israel. Weinstein is an Israeli citizen as well as an American citizen. He serves in the Israeli military, travels with both Israeli and American passports, pays into Israel's national insurance plan, and has voted in local Israeli elections. (*Id.*) Before he was drafted into the Israeli military, he was a Ph.D. candidate at Hebrew University in Jerusalem and, after he completes his service, he hopes to return to his studies and finish his doctorate in Israel sometime in June 1996. (*Id.* at 6.) Further, he, along with other Princeton graduates, has founded the Israel Academy of Liberal Arts in Eli. (*Id.*) Accordingly, Judge Joyner held in the 6/27/94 Memo., and reaffirmed

in the 9/6/94 Memo., that Weinstein was not a Pennsylvania domiciliary.

Because Weinstein has brought nothing to my attention that justifies disregarding these findings, they continue to govern, according to the law-of-the-case doctrine, in this Court. Nevertheless, I must supplement Judge Joyner's finding that Weinstein is no longer a Pennsylvania domiciliary with one that Weinstein has acquired a new domicile elsewhere. This need arises from the well-established rule that "[o]nce domicile is established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven." *Bevilaqua v. Bernstein*, 642 F. Supp. 1072, 1073 (S.D.N.Y. 1986); *accord Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired."); *National Artists Management Co Inc. v. Weaving*, 769 F. Supp. 1224, 1228 (S.D.N.Y. 1991) ("A person is born with a particular domicile, and is presumed to retain it unless it can be shown that she has established a new domicile. That rule applies every time a person establishes a domicile."); *see Pa... v. ...* 1992) ("One may have more that one residence in different parts of the world, but a person may have only one domicile."). Therefore, assuming Weinstein was a Pennsylvania domiciliary prior to 1983, when he lived there as a high school student, it is necessary to find that he has acquired a new domicile in order to conclude that Pennsylvania is no longer his domicile.

[1] I hold that Weinstein has acquired a new domicile in Israel. Although a
> "totality of the evidence" approach is called for, . . . "[a]mong the influential factors are the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment."

*National Artists*, 769 F. Supp. at 1228 (quoting 1 Moore's Federal Practice ¶0.74[3-3], at 707.64). As previously discussed, he holds an Israeli passport, has been a resident of Israel since May 1989, was a Ph.D. candidate at Hebrew University in Jerusalem, serves in the Israeli military, pays into Israel's national in-



surance plan, has voted in local Israeli elections, has assisted in the founding of the Israel Academy of Liberal Arts, and has expressed his intentions to finish his doctorate in Israel after he completes his service in the Israeli military in June 1996. Thus, his Israeli domicile has been "established by physical presence in [Israel] in connection with a current state of mind concerning [his] intent to remain there." *Holyfield*, 490 U.S. at 48; *accord Rosario*, 962 F.2d at 224 ("Domiciliaries are those who have a fixed, permanent and principal home and to which, whenever absent, they always intend to return.")

The conclusion that Weinstein is neither a resident nor a domiciliary of Pennsylvania and is a resident and domiciliary of Israel is significant in determining the substantive law applicable to this action. The cases upon which Weinstein relies to argue that Pennsylvania has a strong interest in protecting his reputation rely on the fact that the plaintiffs in those cases *were* domiciliaries at the time of suit. *Marcone*, 754 F.2d at 1077; *Medico v. Time. Inc.*, 643 F.2d 134, 135 n.1 (3d Cir.), *cert. denied*, 454 U.S. 836 (1981); *Denenberg*, 566 F. Supp. at 1253; *Fitzpatrick*, 537 F. Supp. at 166. Weinstein, however, did not live or work in Pennsylvania when the events described in the publications were researched, written, or published. Further, he did not live in Pennsylvania when he filed this lawsuit and he does not live there currently. Thus, although Weinstein argues that the alleged injury to his reputation would occur in Pennsylvania, it is more likely to be in Israel where he is a citizen and has resided and worked since 1989. Accordingly, Pennsylvania's interest in having its law applied to this action is significantly diminished. *See Buckley*, 782 F. Supp. at 1047-48 ("The fact that [plaintiff] did not reside in Pennsylvania at the time the . . . article was published or at the time he filed this lawsuit also tends to diminish Pennsylvania's interest in this case.").[4]

In addition to the absence of Weinstein as a domiciliary or resident, there is little relating to the defendants' activities that points to the application of Pennsylvania law. None of the conduct or statements to which the alleged defamation relates occurred in Pennsylvania, and none of the research, writing, or editing occurred in Pennsylvania. The only contacts between the defendants and Pennsylvania, as Judge Joyner noted, were that the book physically was printed in Pennsylvania, that it had been shipped and sold in unknown quantities within Pennsylvania, that Friedman had received a $1,500 stipend from a Pennsylvania-based fund, that Friedman had placed several telephone calls to Pennsylvania, and that Friedman had visited Pennsylvania several times to interview people for other books and articles. (9/6/94 Memo., at 4 (referring to the "absence of any operative facts in Pennsylvania").)

The significant contacts and resulting interests do, however, suggest the application of New York law. As the home of the defendants, New York has a strong policy in protecting its media defendants. *See Davis*, 580 F. Supp. at 1092 (discussing New York's interest arising from its status as "the national center of the publishing industry"); *Immuno AG v. Moor-Jankowski*, 77 N.Y.2d 235, 245, 566 N.Y.S.2d 906, 915 [18 Med.L.Rptr. 1625] (articulating New York's historical interest in providing "a hospitable climate for the free exchange of ideas"), *cert. denied*, 500 U.S. 954 (1991). Also, because the Publications relate to matters of public concern (i.e., Israel's West Bank settlement movement), New York has a stronger interest in protecting its media defendants than it otherwise would have. *See Fitzpatrick*, 537 F. Supp. at 172 ("Where the plaintiff is a private figure and the matter not one of public concern, New York's interest in encouraging free discussion is attenuated . . . .").

This interest of New York is the only significant interest discernible in this case, for, as discussed above, Weinstein is neither a Pennsylvania domiciliary nor resident and neither Weinstein nor his

---

[4] Even if the harm to Weinstein's reputation occurred in Pennsylvania, the locus of harm is not dispositive, as Weinstein has insisted. *See. e.g., Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90 (1985) (applying New Jersey law even though the locus of the harm was New York, because the parties were from New Jersey and the interests of New Jersey outweighed those of New

York); *Bayard F. Brogan, Inc. v. Work. Comp. App. Bd.*, 161 Pa. Commw. Ct. 459, 637 A.2d 689 (1994) (noting that the *loci delicti* rule has long since been abandoned in Pennsylvania in favor of interest analysis.

defendants have significant contacts with Pennsylvania. While under New York choice of law principles New York's interest in protecting its media defendants is accorded great deference and under Pennsylvania's methodology it appears not to be, it nonetheless is entitled to some weight under the Pennsylvania approach. *See Melville*, 584 F.2d at 1311 (holding that Pennsylvania's choice of law approach involves weighing and evaluating the importance of contacts with respect to the policies of the interested states). Bearing this in mind, I hold that under Pennsylvania's conflicts law New York substantive law applies because, based on the respective contacts, New York has a greater interest in and possesses the most significant relationship with this dispute.

### B. *New York Choice of Law Analysis*

Like Pennsylvania, New York applies an interest analysis in conflicts of law situations. *Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 798 (1991); *Platano v. Norm's Castle, Inc.*, 830 F. Supp. 796, 798 (S.D.N.Y. 1993); *Zahr v. Wingate Creek Acquisition Corp.*, 827 F. Supp. 1061, 106-65 n.1 (S.D.N.Y. 1993); *Simon v. Maxwell Corp.*, No. 92 Civ. 3762 (SWK), 1993 WL 414457 (S.D.N.Y. Oct. 19, 1993). Under this approach,

> the "law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."

*Istim, Inc.*, 78 N.Y.2d at 347, 575 N.Y.S.2d at 798 (citations omitted). Further, this approach applies on an issue-by-issue basis. *See Platano*, 830 F. Supp. at 798 (stating that "in determining which law to apply to any particular issue of law or aspect of a case, [the court] looks to the state with the greatest interest in that given issue of law or aspect")

New York courts have refined their interest analysis to develop more specialized choice of law rules in the context of defamation suits. In the leading case of *Davis v. Costa-Gavras*, 580 F. Supp. 1082 (S.D.N.Y. 1984), the plaintiffs brought an action for libel based upon the defendants' nationwide publication of a book (in both hardcover and paperback forms) and upon the national distribution of the film adopted from the book. *Id.* at 1090-92. At the time of suit, plaintiff Davis was a New Jersey citizen serving in the armed forces in Rhode Island, plaintiff Purdy was a Pennsylvania citizen residing in Brazil, and plaintiff Dans was a citizen of New Hampshire residing in Chile. The book at issue concerned the 1993 *coup d'etat* in which President Salvador Allende Gossens of Chile was overthrown. All three plaintiffs were stationed in Chile in various capacities in the service of the United States at the time of the *coup d'etat*, and all three lived intermittently in the Washington, D.C./Northern Virginia area over the course of the roughly twenty-five years during which they served the United States. *Id.* at 1088-89.

The District Court, citing *Palmisano v. News Syndicate Co., Inc.*, 130 F. Supp. 17, 19 & n.2 (S.D.N.Y. 1955), enumerated nine contacts of particular importance in multistate actions for libel:

> (1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; . . . (6) . . . of greatest circulation; (8) the state where the libel was first seen; and (9) the law of the forum.

*Davis*, 580 F. Supp. at 1091. The Court found that the first and third contacts pointed to Washington, D.C., the second pointed to Chile, and the remaining contacts pointed primarily to New York and, to a lesser extent, California. *Id.* The book was researched and written in New York; the publisher negotiated its contracts with the author and paperback publisher in New York; editing and promotional planning occurred in New York; almost all of the key meetings took place in New York; the film premiered in New York; New York was the "state of most substantial if not principal circulation"; and, although witnesses to the events depicted in the book and the movie were "scattered around the world, several crucial witnesses . . . live[d] in New York City." *Id.* at 1090-91.

The *Davis* Court also was cognizant that, under New York's interest analysis, these contacts should be "evaluated according to their relative importance with respect to the particular issues." *Id.* at

*Weinstein v. Friedman*

1092. In *Davis*, as in this action, those issues revolved around the law of defamation. The Court, therefore, placed great weight on New York's interest arising from its status as "the national center of the publishing industry." *Id.* at 1092. Specifically, the Court pointed out that New York "has a significant interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform." *Id.; cf. Immuno AG*, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913 (explaining New York's historical interest in providing "a hospitable climate for the free exchange of ideas"). The Court also noted that in a libel action, which is "less plaintiff-centered than other torts", policy reasons supported "deciding issues whose major impact is on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place." *Davis*, 500 F. Supp. at 1093. Finally, the Court explained that in a multistate libel case, where the plaintiffs were from different jurisdictions and the alleged harm to their reputations would be diffused throughout the country and overseas, the state "where defendants' significant acts and omissions gave rise to their liability is the most appropriate source of legal norms, particularly when it is also the forum state." *Id.* at 1093. Based upon these policies and the majority of the enumerated contacts, the *Davis* Court ruled that New York law applied. *Id.* at 1091-93.[5]

When applied to this case, the facts and principles of *Davis* mandate the application of New York law. As discussed above, Weinstein is neither a domiciliary nor a resident of Pennsylvania. The principal activities of Weinstein to which the alleged defamation relates took place

in Princeton, New Jersey, and in Israel, not in Pennsylvania. Defendant Random House and defendant VV Publishing Co. are New York corporations with principal places of business in New York. The writing, editing, and publishing of the Publications occurred in New York. Although *Zealots* has nationwide circulation, the state of principal circulation for *The Village Voice* is New York. The forum is, of course, New York. One factor which arguably points to Pennsylvania law — albeit weakly — is the alleged harm to Weinstein's reputation. Weinstein cited persons in numerous states, including Pennsylvania and New York, and in Israel who are familiar with his reputation. Of those persons, however, only two read the material independent of Weinstein's bringing it to their attention, and they live in New York. (Supplemental Memorandum of Law in Support of Defendants' Motions to Transfer or to Dismiss the Complaint, at 12.) Thus, the majority of the contacts and the resulting interests leaves no doubt that New York law applies to this action.

Although Weinstein makes two further arguments in opposition, they are no more compelling than those previously discussed. First, he argues that defendants have availed themselves of the advantages of doing business in Pennsylvania and should be held to Pennsylvania's standards of conduct. However, he offers little evidence to support this assertion, and it appears that defendants' contacts with and conduct within New York are much more extensive than any supposed contacts with and conduct within Pennsylvania. Second, Weinstein has attempted to distinguish the facts of *Davis* from those here. He notes that in *Davis*, the Court assigned Washington, D.C. merely as the "proxy for the meaningful domestic domicile lacking here due to plaintiffs' foreign service careers." *Davis*, 580 F. Supp. at 1091. Weinstein argues that his contacts with Pennsylvania are greater than those of the *Davis* plaintiffs with Washington and, accordingly, are entitled to greater weight. The Court in *Davis*, however, did not indicate that it accorded the plaintiffs' domicile less weight because their domicile was only a "proxy". In addition, while the *Davis* plaintiffs may not have been "true" domiciliaries of Washington, D.C., their relevant contacts with Washington were, at a minimum, equivalent to Weinstein's contacts with Pennsylvania. *See id.* at 1089 (referring to the District of Columbia

---

[5] The *Davis* Court also pointed to Professor Korn's theory of "conflicts justice." According to this theory, "rules in choice of law, like rules of substantive law, must meet certain minimal standards of fairness" and "[j]ustice in conflicts rules ... requires minimal contacts with another forum before subjecting the nondomiciliary to its laws." *Davis*, 500 F. Supp. at 1092-93. Weinstein argues that this principle supports the application of Pennsylvania law because he has had little contact with New York. However, defendants have had little contact with Pennsylvania, and, therefore, this argument favors neither New York nor Pennsylvania law.

bia as "the geographic focus of their professional reputations as federal officials and public servants").

Accordingly, after balancing the respective interests of Pennsylvania and New York, New York's interests prevail. This conclusion is dictated not only by the principles articulated in *Davis*, but by New York's interest in "provid[ing] a hospitable climate for the free exchange of ideas." *Immuno AG*, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913. This interest stands unmatched by any countervailing interest of Pennsylvania. Therefore, the choice of law analysis of both New York and Pennsylvania requires the application of New York substantive law to this action.

## II. *Standard of Review*

Defendants argue that, under New York substantive law, Weinstein has failed to state a claim for relief. When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true the factual allegations of the complaint and draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). " '[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference.' " *International Audiotext Network, Inc. v. American Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus., Inc. v. Westinghouse Credit Corp.*, 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), *quoted in Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).

## III. *Defamation Claim*

Weinstein's first claim is for defamation. A common law defamation claim in New York has four elements. Plaintiff must plead: 1) a false and defamatory statement of and concerning plaintiff; 2) publication to a third-party; 3) the requisite degree of fault; and 4) special harm or *per se* actionability. *Box Tree South. Ltd. v. Bitterman*, 873 F. Supp. 833, 874 (S.D.N.Y. 1995) (quoting *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 [19 Med.L.Rptr. 1593]

(S.D.N.Y. 1991)). It is the first element that is at issue here.

### A. *No Defamatory Meaning*

Whether a statement is capable of a defamatory meaning is a threshold question of law to be resolved by the court. *Aronson v. Wiersma*, 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 1007 [12 Med.L.Rptr. 1150] (1985); *James v. Gannett Co., Inc.* 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874 (1976); *Tracy v. Newsday, Inc.*, 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3 (1959). If a statement is not capable of a defamatory meaning, then, obviously, the motion to dismiss should be granted. If a statement is capable of a defamatory meaning, however, a court must then assess whether it also is capable of a nondefamatory meaning. If so, then the defamation claim must go to the jury "to determine in what sense the words were used and understood." *Davis v. Ross*, 754 F.2d 80, 83 (2d Cir. 1985) (applying New York defamation law).

In New York, defamatory meaning will be found only in

> words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society.

*Fatley v. Peekskill Star Corp.*, 83 A.D.2d 294, 445 N.Y.S.2d 156 (1981) (citations omitted); *accord Tracy*, 5 N.Y.2d at 135-36, 182 N.Y.S.2d at 3 (" 'A writing is defamatory . . . if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community, even though it may impute to him no moral turpitude to him.' ") (citation omitted). A court must apply this definition of defamation in light of the following factors:

> First, the court must "consider the publication as a whole", and "not pick out and isolate particular phrases." . . . The meaning of a writing "depends not on isolated or detached statements but on the whole apparent scope and intent." . . . Second, the publication should "be tested by its effects upon the average reader." . . . "The words are to be construed not with the close precision expected from lawyers and



judges but as they would be read and understood by the public to which they are addressed." . . . Third, the court should "not strain to place a particular interpretation on the published words," . . . , nor "interpret such writings 'in their mildest and most inoffensive sense to hold them nonlibellous.' " . . . Finally, the statement in question should "be 'read against the background of its issuance' with respect to 'the circumstances of the publication.' " . . . "The construction which it behooves a court of justice to put on a publication is to be derived as well from the expressions used as from the whole scope and apparent object of the writer."

*Davis*, 754 F.2d at 83 (citations omitted); *accord James*, 40 N.Y.2d at 419-20, 386 N.Y.S.2d at 874-875; *see Steinhilber v. Alphonse*, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 904 [13 Med.L.Rptr. 1562] (1986) (relying on the "average person" standard to decide if a "given statement expresses fact or opinion" in a defamation action).

### 1. Monitoring Drinking Games at Princeton

In paragraph 15(g) of the Complaint, Weinstein complains that the Publications state "that while plaintiff, Joshua Weinstein[,] was a student at Princeton he became one of drinking games, filling out a score card on Monday mornings, listing the number of bones broken, students hospitalized and co-eds raped.' " (Compl. ¶15(g).) Whereas the Complaint might be subject to more than one reading — one that Weinstein participated in the mayhem and one that he did not — the text of the Publications is not. It states:

Princeton may be Ivy League, but to Yoram [Hazony's] dismay, its students partied with the best of the Big Ten. On weekends, the "eating clubs" hosted rowdy drinking games with names like "Viking Night" and "Trees and Trolls," in which short undergrads, or Trolls, would try to fight their way up a staircase past the Trees, usually inebriated jocks. The games had a gladiator-type appeal for those who enjoyed being thrown over a banister and consuming prodigious amounts of alcohol. Josh [Weinstein] and Yoram used to monitor the "games," filling out a scorecard on Monday mornings, listing the number of bones broken, students hospitalized, and co-eds raped. "It made us want to become more

religious," said Josh. "All these guys did was vomit and rape."

[2] (*Zealots*, at 181.)[6] The only meaning to which this text reasonably is susceptible is that Weinstein did not participate in the mayhem and, in fact, disapproved of the drinking games at Princeton to such an extent that they "made [him] want to become more religious." (*Id.*) Weinstein's proffered interpretation completely distorts the plain meaning of the passage. No ordinary person could find that these statements, whether read alone or in the context of the entire work, "tend[ ] to expose [Weinstein] to public hatred shame, obloquy, contumely, odium, contempt, ridicule, aversion ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society." *Fairley*, 83 A.D.2d at 296, 445 N.Y.S.2d at 158 (citations omitted). Thus, the statements are not defamatory.

### 2. Strategic Defense Initiative ("SDI") Research and Dungeons and Dragons

Weinstein also complains that the Publications imply "that plaintiff, Joshua Weinstein[,] had spent one summer in New Mexico working on SDI-related research projects'" and "that while a student at Princeton he engaged in extra curricular pleasure center[sic] around 'Dungeons and Dragons', and that 'Josh was the Dragon Master, meaning that he ran the game.' " (Compl. ¶¶15(f), (h).)

On these topics, the Publications state that, "[a] former engineering student, Weinstein spent one summer in New Mexico working on SDI-related research projects" (*Zealots*, at 17) and that

Josh [Weinstein's] and Yoram [Hazony's] extracurricular pleasures centered around "Dungeons and Dragons," a fantasy-oriented game in which players assume the roles of medieval warriors and pursue complex adventures that can take months - or

_____

[6] When a particular statement is contained in both *Zealots* and the Excerpt, citations herein will refer only to *Zealots*.

[7] Although falsity is assumed for the purpose of this motion, I note that Weinstein spent the summer of 1986 in Albuquerque, New Mexico employed at the Sandia National Laboratories as a research assistant in the theoretical mechanics division. (Affidavit of Laura R. Handman, Exh. E, at 14.)

years - to complete. Josh was the Dragon Master, meaning he ran the game. The pair eventually graduated to war-simulation games, in which opposing "generals" strategically move hundreds of small, numbered cardboard soldiers around a board in mock battles. Josh lamented that the Arab-Israeli war game bored him because Israel always defeated the Arabs. "It was just a question of how fast you won and how many losses you took," he said.

(*Zealots*, at 181.) Weinstein asserts that these statements impute to him an aspect of dangerousness because,

[t]he portrait which Friedman paints of Joshua Weinstein as someone who would resort to the militant ideas of Kahane and other radicals in settling the territories is strengthened by the factually inaccurate statements that Joshua Weinstein worked on the strategic defense initiative and also liked to play the dragon master in Dungeons and Dragons with Yoram Hazony.

(Plaintiff's Answer to the Motion of Defendants to Transfer the Action or to Dismiss the Case ("Pl. Memo."), at 30 (footnote omitted).) Weinstein concludes that "[t]he perverseness of the implication suggests not just a level of immaturity but also a dangerousness." (*Id.*)

As with the statements regarding the drinking games, the challenged language has but one reasonable interpretation, and that interpretation is non-defamatory. SDI was a major program of the Reagan Administration directed toward developing a technologically advanced system for protecting the United States from nuclear attack. To have had the ability and opportunity to work on such a project while still a student can only be a favorable reference. That Weinstein — or the persons he associates with — might today look unfavorably on the SDI project for political (or political correctness) reasons does not make the statement defamatory. *See Fairley*, 83 A.D.2d at 296, 445 N.Y.S.2d at 158 ("Among certain segments of the population a social scientist designation might be considered unflattering. However, the peculiarities of taste found in eccentric groups cannot form a basis for a finding of libelous inferences . . . . [T]hat some people would receive a negative inference from [a particular word's] use cannot serve to make the statement actionable.").

Similarly, Weinstein's argument that the Dungeons and Dragons statements impute a level of dangerousness to him is far beyond what an average reader would take from the text. Dungeons and Dragons is a widely popular game that *The Wall Street Journal* has characterized as "fascinating stuff". *Why Webster Hubbell*, Wall St. J., July 18, 1995, at A14. Standing alone, these statements suggest that Weinstein enjoys mentally challenging activities. When read in context, particularly in juxtaposition with the violent, self-destructive antics of other Princeton students, they represent a wholly favorable comment. *See Contemporary Mission. Inc. v. New York Times Co.*, 665 F. Supp. 248, 259 [14 Med.L.Rptr. 1921] (S.D.N.Y. 1987) (noting, while holding that a particular statement in an article was not defamatory, that "there is other language in the article which suggests that the plaintiffs were praised for their work"), *aff'd*, 842 F.2d 612 (2d Cir.), *cert. denied sub nom. O'Reilly v. New York Times Co.*, 488 U.S. 856 (1988).

3. *Membership in and Support for the Eli Garin*

Next, Weinstein complains that the Publications imply "that plaintiff was a member of a garin, established by Yoram Hazony, whose members settled in the town of Eli on the West Bank of Israel;" "that plaintiff, Joshua Weinstein[,] was a part of the West Bank settlement movement;" and "that plaintiff, Joshua Weinstein[,] was actively involved in persuading others to join the settlement movement in Eli." (Compl. ¶15(a), (c), (e).)

The Publications describe the Eli *garin* as "a seed group of twenty families, all friends and Ivy League graduates, who plan to set up a liberal arts college in Eli, which they envision becoming a great university town — the Princeton of Samaria." (*Zealots*, at 171.) Yoram Hazony ("Hazony"), the leader of the garin (*Zealots* at 171), is said to have founded the Israel Academy of Liberal Arts ("IALA") in 1991, "an eight-week summer program in Jerusalem designed to teach American college students Jewish religious values and Western philosophy within a 'politically correct' Zionist environment." (*Zealots*, at 175.) The IALA is to be "the precursor to a full-fledged liberal arts college in Eli" (*id.*) and is said to describe itself in its brochure as

"devoted to the idea that the mind, given a supportive environment of good friends and good conversations, can create thoughts of consequence on important issues." (*Zealots*, at 176). Weinstein, described by Hazony as "our Renaissance man," is "IALA's education director and the designated director of Yoram's future university." (*Zealots*, at 176.)

The members of the Eli *garin* are described in positive terms as thoughtful, philosophical, and serious people who are willing to make great sacrifices in pursuit of high ideals. The Publications quote Hazony as describing religious settlements such as Eli in Utopian terms as "tiny, self-contained, idealistic communities where people strive to implement a Jewish vision of the good society, where people love one another freely, and I don't mean in a sexual sense, but are willing to sacrifice to help one another and be the way people are supposed to be. My wife and I decided years ago we couldn't stand the idea of raising children anywhere else. Eli is just such a good environment. All the problems that plague living in Princeton, New Jersey, just don't exist here. There's no violent crime, there's almost no divorce, no .................... is basically unheard of. People here have something to live for, something to pull together for, and their children turn out to be straight, powerful people."

(*Zealots*, at 190.) The people of Eli live in modest surroundings[8] and pursue their

religious studies and worship seriously.[9] The Hazonys are described as being aware that they are "the 'model' settler family, and that everything they did was by way of example." (*Zealots*, at 173.) Weinstein is described positively as exuberantly engaged in the religious dialogue:

> There was an occasional squabble over some finer point of *Halacha* [10] among these newly awakened Orthodox Jews, but when Yoram and Josh Weinstein, also a *baal teshuvah* [11] and a Princeton graduate, agreed, they whooped and hollered and gave each other the "high five," like football players after scoring a touchdown.

(*Zealots*, at 173.) He is said to be a "congenial host", "making fun of himself for doing a less than sterling job that day giving a lecture on Nietzsche at the Hebrew University" (*Zealots*, at 177.) Hazony's description of him as their "Renaissance man" is supported by the report that the books in his apartment range from *Popular Halacha* to *Beloved* by Toni Morrison. (*Id*.)

Regardless of whether the Publications fairly can be said to imply that Weinstein is a member of the Eli *garin* on the West Bank and that he attempted to persuade ......................................... not defamatory. Both the Publications'

---

[8] The Hazonys' living room is described as "sparsely furnished" with "a metal table on wheels and two twin beds that doubled as couches . . . . The kitchen was small and messy. The refrigerator was very old, and the stove was a rusty top cooker with two burners." (*Zealots*, at 172.) The synagogue is described as "look[ing] something like a recreation hall in a Catskill Mountains summer camp, with unfinished wood paneling and exposed ceiling beams." (*Id*.) Friedman similarly describes Weinstein's apartment in Jerusalem in modest terms:

> Weinstein's tiny apartment could have been a grad student's humble digs anywhere in America. The living room was furnished with an old couch, cheap wicker chairs, a world map covering one wall, a glass-topped coffee table with a copy of *Newsweek*, and stacks of books in Hebrew and English such as *Popular Halacha, Zionist Revolution, Gateway to Self-Knowledge, Jewish Travel Guide*, and Toni Morrison's *Beloved*. While the bedroom door had fallen off its

hinges, there was an expensive, imported tap-water filtering system in the kitchenette.

(*Zealots*, at 176.)

[9] "Yoram [Hazony] elaborately introduced each Sabbath prayer, which everyone enjoyed immensely. The Hazonys' three-year-old daughter, Avital, . . . sang her very first Kiddush (prayer) with the attentive help of Yoram." (*Zealots*, at 172.)

Hazony is quoted as saying: " 'We're serious about bringing something important into the world with the Land of Israel . . . .' " (*Zealots*, at 190.)

After the prayer and during dinner, "Yoram [Hazony] held forth with a discussion about the Bible before veering off into a conversation about what vices ancient Rome symbolized (materialism) in the Torah compared with Persia (sensuality)." (*Zealots*, at 173.)

[10] "Halacha" refers to Jewish law. *E.g.*, Rabbi Abraham Cooper, *Courageous Muslim Action Could End Terrorism*, Houston Chron., Mar. 7, 1996.

[11] "Baal teshuva" refers to one who has returned to a traditional way of life. *E.g.*, Rafael A. Ivarez, *Marrying, Art, Love and "Praise to God"*, The Baltimore Sun, Dec. 28, 1994.

words and their overall impression convey that the group is one of intelligent idealists seeking a better life for themselves and their children within the framework of their religion, and that plaintiff shares those characteristics but is at the same time more scholarly and possessed of a witty self-deprecating sense of humor.[12] He is described by Hazony as an integral part of Hazony's vision of an academy of scholars on the West Bank, serving as the present director of IALA and future director of the future college (*Zealots*, at 176), a characterization of which Weinstein does not complain. Thus, assuming that the Publications imply that Weinstein was a member of the Eli *garin* and that he attempted to persuade others to join, they are capable of only a single meaning and that meaning is not defamatory. *See Pritchard v. Herald Co.*, 120 A.D.2d 956, 503 N.Y.S.2d 460, 462 (4th Dept. 1986) (affirming the trial court's dismissal of a complaint where the plaintiff was described as " 'controversial' " and a " 'black activist' " because, "when judged by the temper of the times and the current of contemporary public opinion," such labels do "not arouse in the mind of the average person of ordinary sensibility an evil or unsavory opinion, nor expose plaintiff to public hatred, contempt, or aversion").

---

[12] Weinstein complains of the quote attributed to him at the Hazonys' home after sunset on a Saturday: "I '*love* coming out here and *occupying the territories*' said Josh, ever the smart-ass. 'I haven't done it in a while. Somebody's got to do it or they're not being occupied, right.' " (*Zealots*, at 174.) Passing that it attributes to him the positive attribute of intelligent humor, it is at worst the "rhetorical hyperbole" and "vigorous epithet" protected by the First Amendment. *See, e.g., Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 14 [1 Med.L.Rptr. 1589] (1970) (holding that the term "blackmail" was not defamatory when spoken by a citizen at a public meeting — and later reported in a newspaper — to describe a real estate developer's bargaining position because the term must have been perceived to be "rhetorical hyperbole, a vigorous epithet"), *cited by 600 West 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 143-45, 589 N.Y.S.2d 825, 830-31 [21 Med.L.Rptr. 1811] (1992) (holding the same with respect to allegations that a lease is "illegal" and "is as fraudulent as you can get and it smells of bribery and corruption"), *cert. denied*, U.S. , 113 S. Ct. 2341 (1993).

### 4. *Support of Kahane's Advocacy of Violence*

The Publications, according to Weinstein, also falsely imply

that [he] approved and/or agreed with the teachings or philosophy of Rabbi Meir Kahane, whose viewpoint Friedman describes in Chapter 7 as a "xenophobic brand of militant Judaism in which the outside world is viewed as a bleak panorama of hatred for Jews, and where a Torah in one hand is inevitably supplemented by an AK-47 in the other . . .";

and that

[v]iewed as a whole, Chapter 7 of *Zealots for Zion* was meant to inaccurately portray plaintiff, Joshua Weinstein[,] as a militant activist, politically affiliated with the far right wing which advocates violence in the efforts of Jews to establish settlements in the occupied territories of Israel and with a distorted view of others.

(Compl. ¶¶15(b), 16.)

Chapter 7 devotes many pages to discussing the effect of Kahane's career in the context of his effect on Hazony. It begins: "A staunch conservative for as long as anyone could remember, Yoram [Hazony] secured slam hit to the far right in the spring of 1984 after Rabbi Meir Kahane spoke on campus — an event Yoram would later describe as one of the most significant in his life." (*Zealots*, at 181.) Following a summary description of Kahane's career up to that time, Chapter 7 continues:

Yoram [Hazony] was ripe for Kahane's message. 'In the spring of 1984,' Yoram later recalled in *The Jerusalem Post*, 'on a night when most of the university's undergraduates were out drinking and dancing at the annual "P-Party,' Rabbi Kahane came to Princeton. Two hundred and fifty students, most nonobservant Jews, gave up the free beer to go hear what the infamous fanatic, condemned by the Hillel but brought to campus by the debate team, had to say for himself. It was a speech many of us never forgot.

(*Zealots*, at 183.) Chapter 7 further states, after discussing the contents of Kahane's speech:

Kahane "mesmerized" the students, Yoram [Hazony] recounted in *The Jerusalem Post*. "Most of my friends, who had never had a conversation with an observant Jew, were astounded that an Orthodox rabbi could be an intelligent

person, that he could actually defend his views against a crowd of Princeton students, when we had all thought Judaism had to be something primitive and foolish. We listened in astonishment, and finally in shame, when we began to realize he was right. We did know nothing."

"Rabbi Kahane was the only Jewish leader who ever cared enough about our lives to actually come around and tell us what he thought we could do . . . [to] learn about Judaism, move to Israel, and stand up and fight for what you believe in . . . And his message worked. At least five students who were in the hall that night gradually became observant."

More than that many of those students later joined the Eli *Garin*, a tribute to Kahane's xenophobic brand of militant Judaism in which the outside world is viewed as a bleak panorama of hatred for Jews, and where a Torah on one hand is inevitably supplemented by an AK-47 in the other. (*Zealots*, at 184.)

Next, subsequent to a lengthy description of events following Kahane's death, Chapter 7 quotes Hazony's memorial to Kahane in *The Jerusalem Post*:

"We found ourselves drawn to Kahane," [Hazony] wrote in a bylined column, "because, unlike any other leader we had ever met, he was willing to say what needed to be said; that an ignoramus was an ignoramus, that a phony was a phony, that there really were things in this world worth fighting for. By coming out and giving Jewish voice to the painful truths about our Jewishness, truths we had previously heard only from those openly opposed to Judaism, he returned to us the belief that Judaism could have truth on its side, that it could be something we didn't have to be embarrassed about, that we should be proud to wear a *kipa* and make our stand on the world stage as Jews.

Although *Hazony was never able to reconcile himself to Kahane's predilection for violence*, he praised the rabbi for inspiring, cajoling, and shaming tens of thousands of youths into being better Jews and Zionists. Kahane "changed our lives, thrilled and entertained us, helped us grow up into strong, Jewish men and women," he wrote.

(*Zealots*, at 187-88 (emphasis added).)

Finally, after noting that "Hazony went

to Kahane's apartment in Jerusalem to sit *shivah*" (*Zealots*, at 188) and that "[t]he Hazonys had been personally close to Kahane" (*id.*), Chapter 7 states: "*Hazony* is certainly not a thug and is *quick to decry violence, unlike many supporters of the late Meir Kahane*" (*Zealots*, at 189 (emphasis added)).

As is apparent from the above recitation (and from a review of the Publications in their entirety), Weinstein's name is nowhere associated with Kahane's. Rather, Friedman's discussion of Kahane's influence on the former Princeton students centers on Kahane's influence on Hazony. Thus, in order to satisfy the "of and concerning plaintiff" requirement of a defamation action, Weinstein appears to argue *sub silentio* that all of Hazony's views are attributed to him and that Hazony agreed with Kahane's views about the use of violence. The Publications, however, belie both of these arguments.

First, the Publications neither state nor imply that Weinstein shared all of Hazony's views. Indeed, the Publications make clear that, even among those gathered at the Sabbath in Eli and at the study group, there is no uniformity of views, but, rather, sincere disagreements, for example, about self-criticism,[13] interpretation of Jewish laws,[14] and immigration policies.[15] Second, assuming that the Publications imply that all of Hazony's views were shared by Weinstein, the Publications clearly describe that, although Hazony accepted certain of Kahane's non-violent teachings, he "was never able to reconcile himself to Kahane's predilection for violence." (*Zealots*,

---

[13] Haunted by her witnessing Israeli soldiers remove Arabs from a public bus, "Allison was not as gung-ho about settlement life as others." (*Zealots*, at 174.)

Avi was not interested in moving to Eli, "'I want something more adventurous.'" (*Zealots*, at 1771.)

[14] "There was an occasional squabble over some finer point of Halacha among these newly awakened Orthodox Jews, but when Yoram and Josh Weinstein, also a *baal teshuvah* and a Princeton graduate, agreed, they whooped and hollered and gave each other the 'high five,' like football players after scoring a touchdown." (*Zealots*, at 173.)

[15] "Yosha . . . worried that within a generation, the non-Jews among the Russians would de-Judaize Israel through intermarriage. Yoram disagreed, arguing that anybody who claims to be a Jew must be welcomed." (*Zealots*, at 173.)

at 187-88.) Instead, Hazony is described as "quick to decry violence, unlike many of the supporters of the late Meir Kahane." (*Zealots*, at 189.) Thus, for example, Hazony rejected Kahane's notion that the way to solve Israel's demographic problem is to expel the Arabs, favoring instead a constructive, non-violent approach. (*Zealots*, at 191.) In light of these statements, no reasonable jury could find that these careful descriptions of Hazony's and, I assume for purposes of this motion, Weinstein's views on Kahane's teachings could support an inference that Weinstein approved of the violent aspects of Kahane's teachings.

Further, even if the statements were defamatory of Hazony, Weinstein may not rely on his mere association with Hazony to render the statements defamatory of and concerning him. *See Julian v. American Business Consultants Inc.*, 2 N.Y.2d 1, 17-18, 155 N.Y.S.2d 1, 16-17 (1956) (holding that an actor could not be defamed by a book characterizing many people in the broadcast industry as communist "dupes", because the book's description of his attendance at communist front meetings did not support the application of those terms to him); *I.W.C. Agency, Inc. v. St. Paul Fire and Mar. Ins. Co.*, 122 A.D.2d 633, 509 N.Y.S.2d 97, 100 (2d Dept. 1986) (holding that an insurance broker's defamation complaint properly was dismissed because the letter alleging that an application for insurance contained misrepresentations would be defamatory only of the policy holder, not of the insurance broker, even though the broker also was identified in the letter); *Cohn v. National Broadcasting Co., Inc.*, 67 A.D.2d 140, 145, 414 N.Y.S.2d 906, 909 (1st Dept. 1979) ("Even assuming as true plaintiffs' assertion that the film unnecessarily distorted McCarthy's career and was unmistakably disparaging to the late Senator, this would not give rise to a claim for defamation by plaintiffs as his former aides and advisors."), *aff'd*, 50 N.Y.2d 885, 430 N.Y.S.2d 265, *cert. denied*, 449 U.S. 1022 (1980).

In sum, an ordinary reader of the Publications would not conclude that Hazony's views were attributed to Weinstein, or, if they were, that such views included the approval of Kahane's (or anyone else's) use of violence to establish or maintain settlements in the occupied territories. Finally, even if the Publications defamed Hazony, Weinstein's mere

association with Hazony is not sufficient to render the statements defamatory of and concerning Weinstein.

### 5. *Publications as a Whole*

The Complaint also alleges that [v]iewed as a whole, Chapter 7 of *Zealots for Zion* was meant to inaccurately portray plaintiff, Joshua Weinstein[,] as a militant activist, politically affiliated with the far right wing which advocates violence in the efforts of Jews to establish settlements in the occupied territories of Israel and with a distorted, perverse and dangerous view of others.

(Compl. ¶16 or 18). As with the specific statements previously discussed, a court would have to strain to find a defamatory meaning in the Publications as a whole. *See Cohn*, 50 N.Y.2d at 887, 430 N.Y.S.2d at 265 (holding that in the absence of "strain[ing] to find a defamatory interpretation where none exists," neither the individual passages nor "the cumulative effect of all such passages [can] be said to be defamatory"). They fail to support Weinstein's characterizations that he is portrayed as someone associated with violence. To the contrary, the person with whom Weinstein claims he is associated, and thereby defamed, Hazony, unambiguously is stated to be opposed to violence and, as a result, not a pure follower of Kahane. (*Zealots*, at 189). The Publications as a whole, therefore, are not susceptible to a defamatory meaning.

### B. *Non-Actionable Statements of Opinion*

Defendants also argue that certain of the statements complained of are not actionable because they "cannot 'reasonably' [be] interpreted as stating actual facts' about [plaintiff]." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 [17 Med.L.Rptr. 2009], 20 (1990) (quoting *Hustler Magazine Inc. v. Falwell*, 485 U.S. 46, 50 [14 Med.L.Rptr. 2281] (1988)); *accord 600 West 115th St. Corp. v. Van Gutfeld*, 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829 [21 Med.L.Rptr. 1811] ("[O]nly statements alleging facts can properly be the subject of a defamation action.").

Under both federal and New York standards, the question of whether the complained-of expression constitutes ac-



*Weinstein v. Friedman*

tionable fact or non-actionable opinion is one for the court to resolve. *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 282-84 (1974); *Greenbelt Coop. Publishing Ass'n. v. Bresler*, 398 U.S. 6, 11-14 [1 Med.L.Rptr. 1589] (1970); *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817; *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950 [2 Med.L.Rptr. 2169], *cert. denied*, 434 U.S. 969 (1977). "The dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [reader] could have concluded that [the Publications were] conveying facts about the plaintiff . . . .' " *Gross*, 82 N.Y.2d at 152, 603 N.Y.S.2d at 817 (citation omitted); *see Milkovich*, 497 U.S. at 21 ("The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the [author's] column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding.").

Differences do exist, however, between the federal and New York standards. First, the New York State Constitution affords more protection to opinion statements than the Federal Constitution. The New York Court of Appeals, noting that New York, as "a cultural center for the Nation, has 'long provided a hospitable . . . climate for the free exchange of ideas,' " *Immuno AG*, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913, and that the New York Constitution's free speech guarantee is drafted with broad language,[16] has concluded at the " 'protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by' the Federal Constitution." *Immuno AG*, 77 N.Y.2d at 249, 566 N.Y.S.2d at 914 (quoting *O'Neill v. Oakgrove Constr. Inc.*, 71 N.Y.2d 521, 529 n.3, 528 N.Y.S.2d 1, 5 [15 Med.L.Rptr. 1219] (1988)); *accord Gross v. New York Times Co.*, 82 N.Y.2d 146, 152, 603 N.Y.S.2d 813, 817 [21 Med.L.Rptr. 2142] (1993) (holding that under the State Constitution, the New York Court of Appeals "has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more

protective of 'the cherished constitutional guarantee of free speech' ") (citation omitted); *600 West 115th St.*, 80 N.Y.2d at 138, 589 N.Y.S.2d at 829 (noting "the scope of broader protection afforded by our state constitutional provision").

Second, the federal and New York standards resolve the fact-opinion inquiry using slightly different approaches. The Court in *Ollman v. Evans*, 750 F.2d 970 [11 Med.L.Rptr. 1433] (D.C. Cir.), *cert. denied*, 471 U.S. 1127 (1985), enumerated a four-factor test to apply in making this determination under the federal standard. These factors are: (1) "whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous," (2) whether the statement is "capable of being objectively characterized as true of false," (3) a consideration of "the full context of the statement — the entire article or column, for example — inasmuch as other unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content," and (4) a consideration of "the broader . . . context in which the statement appears, for [d]ifferent types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Ollman*, 750 F.2d at 979, *cited by Steinhilbe*, 68 N.Y.2d at 292, 508 N.Y.S.2d at 905. Subsequently, in *Milkovich*, the Supreme Court addressed this same issue. Although it did not expressly adopt the *Ollman* factors, it applied an analysis largely similar to that in *Ollman*. *See Immuno AG*, 77 N.Y.2d at 244, 566 N.Y.S.2d at 910-911 (interpreting *Milkovich* as endorsing the first two factors of the *Ollman* test and substituting a "type of speech" test for the last two factors). The Supreme Court first held that the statements at issue had a precise meaning. *See Milkovich*, 497 U.S. at 21 (holding that "a reasonable factfinder could conclude that the statements in the . . . column imply an assertion that petitioner . . . perjured himself in a judicial proceeding"). Next, the Supreme Court held that the precise meaning was "sufficiently factual to be susceptible of being proved true or false." *Id.* Finally, the Supreme Court assessed whether either the "general tenor of the

---

[16] Instead of following the language of the First Amendment to the Federal Constitution, the New York Constitution provides that "[e]very citizen may freely speak, write and publish . . . on all subjects." N.Y. Const., Art. I, §8.

article" or the existence of "loose, figurative, or hyperbolic language" in the complained-of statements negated "the impression that the writer was seriously maintaining" the truth of the facts in the statement. *Id.*

The New York Court of Appeals employs a slightly different method of analysis, perhaps with an ear toward Justice Brennan's dissent in *Milkovich*.[17] In New York, the analysis must begin with "the content of the whole communication, its tone and apparent purpose." *Immuno AG*, 77 N.Y.2d at 250, 566 N.Y.S.2d at 914, *cited with approval by Brian v. Richardson*, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 350-51 (1995).

Given the purpose of court review - to determine whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff - we believe that an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, even if those claims are ostensibly couched in loose, figurative or hyperbolic language in charged circumstances. A media defendant surely has no license to misportray facts; false statements are actionable when they would be perceived as factual by the reasonable person. But statements must first be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying *any* facts. *Immuno AG*, 77 N.Y.2d at 255, 566 N.Y.S.2d at 917 (citations omitted) (emphasis in original).

Weinstein complains of certain passages in the Publications in which statements are attributed to a "rabbi at Princeton who knew Yoram [Hazony] well." Weinstein alleges that these passages suggest that he is "not able to see the world in gray" but only in "Kahane's

black and white" (Compl. ¶15(i)); has a fixed belief system in which "you are either pro-Israel or an enemy of Israel, in which you are either with us or against us, in which you are either a good Jew or a bad Jew" (Compl. ¶15(j)); and comes from a troubled home (Compl. ¶15(d)). Related to these allegations is Weinstein's conclusion that the Publications were intended to portray him inaccurately as having "a distorted, perverse and dangerous view of others". (Compl. ¶16.) The pertinent portion of Chapter 7 reads as follows:

"My perception is that the Princeton students who joined Yoram [Hazony] in Eli needed a fixed belief system," said the Princeton rabbi who knew them well. "One in which you are either pro-Israel or an enemy of Israel, in which you are either a good Jew or a bad Jew. Now all of that is a psychological splitting off - of not being able to see the world in gray, which, for my money, is what adult-hood is about." According to the rabbi, some of them come from troubled homes, "and Kahane's black-and-white views allow them to draw a clear picture of

(*Zealots*, at 184.)

[3] Following the New York Court of Appeals' direction first to view the work as a whole and in context, I find that the "full context of the communication in which the statement appears, the broader social context and surrounding circumstances" are indeed such as to signal to an average reader that what is being read is likely to be opinion, not fact.[18] *Gross*, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817. The statements are attributed to a rabbi who is expressly stating his own "perception", or opinion. These perceptions delve into the psychological motivations and backgrounds of individuals who moved to Israel. Further, they are contained in a concededly political book looking at the nature of and motivation behind the settlement movement. I hold under the New York standard that, viewed in their context, no reasonable reader could view the statements attrib-

---

[17] Justice Brennan recalled Justice Holmes' observation that: " 'A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.' " *Id.* at 26 (quoting *Towne v. Eisner*, 245 U.S. 418, 425 (1918)).

[18] Although it is not clear that these statements are of and concerning Weinstein, I need not address this issue because of my holding that they are non-actionable statements of opinion.

uted to the rabbi as expressing or implying *any* facts about Weinstein.[19]

Alternatively, to the extent that the statement attributed to the rabbi that "some of them come from troubled homes" could be interpreted as based on objective facts possessed by the rabbi and not known to the reader, and thus stating actual facts about Weinstein, this statement is not defamatory. Even if Weinstein came from a troubled home (however defined), that fact would not tend "to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or . . . tend[ ] to excite adverse, derogatory, or unpleasant feelings or opinions about the plaintiff." *Davis v. Costa-Gavras*, 619 F.Supp. 1372, 1375 [12 Med.L.Rptr. 1281] (S.D.N.Y. 1985) (citing Prosser, *Handbook of the Law of Torts* §111, at 739 (1971)); *See Aronson*, 65 N.Y.2d at 594, 493 N.Y.S.2d at 1008 (holding that an employer's statement of dissatisfaction with plaintiff employee's job performance, including that the employer could not get the employee to hand in time sheets or anything else and that the employee was neglectful, was not defamatory); *cf. Gross*, 82 N.Y.2d at 156, 603 N.Y.S.2d at 819 820 ("[W]e stress once again our commitment to avoiding the hypertechnical parsing of written and spoken words for the purpose of identifying 'possible "fact[s]"' that might

---

[19] Even under the less protective federal analysis, I find that, because a reasonable reader could not conclude that the statements complained of were conveying facts about Weinstein, these statements constitute protected speech. At the outset, I note that the world view attributed to the students and the characterization of their home life by the Rabbi do not have a "precise meaning which is readily understood" but, to the contrary, are utterly vague and subjective. Whether plaintiff "is able to see the world in gray" or only in "Kahane's black and white", whether plaintiff has a "fixed belief system" in which "you are either pro-Israel or an enemy of Israel, in which you are either a good Jew or a bad Jew", and whether plaintiff came from a "troubled home" are not capable of being proven true or false. In any event, the type of speech employed is loose and figurative, the kind of psychological characterization and interpretation that negates any implication that the writer is conveying fact about Weinstein. Further, the general tenor of the paragraph, introduced as it is by the author's quoting the rabbi as stating his "perception[s]," negates any factual representation. Thus, under the federal analysis, the statements attributable to the rabbi are not actionable.

form the basis of a sustainable libel action"); *Cohn*, 50 N.Y.2d at 887, 430 N.Y.S.2d at 265 ("[C]ourts will not strain to find a defamatory interpretation where none exists").

Finally, Weinstein complains of the Excerpt headline, which reads: "'Rule By the Best. Yuppie Settlers from Princeton Play Napoleon on the West Bank.'" (Excerpt, at 1.) Weinstein claims that the headline, "when read in the context of the entire Village Voice publication, portrayed plaintiff, Joshua Weinstein[,] in a defamatory, false light." (Compl. ¶21.) I disagree; the average reader viewing the headline in its tone and purpose, could conclude only that, at worst, the headline is a slightly exaggerated statement of the Excerpt's contents. Accordingly, the headline constitutes rhetorical hyperbole and is not actionable. *See Milkovich*, 497 U.S. at 16-17; *Greenbelt*, 389 U.S. at 14; *600 West 115th St.*, 80 N.Y.2d at 143-45, 589 N.Y.S.2d at 830-31; *Fudge v. Penthouse Int'l. Ltd.*, 840 F.2d 1012, 1016 [14 Med.L.Rptr. 2353] (1st Cir.) (holding that the headline "Little Amazons Attack Boys" constituted non-actionable rhetorical hyperbole, particularly when read in context of the article), *cert. denied*, 488 U.S. 821 (1988).

## IV. *Invasion of Privacy Claim*

[4] Weinstein also alleges a common law invasion of privacy claim. As the New York Court of Appeals repeatedly has held, however, New York does not recognize a claim for private facts or false light invasion of privacy; it recognizes only a claim for commercial misappropriation as provided under Sections 50 and 51 of the New York Civil Rights Law.

> While the courts of other jurisdictions have adopted some or all of these torts, [i.e., unreasonable publicity of private facts, unreasonable intrusion upon seclusion, and false light], in this State the right to privacy is governed exclusively by sections 50 and 51 of the Civil Rights Law; we have no common law of privacy . . .

*Howell v. New York Post Co.. Inc.*, 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 354 [21 Med.L.Rptr. 1273] (1993) (citations omitted); *accord Stephano v. News Group Publications. Inc.*, 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224 [11 Med.L.Rptr. 1303] (1984). Further, Sections 50 and 51 "were drafted narrowly to encompass



only the commercial use of an individual's name and no more." *Arrington v. New York Times Co.*, 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 943 [8 Med.L.Rptr. 1351] (1982). Weinstein has not pleaded a violation of Sections 50 and 51, and, accordingly, his invasion of privacy claim, Count II, is dismissed.

### CONCLUSION

Defendants' motion to dismiss the complaint is granted. The Clerk of the Court shall mark this action closed.
SO ORDERED.

---

## MASSON v. THE NEW YORKER MAGAZINE INC.

#### U.S. Court of Appeals
#### Ninth Circuit

JEFFREY M. MASSON v. THE NEW YORKER MAGAZINE INC., JANET MALCOLM, and ALFRED A. KNOPF INC., No. 94-17147, June 5, 1996

### REGULATION OF MEDIA CONTENT

1. **Defamation — Defamatory content — Inaccurate quotations (§11.0510)**

**Defamation — Trial procedures — Jury instructions (§11.1705)**

**Defamation — Standard of liability — Actual malice (§11.3002)**

Public figure plaintiff failed to demonstrate that federal district court erred in instructing jury in defamation trial based on article that allegedly contained inaccurate quotations attributed to him that if jury found that plaintiff made statement, it was required to determine whether author recklessly or deliberately altered plaintiff's words so as to effect material change in their meaning.

2. **Defamation — Defamatory content — Inaccurate quotations (§11.0510)**

**Defamation — Trial procedures — Jury instructions (§11.1705)**

**Defamation — Truth — In general (§11.4001)**

Jury's finding, in defamation trial based on article that allegedly contained inaccurate quotations attributed to public figure plaintiff, that quotation was not false indicates that jury never reached question of whether author acted with malice in attributing statement to plaintiff, and thus whether federal district court erred by instructing jury that plaintiff was required to establish that author had duty to investigate contradictory information regarding quotations is moot issue.

3. **Defamation — Defamatory content — Inaccurate quotations (§11.0510)**

**Defamation — Trial procedures — In general (§11.1701)**

**Defamation — Standard of liability — Actual malice (§11.3002)**

Public figure plaintiff failed to demonstrate that federal district court abused its discretion by refusing to permit, in defamation trial based on article allegedly containing inaccurate quotations attributed to him, introduction of some excerpts from book written by author of article after defamation action was filed.

4. **Defamation — Defamatory content — Inaccurate quotations (§11.0510)**

**Defamation — Post-trial procedures — In general (§11.5701)**

Jury verdict in favor of free-lance writer in defamation suit based on article allegedly containing inaccurate quotations attributed to public figure plaintiff bars plaintiff, under doctrine of defensive collateral estoppel, from relitigating issue of magazine's liability in subsequent trial.

---

Libel action against magazine, author, and book publisher. The U.S. Court of Appeals for the Ninth Circuit affirmed the trial court's grant of summary judgment in favor of the defendants (16

¶38 Thus the fact that the depositions are now retained by parties pursuant to Wis. Stat. § (Rule) 804.01(6) does not change the circuit court's control over the depositions and the circuit court's power to order them filed in court.

## II

¶39 The majority opinion does not address under what circumstances a non-party may have access to depositions filed in circuit court. The majority opinion merely holds that common law and the First Amendment do not require public access to *unfiled* pretrial discovery material.

¶40 I need not discuss the common law or First Amendment rights to public access of pretrial discovery material that is filed in court. The Wisconsin rules set forth in Wis. Stat. ch. 804 relating to discovery govern public access to filed pretrial discovery material. The rules recognize that private litigants have protectable interests in information disclosed through discovery and afford means for protecting those interests. Public access is not permitted when good cause is shown to close access. Wis. Stat. § 804.01(3)(a), like Federal Rule of Civil Procedure Rule 26(c)[16] provides in pertinent part that "Upon motion by a party or person from whom discovery is sought and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Thus a party may seek a protective order to limit access to pretrial discovery material if the party shows good cause. "[T]he obverse

also is true, i.e. if good cause is not shown, the discovery materials in question should not receive judicial protection and therefore would be open to the public for inspection."[17] In other words, unless the public has access to discovery material under the law, a party would not need a court order seeking to protect the material.[18]

## III

¶41 I conclude that Wis. Stat. §§ (Rules) 804.01(3) and 804.01(6) permit a person, including the media, to intervene in an action for the limited purpose of asking the court to order pretrial discovery material to be filed in the court and to order access to the filed pretrial discovery material. I further conclude that the circuit court must exercise its discretion in determining whether to allow access to all, part or none of the pretrial discovery material that is filed. Judicial restriction on access to filed pretrial discovery material is valid, under the rules, when good cause is shown, including potential harm to commercial, economic, privacy or reputational interests of parties or nonlitigants and the possible prejudice to the parties' fair trial rights. Federal courts that have examined the analogous federal rule have  ... to effectuate such reach.[19]

¶42 For the reasons set forth, I concur.

---

**ATTACHMENT / EXHIBIT E**

# WILSON v. NEWS-PRESS PUBLISHING CO.

### Florida Circuit Court
### Lee County

DAVID E. WILSON, Plaintiff v. NEWS-PRESS PUBLISHING CO., et

---

F.R.D. 346, 354 (S.D.N.Y. 1996); *Hawley v. Hall*, 131 F.R.D. 578, 581-83 (D. Nev. 1990).

[16] Rule 26(c) provides:
Protective Orders. Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following . . . .

[17] *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145 (2d Cir. 1987).
[18] *See also* Wis. Stat. § 885.44(13)(a) regarding videotaped depositions, which expressly provides that a copy of a videotaped deposition or a written transcript or audio recording shall be provided to any party or other person authorized by the court.
[19] *See, e.g., Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 790 (1st Cir. 1988); *In re "Agent Orange" Product Liability Litigation*, 821 F.2d 139, 145-46 (2d Cir. 1987); *In re NASDAQ Market-Makers Antitrust Litigation*, 164 F.R.D. 346, 351-54 (S.D.N.Y. 1996); *Hawley v. Hall*, 131 F.R.D. 578, 581-83 (D. Nev. 1990).

al., Defendants, No. 97-9089-CA-JBR, April 7, 2000

## REGULATION OF MEDIA CONTENT

### 1. Defamation — Defamatory content — In general (§11.0501)

### Defamation — Truth — In general (§11.4001)

Defendant's motion to dismiss defamation complaint concerning statements made in article about retirement of former chief deputy of county sheriff's department is granted, since certain allegedly defamatory statements would not have "different effect" on "common mind" of reader than if plaintiff's asserted "truth" had been published, and since remaining statements do not contain facts capable of being proven true or false.

### 2. Defamation — Truth — In general (§11.4001)

Defendants cannot be found liable for defamation for statement published in newspaper article about retirement of former chief deputy of county sheriff's department, regardless of capacity in which person is undertaking, since allegedly defamatory statements must be considered by trial court without forcing or straining interpretation, and since statement, given its natural sense, is both non-defamatory and substantially true.

### 3. Defamation — Truth — In general (§11.4001)

Defendants cannot be found liable for published statement that plaintiff, former chief deputy of county sheriff's department, was "nearly indicted" on drug-running charges, since it was not improper for defendants to summarize uncontested facts by stating that plaintiff was "nearly indicted," since such an occurrence is impossible and therefore incapable of verification, and since reader of statement would not perceive that plaintiff had been indicted.

### 4. Defamation — Privilege — Fair reports privilege (§11.4505)

Defendants cannot be found liable for published statement that plaintiff, former chief deputy of county sheriff's department, sold airplane to corporation before it was actually incorporated, since facts upon which statement was based came from bill of sale filed with Federal Aviation Administration, which was official

government record, and since such statements are non-actionable, even if defendants knew or should have known of information's falsity.

———

Action against newspaper defendants for defamation. On defendant's renewed motion to dismiss complaint.

Granted.

Related decision: 26 Med.L.Rptr. 1703.

Robert Hagaman, of Robert R. Hagaman & Associates, Naples, Fla.; Louis S. St. Laurent II, Coral Springs, Fla., for plaintiff.

Steven Carta, of Simpson, Henderson, Carta & Randolph, Ft. Myers, Fla.; Charles D. Tobin, of Gannett Co. Inc., Arlington, Va., for defendant.

*Full Text of Opinion*

Rosman, C.J.:

### ORDER GRANTING DEFENDANTS' NEWS-PRESS PUBLISHING CO.'S RENEWED MOTION TO DISMISS

This matter having come before the Court on March 6, 2000, upon the Defendant's Renewed Motion to Dismiss, and the Court having reviewed the motion, heard argument of counsel and being otherwise fully advised in these premises, it is:

ORDERED AND ADJUDGED that the motion is granted.

This Court adopts in large part the legal argument of the defense and makes the following findings of law and fact (paragraphs from the Plaintiff's Complaint will be referred to by the paragraph symbol "¶" followed by the paragraph number):

In this defamation action brought against the News-Press by the former chief deputy of the Lee County Sheriff's department, the News-Press has filed a renewed motion to dismiss the complaint. The renewed motion follows the decision issued in this case by the Second District Court of Appeal. See, *Wilson v. News-Press Pub. Co.,* 738 So.2d 1000 (Fla. DCA 1999). That decision reversed the dismissal with prejudice of this action by the former presiding judge in this case, the Honorable R. Wallace Pack, but expressly granted the News-Press the



right to reassert a motion to dismiss or strike.

The Plaintiff, DAVID WILSON, retired as Undersheriff from the Lee County Sheriff's Department in the Spring of 1996 after 24 years of service. (¶ 14) Mr. Wilson is suing the News-Press for alleged defamatory statements contained in an article appearing in the February 9, 1996 edition of the News-Press about Mr. Wilson's planned retirement from that Department (¶¶ 14, 18 and 19 and Ex. 1), and in a "Correction" of that article, published February 10, 1996 (Ex. 6). The specific statements claimed to be defamatory are contained in Paragraphs 21 and 86 of the Complaint.

Mr. Wilson alleges he has been damaged by the statements he quotes in the Complaint and seeks not only actual damages, but punitive damages and attorney's fees as well (¶ 117). It is this Court's finding that the specific statements alleged as defamatory are not, as a matter of law, actionable on the face of the Complaint and attached exhibits.

In defamation actions, trial courts play a "prominent function" in determining whether the case should be submitted to [?]

778 (Fla. 4th DCA 1973).

Whether a challenged statement is defamatory or actionable is a matter for consideration by the court. *McIver v. Tallahassee Democrat, Inc.*, 489 So.2d 793 [13 Med.L.Rptr. 1111] (Fla. 1st DCA 1986). If a court finds that a statement could not possibly have a defamatory or harmful effect, the court may dismiss the case for failure to state a cause of action. *McCormick v. Miami Herald Pub. Co., supra; Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593 (Fla. 4th DCA 1983) and *Friedgood v. Peters Pub. Co.*, 521 So.2d 236 [15 Med.L.Rptr. 1010] (Fla. 4th DCA 1988). When considering whether an alleged defamatory statement is actionable, the court should consider the statement in its natural sense without a forced or strained construction. *Byrd*, supra.

It is the general rule that the truth of an alleged defamatory statement is a complete defense in a civil action for defamation. See, e.g., *Applestein v. Knight Newspapers, Inc.*, 337 So.2d 1005 (Fla. 3rd DCA 1976) and *Brake and Alignment Supply Corp., Inc. v. Post-Newsweek Stations of Florida, Inc.*, 472 So.2d 517 [11 Med.L.Rptr. 2183] (Fla. 3rd DCA 1985).

As observed in *Byrd v. Hustler Magazine, Inc., supra*, "[A] false statement of fact is the *sine qua non* for recovery in a defamation action." See also, *Freidgood v. Peters Pub. Co., supra* ("a false statement of fact is absolutely necessary if there is to be a recovery in a defamation action.").

For the defense of truth to be applicable, it is sufficient if the article is substantially true; and inaccuracies not materially affecting its meaning do not defeat that defense. *McCormick v. Miami Herald Pub. Co.*, 139 So.2d 197 (Fla. 2d DCA 1962); and Restatement (Second) of Torts, §581A, comment, at 237 (1977). As recently stated in the case of *Smith v. Cuban American Nat. Foundation*, 731 So.2d 702 [27 Med.L.Rptr. 2499] (Fla. 3rd DCA 1999), "Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true."

One way of determining whether a statement is substantially true on a motion to dismiss is to review the unchallenged factual matters contained in the allegations of and exhibits to a complaint, all of which the Court must do. [?] *Inc., supra.*

A similar method to the "gist" or "sting" analysis that courts utilize to determine whether an otherwise defamatory statement is actionable is the "common mind/different effect" test. That test considers whether the defamatory statements as published would have a "different effect" on the "common mind" of the reader from that which the pleaded truth would have produced. See, *Smith v. Cuban American Nat. Foundation, supra; McCormick v. Miami Herald Pub. Co., supra; Hammond v. Times Pub. Co.*, 162 So.2d 681 (Fla. 2d DCA 1964); and *Bishop v. Wometco Enterprises, Inc.*, 235 So.2d 759 (Fla. 3rd DCA 1970). See also, *Bermuda Triangle Coffeehouse Co. v. Florida Media Affiliates, Inc.*, 27 Med.L.Rptr. 1205 (Fla. Cir. Ct. 1988), The test was implemented because speakers ". . . are not to be held to the exact facts or to the most minute details of the transactions they publish . . ." *McCormick, supra*, at 200.

[1] It is this Court's finding that certain of the statements sued upon, if eliminated from the article, would not have a different effect on the mind of the reader than if the "truth" had been published.

Those statements therefore, are not actionable.

It is also the finding of this Court that certain statements are not actionable because the allegations of the Complaint and its exhibits demonstrate that those statements do not contain facts which are capable of being proven as true or false. Whether or not a statement is one of actionable fact or is a question of law is to be initially resolved by the trial court. *Della-Donna v. Yardly*, 512 So.2d 294 (Fla. 4th DCA 1987); *Florida Medical Center, Inc. v. New York Post Co. Inc.*, 568 So.2d 454 [18 Med.L.Rptr. 1224] (Fla. 4th DCA 1990).

In order to be actionable, a statement must contain a provably false factual connotation. *Florida Medical Center, Inc. v. New York Post Co., Inc.*, 568 So.2d 454 [18 Med.L.Rptr. 1224] (Fla. 4th DCA 1990), citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 [17 Med.L.Rptr. 2009] (1990). In other words, the statement must be of a fact "subject to proof of truth or falsity." Id.

*THE ALLEGED DEFAMATORY STATEMENTS*

1. *"The career of one of the most controversial law enforcement officials in the history of Lee County law enforcement may be coming to an end."* (¶ 21a.)

In ¶ 23 of the Complaint, Mr. Wilson alleges that this statement, when read in conjunction with the balance of the article, is defamatory because it presents him "as someone who had been involved in criminal activities while serving in law enforcement." However, regardless of that interpretation by Mr. Wilson, other allegations of the Complaint and the exhibits attached to the Complaint demonstrate the substantial truth of that statement. For example, in ¶ 24 of the Complaint, Mr. Wilson acknowledges that he was controversial during a period of time in the mid 1980's; and in ¶ 132, Mr. Wilson acknowledges that a deputy claimed he was in a certain area after a drug incident occurred in that area.

More pointedly, Exhibits 5 and 8 to the Complaint (two News-Press articles published in the 1980's) contain unchallenged reports that, among other things, a federal grand jury was investigating Mr. Wilson's alleged drug smuggling involvement and that he volunteered to take and did take a lie detector test to "put to rest" the rumors that he was involved in drug smuggling. To the same effect, in another exhibit to the Complaint (Exhibit 2) an assistant U.S. Attorney is quoted as naming Mr. Wilson as a "target" of a federal government investigation at that time.

All of those matters involving Mr. Wilson are undeniably "controversial." Again, all those matters, as contained in the Exhibits to the Complaint, are accepted as true for the purpose of deciding the present motion to dismiss. See *Chiang v. Wildcat Groves, Inc., supra*. Therefore, the substantial truth of the statement that Mr. Wilson was controversial is established on the face of the pleading.

Moreover, as to that part of the statement that Mr. Wilson was "one of the most controversial law enforcement officers," that statement is one of pure opinion, because that subjective statement does not contain a provably false factual connotation, and is therefore not actionable as a matter of law. *Florida Medical Center, Inc. v. New York Post Co., Inc., supra*.

2. *"David Wilson, 53, the top Lee County Sheriff's Deputy who has been both a suspect in an international drug smuggling [ring] and a nationally recognized lawman, Lee County Sheriff's Office, has announced his retirement."* (¶ 21b.)

The portion of that statement which is being contested is that part which states Mr. Wilson has been "a suspect in an international drug smuggling ring." Exhibits 2, 5 and 8 to the Complaint establish the substantial truth of that statement. Some excerpts from those Exhibits demonstrate that truth:

(a) Exhibit 2 contains the following uncontested statement: "Zimmerman [Assistant U.S. Attorney] calls Wilson and Yahl 'targets'."

(b) Exhibit 5 contains the following uncontested statements:

"Wilson, Moss and other current and former members of the sheriff's department are being investigated by a federal grand jury for possible involvement in Carter's smuggling ring."

"Wilson said he knows he has been part of a federal grand jury investigations (sic) for three years and said that fact alone should prove his innocence."

" 'I've volunteered to testify but never once been asked to,' he said. 'And this is the second federal grand jury to be convened. If they can't pin something

on me in this length of time, kind of takes on the appearance of a head-hunting party doesn't it?' ''

(c) Exhibit 8 contains the following uncontested statements:

"Lee County Sheriff's Col. Dave Wilson said Thursday he passed a lie detector test and hopes the results will forever put to rest the vicious rumors and outright lies that were intentionally designed to make it look as though I was involved in drug smuggling."

"Wilson said two federal grand juries in Tampa have been asking questions of witnesses over the past three years 'trying to tie me to drug smuggling.' ''

Clearly, these above-quoted excerpts from the exhibits to the Complaint establish on the face of that pleading that Mr. Wilson has been a suspect in a drug smuggling ring. That being the case, that statement is substantially true and is not actionable for that reason.

3. *"Wilson is offering to take an early retirement deal that will take effect on April Fool's Day,* but that must be approved by county commissioner's Feb 21 during a public hearing." (¶ 21c.)

[2] In paragraphs 27 and 28 of the Complaint, Mr. Wilson alleges that the statement above was intended by the News-Press to mean that he was not serious about contemplating retirement and that he was lying and playing a joke on the public. That claimed innuendo is a strained interpretation of that statement. Florida courts have held that an alleged defamatory statement must be considered by a trial court in its natural sense "without a forced or strained construction." *Byrd v. Hustler Magazine, Inc.,* 433 So.2d 593 (Fla. 4th DCA 1983). The natural sense of the subject statement would not lead one to the conclusion that Mr. Wilson was lying about his retirement and playing a joke on the public.

Therefore, the subject statement is both non-defamatory of Mr. Wilson and substantially true, as shown on the face of the Complaint and the article itself.

4. "He held that position throughout Wanicka's term, *despite a fallout between the two,* and held the position in 1988 when McDougall became Sheriff." (¶ 21d.)

In paragraph 29 of the Complaint, Mr. Wilson alleges that this statement was meant to be understood that he did

not get along with his superiors and that his alleged drug smuggling involvement caused the reported falling out.

Again, that interpretation is a strained one. Nothing in that statement or the article itself reasonably suggests that innuendo, especially when one considers that Mr. Wilson was investigated for being possibly involved in drug smuggling *between 1982 and 1986* (see, Exhibit 2), and the "falling out" was reported in the article to have occurred much later in *1988.*

Furthermore, stating that Mr. Wilson had a "falling out" with his boss, even if false, is not defamatory of Mr. Wilson, whether standing alone or in the context of the entire article. Nothing in that language suggested poor job performance or corruption by Mr. Wilson. To the contrary, the balance of the statement reports that Mr. Wilson continued in his position as chief deputy for Sheriff McDougall's administration, giving rise only to positive inferences about Mr. Wilson's job performance.

5. *"During the mid-1980's, Wilson came under fire after a fellow deputy claimed he saw Wilson on an airstrip during a drug run gone bad."* (¶ 21e.)

As to the '... statement appears on the face of the Complaint and its Exhibits.

(a.) In paragraph 32 of the Complaint, Mr. Wilson alleges:

*"The truth of the matter is that one disgruntled deputy had claimed that Plaintiff was in the area after a drug incident* along with numerous other law enforcement officers." (emphasis supplied).

(b.) Exhibit 8 to the Complaint speaks even more fully to the truth of the challenged statement. In that uncontested news article reporting about a lie detector test that Mr. Wilson took to refute allegations of his involvement with drug smuggling, the newspaper wrote:

Wilson released a partial list of the questions asked of him. He said they were the questions relevant to the grand jury investigation and in response to allegations by former Lee County sheriff's deputy Frank Richbourg that Wilson was at the scene of the July 9, 1981, smuggling incident on the airstrip near Carter's home on Corkscrew Road.

"I said I'd take the lie detector test and I passed," Wilson said, "Now what about Richbourg?"



*Wilson v. News-Press Publishing Co.*                    26 ..ed. L. Rptr.   1699

"We know the Tampa jury has been asking questions about Dave," Wanicka said, "but it's always seemed real strange to us that they've never — not once in three years — tried to talk to Dave. But then, it's an election year."

It is clear from the above-cited portions of the Complaint and its exhibits that Mr. Wilson *was reportedly* seen at the airstrip and that he came "under fire" because of that report. Thus, the substantial truth of the subject statement is demonstrated on the face of the pleadings, rendering that statement non-actionable.

6. *"Federal officials ... discovered Wilson had sold an airplane to a major drug dealer..." Wilson adamantly denies any involvement.* (¶ 21f.)

While standing alone, the statement may be defamatory. When compared with the Complaint's allegations on this issue, it is however not actionable under the "common mind/different effect" test.

That test is: "... whether the defamatory statement as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *McCormick v. Miami Her-ald Pub. Co. supra.*

In ¶ 35 of the Complaint, Mr. Wilson [illegible] that he did not sell his airplane to a major drug dealer, and that the News-Press had official documents revealing that truth. To support that contention, Mr. Wilson attaches these "official documents" to the Complaint in the form of an FAA Aircraft Bill of Sale (part of Ex. 5), Articles of Incorporation of Paradise Aviation Marine, Inc. (Ex. 7), and a 1982 Annual Report of that corporation (Ex. 7).

The bill of sale for the airplane, signed by Mr. Wilson and dated July 21, 1981, lists Paradise-Aviation Marine, Inc., as the purchaser. The 1982 Annual Report lists Joseph R. Carter (identified in the Complaint as the "major drug dealer") as a director of that corporation. Moreover, Exhibit 5 to the Complaint reveals that the federal grand jury investigating Mr. Wilson's drug smuggling involvement was also investigating his sale of that airplane.

Thus, based on the undisputed facts shown by those exhibits, the subject article could have truthfully and accurately stated, "Federal officials ... discovered that Wilson had sold an airplane to a corporation, which has a major drug dealer as one of its directors." in lieu of the challenged statement which states,

"Federal officials ... discovered Wilson had sold an airplane to a major drug dealer."

Thus, the truthful statement would have had no different effect on the mind of the reader than the allegedly defamatory statement; and, for that reason, the allegedly defamatory statement is not actionable. *McCormick v. Miami Herald Pub. Co., supra.*

7. *"Federal officals nearly indicted him (Wilson) on drug-running charges. Wilson adamantly denies any involvement."* (¶ 21f.)

Once again, the Exhibits to the Complaint facially demonstrate the substantial accuracy of that statement. As shown above, Exhibits 2, 5 and 8 reveal that:

(a) At least one deputy claimed that Mr. Wilson had somehow been involved in a drug run on an airstrip;

(b) An assistant U.S. Attorney had labeled Wilson a "target" of a federal criminal investigation;

(c) Mr. Wilson was investigated by two federal grand juries over a period of at least three years; and

(d) Federal prosecutors were tying to tie Mr. Wilson to drug smuggling.

Therefore, based upon all of those uncontested facts, it is not improper to [illegible] federal officials "nearly indicted" Mr. Wilson on drug smuggling charges. Moreover, the term "nearly indicted" is non-actionable under defamation law.

In order to be actionable, an allegedly defamatory remark must contain a provably false factual statement, i.e., it must contain a fact or factual connotation, which must be verifiable as true or false. Otherwise, the statement constitutes non-actionable opinion. *Florida Medical Center, Inc. v. New York Post Co., Inc., supra.*

[3] It is technically incorrect to characterize someone as being "nearly indicted." However, the technical error stems not from any provably false factual content, but from the very impossibly of such an actual occurrence.

One can not actually be "nearly indicted." One is either indicted or not, there is simply no in-between. However, anyone reading this statement in the News-Press would not have had the erroneous impression that Mr. Wilson was indicted. Moreover, the use of the adjective "near" to describe the state of insolvency has been held to render the entire phrase subjective and therefore non-actionable, See, *Ohio Savings Association v. Business First of Columbus*, 540 N.E. 2d 320 (Ohio

Ct. App. 1988). The use of the word "nearly" with the word "indicted," also renders that phrase entirely subjective, and not capable of factual verification as to its truth or falsity.

Therefore that phrase is not actionable because it "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co., supra,* quoting from *Hustler Magazine, Inc. v. Falwell, supra.*

*8. "Lee County Undersheriff David Wilson sold an airplane to Paradise-Aviation Marine, Inc., on July 21, 1981." (¶86)*

That allegedly defamatory statement appeared in a February 10, 1996 correction (Ex. 6) to the February 9, 1996 retirement article (Ex. 1). Mr. Wilson claims that statement is false, because Paradise-Aviation was not incorporated until November 20, 1981, as shown by that corporation's article of incorporation attached to the Complaint as Exhibit 7.

[4] However, when the corporation was registered with the state, the bill of sale for the airplane (Ex. 5), a public record filed with the FAA, shows it was signed by Mr. Wilson on July 21, 1981, with *Paradise-Aviation as the buyer.* Therefore, that report is not only substantially but a fair and accurate report of matters contained in an official government record. Being a report of matters contained in an official record renders the statement non-actionable, regardless of any claimed falsity. See, *Woodard v. Sunbeam Television Corp.,* 616 So.2d 501 [21 Med.L.Rptr. 1286] (Fla. 3rd DCA 1993), recognizing the privilege afforded the news media to publish "the contents of an official document, so long as their account is reasonably accurate and fair," (citation omitted), even if the official documents contain erroneous information. See also, *Stewart v. Sun Sentinal Co.,* 695 So.2d 360 [25 Med.L.Rptr. 1763] (Fla. 4th DCA 1997) to the same effect. The privilege applies even if the media defendant knew or should have known the information in the official document was false. *Ortega v. Post-Newsweek Stations, Fla., Inc.,* 510 So.2d 972 [14 Med.L.Rptr. 1307] (Fla. 3rd DCA 1987).

Therefore, the statement in the News-Press' correction that the airplane was sold to a corporation, rather than to an individual, is not actionable, because it is both true and an accurate report from an official document.

9. "In the mid-1980's, federal officials were investigating Wilson and others in the Lee County Sheriff's Office. Wilson was not indicted on any charges. The News-Press *inadvertently reported Wilson was nearly indicted.*" (¶86)

That underlined statement was also contained in the News-Press' corrections to the retirement article. Mr. Wilson complains the use of the word "inadvertently" left the connotation that, although he was actually nearly indicted, the publication of that phrase was a mistake (¶196).

That claimed innuendo is a strained and extreme interpretation of that correction. The correction expressly clarifies the imprecise use of the phrase "nearly indicted" by stating that Wilson was not indicted. Mr. Wilson's contention that the News-Press' statement that the use of the incorrect phrase was "inadvertent" somehow connotes that Mr. Wilson was actually "nearly indicted" is illogical.

This Court finds that by publishing that the retirement article inadvertently reported that Mr. Wilson was "nearly indicted" is not defamatory. For that reason, the statement is not actionable.

This Court has reviewed the Complaint and attached exhibits. Also this Court has read the memoranda of law, pertinent case law, and has reflected on the arguments made by both counsel. The salient article, exhibit 1, titled "Top Lee Deputy to Retire" has been read many times by the Court before arriving at this ruling.

The article and correction when read in their entirety, contain an account of the end of a 28 year career in law enforcement by a person who has drawn official scrutiny. The article contains very positive statements concerning the Plaintiff's career and character attributed to our local Sheriff and State Attorney.

The Court finds that the Complaint and its exhibits show, Mr. Wilson was involved in controversial matters during his tenure in law enforcement: He was the target of a lengthy federal grand jury investigation into alleged drug smuggling activities. He was reported by a fellow deputy to have been at the scene of a drug run gone bad. Official records do reveal that he sold his airplane to a corporation, which had a drug smuggler as one of its directors; and Federal offi-

cials did conduct an investigation into that sale.

However, nowhere in the publications in question is it stated that Mr. Wilson was actually involved in drug smuggling activities, or that he was in fact at the scene of the airport drug bust or that he knew that Mr. Carter was or would be a director of the corporation that acquired his airplane.

This Court is not unmindful of the standard required to survive a motion to dismiss. In ruling on this matter, the Court is also aware of the constitutional importance and historical significance of a case of this nature, a case rooted in the Bill of Rights within the First Amendment to the Constitution of the United States. Respectfully, this is not a contract action nor a negligence case. It is one that involves freedom of speech and freedom of the press. The standard is and should be different because of the constitutional issues involved. Where the facts are not in dispute in defamation cases, pretrial dispositions are "especially appropriate" because of the chilling effect these cases have on free speech. See *Karp v. Miami Herald Pub. Co.*, 359 So.2d 580 [3 Med.L.Rptr. 2581] (Fla. 3d DCA 1978).

Our Founders envisioned a press that sought to inform and inform Americans in that government would be elected officials, members of the executive and legislative branches, law enforcement, and the judiciary. Concurrent with a free press is the public's right to be informed and speak freely about its government. Maintaining free, robust, political debate and discussion serve as the foundation of our free society.

Prior to the passage of the Bill of Rights, Thomas Jefferson in 1787 urged the following:

The basis of our government being the opinion of the people, the very first object should be to keep that right; and were it left to me to decide whether we should have a government without newspapers, or newspapers without a government, I should not hesitate a moment to prefer the latter.

While this court recognizes actionable defamation cases, the pleadings in the case at bar do not allege one. The statements claimed to be defamatory should be left to the public to debate, within the free and open marketplace of ideas within our community, addressing both the positive attributes and claims of controversy in a 28 year law enforcement ca-

reer. To do otherwise would have a chilling effect on the Press's right to scrutinize and inform our community about its government. Moreover, it would have a chilling effect on our community's right to know about its government and freely discuss and debate those issues.

Wherefore, the Motion to Dismiss the Complaint is Granted. The Plaintiff shall have 30 days for Leave to Amend.

# CALIFORNIA FIRST AMENDMENT COALITION v. CALDERON

## U.S. District Court
## Northern District of California

CALIFORNIA FIRST AMEND-MENT COALITION, and SOCIETY OF PROFESSIONAL JOURNAL-ISTS, NORTHERN CALIFORNIA CHAPTER, Plaintiffs v. ARTHUR CALDERON, Warden of San Quentin State Prison, and JAMES H. GOMEZ, Director of the California Department of Corrections, Defendants. No. C 96-1291-VRW. January 25, 2000.

### NEWSGATHERING

**1. Access to places — Jails (§40.1103)**

Plaintiffs have presented sufficient evidence to preclude summary judgment that policy of state department of corrections, which permits observation of execution by lethal injection only after condemned inmate is strapped down and intravenous shunt has been inserted, is not exaggerated response to legitimate security and safety concerns, since there have been no incidents in which prison employees' identities were revealed, and no acts of retaliation against execution workers, and since plaintiffs have presented evidence that policy is motivated in part by desire to control public's perception of executions, and that defendants have alternative means of concealing identities of executioners.

———

Action by journalists against officials of state department of corrections seeking injunction that would allow witnesses to view greater portion of process of execution by lethal injection. On defendants' renewed motion for summary judgment. Denied.